Carl A. Clyde, OSB No. 095782
SORENSON, RANSOM, FERGUSON & CLYDE, LLP
133 NW D Street
Grants Pass, OR 97526
Telephone: (541) 476-3883
Fax: (541) 474-4495
E-Mail: cclyde@roguevalleylaw.com
Of Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
MEDFORD DIVISION

| | |
|---|---|
| DONALD L. OLSON as TRUSTEE OF THE OLSON LIVING TRUST, | Case No.  1:15-CV-1692-CL |
| Plaintiff, | FIRST AMENDED COMPLAINT |
| vs. | (Breach of Contract) |
| | $69,604.39 |
| CHICAGO TITLE INSURANCE COMPANY, successor to TICOR TITLE INSURANCE COMPANY, and the CITY OF GRANTS PASS | Demand for Jury Trial |
| Defendants. | |

Plaintiff alleges as follows:

1.

Plaintiff is the owner of real properties located at 1711 Softwood Way, Grants

Pass, Oregon 97526, 1115 Catherine Way, Grants Pass, Oregon 97526, 1726 Kids

Way, Grants Pass, Oregon 97526, and 1736 Kids Way, Grants Pass, Oregon 97526.

///

///

SORENSON, RANSOM & FERGUSON & CLYDE, LLP
ATTORNEYS AT LAW
133 NW 'D' STREET
GRANTS PASS, OR 97526
(541) 476-3883   FAX (541) 474-4495

2.

At all material times, Ticor Title Insurance Company was a California corporation which issues real property title insurance policies.  At the time when the policies were issued, Defendant Chicago Title was a licensed insurance producer, and transacted insurance in the state of Oregon.  At all material times, Defendant Chicago Title Insurance Company was the successor in interest to Ticor Title Insurance Company, hereinafter "Defendant Chicago Title".

3.

At all material times, the City of Grants Pass was an Oregon political subdivision as defined by ORS 657.097, hereinafter "Defendant City of Grants Pass".

4.

On or about May 1, 2008, Defendant Chicago Title issued lender's Policy No. 26-62822, in connection with the real property at 1711 Softwood Way, and identifying Plaintiff as the Insured.  A copy of the policy is attached hereto as "Exhibit 1" and is thereby incorporated.  At the time the policy was issued, Plaintiff was the beneficiary of a first Trust Deed on the property, which is recorded in the Official Records of Josephine County as Instrument No. 2008-017530.  Subsequently, the grantor of the Trust Deed defaulted in its obligation to Plaintiff, and on or about May 25, 2011 the real property was conveyed to Plaintiff via a deed in lieu of foreclosure, which was recorded in the Official Records of Josephine County as Instrument No. 2011-006124.

///

///

SORENSON, RANSOM & FERGUSON & CLYDE, LLP
ATTORNEYS AT LAW
133 NW 'D' STREET
GRANTS PASS, OR  97526
(541) 476-3883    FAX (541) 474-4495

5.

In early June of 2011, Plaintiff discovered that prior to the issuance of the insurance policy, 1711 Softwood Way was encumbered by System Development Charges, (hereinafter: "SDC's") which were not disclosed in Schedule B of the Policy as being excepted from coverage.  At the same time, Plaintiff discovered that prior to the issuance of the insurance policy, 1711 Softwood Way was encumbered by Advanced Financed District Charges, (hereinafter: "AFD's"), which were not disclosed on Schedule B of the Policy as an exception to coverage, sufficient to put Plaintiff on notice of a pre-existing financial obligation.

6.

On or about April 29, 2008, Defendant Chicago Title issued lenders Policy No. 26-62819, in connection with the real property at 1115 Catherine Way, and identifying Plaintiff as the Insured.  A true copy of the policy is attached hereto as "Exhibit 2" and is thereby incorporated.  At the time the policy was issued, Plaintiff was the beneficiary of a first Trust Deed on the property, which was recorded in the Official Records of Josephine County as Instrument No. 2008-007139.  Subsequently, the grantor of the Trust Deed defaulted on its obligation to Plaintiff, and on or about May 25, 2011, the real property was conveyed to Plaintiff via a deed in lieu of foreclosure, which was recorded in the Official Records of Josephine County as Instrument No. 2011-006123.

7.

In early June of 2011, Plaintiff became aware that prior to the issuance of the insurance policy, 1115 Catherine was encumbered by SDC's, which were not disclosed

SORENSON, RANSOM & FERGUSON & CLYDE, LLP
ATTORNEYS AT LAW
133 NW 'D' STREET
GRANTS PASS, OR  97526
(541) 476-3883    FAX (541) 474-4495

in Schedule B of the Policy as being excepted from coverage.  At the same time,
Plaintiff discovered that prior to the issuance of the insurance policy, 1115 Catherine
Way was encumbered by AFD's, which were not disclosed on Schedule B of the Policy
as an exception to coverage, sufficient to put Plaintiff on notice of a pre-existing
financial obligation.

8.

On or about August 30, 2007, Defendant Chicago Title issued lenders Policy
No. 26-60393, in connection with the real property at 1726 Kids way, and identifying
Plaintiff as the Insured as to an undivided 50% interest.  A true copy of the policy is
attached hereto as "Exhibit 3" and is thereby incorporated.  At the time the policy was
issued, Plaintiff was the beneficiary of a first Trust Deed as to an undivided 50%
interest.  The Trust Deed was recorded in the Official Records of Josephine County as
Instrument No. 2007-017096.  Subsequently, the grantor of the Trust Deed defaulted
on its obligation to Plaintiff, and on or about May 25, 2011 the real property was
conveyed to Plaintiff alone via a deed in lieu of foreclosure, which was recorded in the
Official Records of Josephine County as Instrument No. 2011-006125.

9.

In early June of 2011, Plaintiff became aware that prior to the issuance of the
insurance policy 1726 Kids Way was encumbered by SDC's, which were not disclosed
in Schedule B of the Policy as being excepted from coverage.  At the same time,
Plaintiff discovered that prior to the issuance of the insurance policy, 1726 Kids Way

///

///

SORENSON, RANSOM & FERGUSON & CLYDE, LLP
ATTORNEYS AT LAW
133 NW 'D' STREET
GRANTS PASS, OR  97526
(541) 476-3883    FAX (541) 474-4495

was encumbered by AFD's, which were not disclosed on Schedule B of the Policy as an exception to coverage, sufficient to put Plaintiff on notice of a pre-existing financial obligation.

10.

On or about November 19, 2008, Defendant Chicago Title issued lenders Policy No. 26-64437, in connection with the real property at 1736 Kids Way, and identifying Plaintiff as the Insured.  A true copy of the policy is attached hereto as "Exhibit 4" and is thereby incorporated.  At the time the policy was issued, Plaintiff was the beneficiary of a first Trust Deed, recorded in the Official Records of Josephine County as Instrument No. 2008-017530.  Subsequently, the grantor of the Trust Deed defaulted in its' obligations to Plaintiff, and on or about May 25, 2011 the real property was conveyed to Plaintiff via a deed in lieu of foreclosure, which was recorded in the Official Records of Josephine County as Instrument No. 2011-006126.

11.

In early June of 2011, Plaintiff became aware that prior to the issuance of the insurance policy 1736 Kids Way was encumbered by SDC's, which were not disclosed in Schedule B of the Policy as being excepted from coverage.  At the same time, Plaintiff discovered that prior to the issuance of the insurance policy, 1736 Kids Way was encumbered by AFD's, which were not disclosed on Schedule B of the Policy as an exception to coverage, sufficient to put Plaintiff on notice of a pre-existing financial obligation.

///

///

SORENSON, RANSOM & FERGUSON & CLYDE, LLP
ATTORNEYS AT LAW
133 NW 'D' STREET
GRANTS PASS, OR  97526
(541) 476-3883    FAX (541) 474-4495

Page 5- FIRST AMENDED COMPLAINT

12.

The "Covered Risks" section of each policy is identical, and provides that subject to the exclusions from coverage contained in Schedule B, as of the date of the policy, Defendant Chicago Title would insure Plaintiff against any loss or damage sustained or incurred by reason of:

> "Any defect in or lien or encumbrance of the Title.  This Covered Risk includes but is not limited to insurance against loss from [T]he lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid."  Covered Risks 2(b).

13.

On or about May 20, 2013, Plaintiff submitted a Proof of Loss to Defendant Chicago Title as to each and every loss, and has performed all other obligations under the policies.  Defendant Chicago Title or Defendant Chicago Title's successor has denied each of Plaintiff's claims under the policies.

FIRST CLAIM FOR RELIEF
Breach of Contract - Defendant Chicago Title

14.

Plaintiff re-alleges Paragraphs 1 through 13 above.

15.

Plaintiff entered into an insurance contract with Defendant Chicago Title. Defendant Chicago Title agreed to insure Plaintiff against any defects caused by any liens or encumbrances on the title of 1711 Softwood Way, caused by the real estate of real estate taxes or assessments imposed by a governmental authority due or payable, but unpaid.  Despite this agreement, Defendant Chicago Title refused to pay Plaintiff's losses related to a covered risk.

SORENSON, RANSOM & FERGUSON & CLYDE, LLP
ATTORNEYS AT LAW
133 NW 'D' STREET
GRANTS PASS, OR  97526
(541) 476-3883    FAX (541) 474-4495

16.

Plaintiff is the beneficiary of the insurance contract and has the right to receive loss payment in these circumstances.

17.

Plaintiff has performed all of Plaintiff's obligations under the terms of the Policy. Plaintiff has presented Proofs of Loss to Defendant Chicago Title, and presented claims under the Policy with Defendant Chicago Title, which have been denied. Plaintiff has exhausted Plaintiff's remedies under the Policy, short of litigation.

18.

Defendant Chicago Title has breached its contract with Plaintiff by failing to pay Plaintiff's claims in accordance with the terms of the Policy. Plaintiff has been damaged in the amount of $15,594.95, or such other amount as may be proven at trial, because of Defendant Chicago Title's failure to pay for damages which are covered under the Policy.

SECOND CLAIM FOR RELIEF
Breach of Contract - Defendant Chicago Title

19.

Plaintiff re-alleges Paragraphs 1 through 18 above.

20.

Plaintiff entered into an insurance contract with Defendant Chicago Title. Defendant Chicago Title agreed to insure Plaintiff against any defects caused by liens or encumbrances on the title of 1115 Catherine Way, caused by the real estate of real

SORENSON, RANSOM & FERGUSON & CLYDE, LLP
ATTORNEYS AT LAW
133 NW 'D' STREET
GRANTS PASS, OR  97526
(541) 476-3883    FAX (541) 474-4495

estate taxes or assessments imposed by a governmental authority due or payable, but unpaid. Despite this agreement, Defendant Chicago Title refused to pay Plaintiff's losses related to a covered risk.

21.

Plaintiff is the beneficiary of the insurance contract and has the right to receive loss payment in these circumstances.

22.

Plaintiff has performed all of Plaintiff's obligations under the terms of the Policy. Plaintiff has presented Proofs of Loss to Defendant Chicago Title, and presented claims under the Policy with Defendant Chicago Title, which have been denied. Plaintiff has exhausted Plaintiff's remedies under the Policy, short of litigation.

23.

Defendant Chicago Title has breached its contract with Plaintiff by failing to pay Plaintiff's claims in accordance with the terms of the Policy. Plaintiff has been damaged in the amount of $15,604.39, or such other amount as may be proven at trial, because of Defendant Chicago Title's failure to pay for damages which are covered under the Policy.

THIRD CLAIM FOR RELIEF
Breach of Contract - Defendant Chicago Title

24.

Plaintiff re-alleges Paragraphs 1 through 23 above.

///

SORENSON, RANSOM & FERGUSON & CLYDE, LLP
ATTORNEYS AT LAW
133 NW 'D' STREET
GRANTS PASS, OR  97526
(541) 476-3883    FAX (541) 474-4495

25.

Plaintiff entered into an insurance contract with Defendant Chicago Title. Defendant Chicago Title agreed to insure Plaintiff against any defects caused by liens or encumbrances on the title of 1726 Softwood Way, caused by the real estate of real estate taxes or assessments imposed by a governmental authority due or payable, but unpaid. Despite this agreement, Defendant Chicago Title refused to pay Plaintiff's losses related to a covered risk.

26.

Plaintiff is the beneficiary of the insurance contract and has the right to receive loss payment in these circumstances.

27.

Plaintiff has performed all of Plaintiff's obligations under the terms of the Policy. Plaintiff has presented Proofs of Loss to Defendant Chicago Title, and presented claims under the Policy with Defendant Chicago Title, which have been denied. Plaintiff has exhausted Plaintiff's remedies under the Policy, short of litigation.

28.

Defendant Chicago Title has breached its contract with Plaintiff by failing to pay Plaintiff's claims in accordance with the terms of the Policy. Plaintiff has been damaged in the amount of $19,103.03, or such other amount as may be proven at trial, because of Defendant Chicago Title's failure to pay for damages which are covered under the Policy.

///

SORENSON, RANSOM & FERGUSON & CLYDE, LLP
ATTORNEYS AT LAW
133 NW 'D' STREET
GRANTS PASS, OR 97526
(541) 476-3883    FAX (541) 474-4495

## FOURTH CLAIM FOR RELIEF
### Breach of Contract - Defendant Chicago Title

29.

Plaintiff re-alleges Paragraphs 1 through 28 above.

30.

Plaintiff entered into an insurance contract with Defendant Chicago Title.

Defendant Chicago Title agreed to insure Plaintiff against any defects caused by liens

or encumbrances on the title of 1736 Softwood Way, caused by the real estate of real

estate taxes or assessments imposed by a governmental authority due or payable, but

unpaid.  Despite this agreement, Defendant Chicago Title refused to pay Plaintiff's

losses related to a covered risk.

31.

Plaintiff is the beneficiary of the insurance contract and has the right to receive

loss payment in these circumstances.

32.

Plaintiff has performed all of Plaintiff's obligations under the terms of the

Policy.  Plaintiff has presented Proofs of Loss to Defendant Chicago Title, and

presented claims under the Policy with Defendant Chicago Title, which have been

denied.  Plaintiff has exhausted Plaintiff's remedies under the Policy, short of

litigation.

33.

Defendant Chicago Title has breached its contract with Plaintiff by failing to

pay Plaintiff's claims in accordance with the terms of the Policy.  Plaintiff has been

SORENSON, RANSOM & FERGUSON & CLYDE, LLP
ATTORNEYS AT LAW
133 NW 'D' STREET
GRANTS PASS, OR  97526
(541) 476-3883   FAX (541) 474-4495

damaged in the amount of $19,103.00, or such other amount as may be proven at

trial, because of Defendant Chicago Title's failure to pay for damages which are

covered under the Policy.

FIFTH CLAIM FOR RELIEF
ATTORNEY FEES

34.

Plaintiff realleges paragraphs 1 through 13 above.

35.

Because settlement was not made within six (6) months of Defendant Chicago

Title receiving proof of the loss, Plaintiff is entitled to recover attorney fees, pursuant

to ORS 742.061, as to each of Plaintiff's claims for relief.

SIXTH CLAIM FOR RELIEF
Count One:  Declaratory Judgment

36.

Plaintiff realleges paragraphs 1 through 13 above.

37.

In the alternative to Plaintiff's Claims for Relief, 1 through 5, Plaintiff seeks a

declaration that the SDC's are not continuing liens secured by the properties as

claimed by Defendant City of Grants Pass.  On or about July 22, 1991, Defendant City

of Grants Pass enacted Ordinance No. 4708, which allowed Defendant City of Grants

Pass to establish SDC's, subject to the provisions of the City of Grants Pass Municipal

Code, hereinafter "the Code", Chapter 8.09.  A copy of the original 1991 Ordinance is

///

///

SORENSON, RANSOM & FERGUSON & CLYDE, LLP
ATTORNEYS AT LAW
133 NW 'D' STREET
GRANTS PASS, OR  97526
(541) 476-3883    FAX (541) 474-4495

Page 11- FIRST AMENDED COMPLAINT

attached as Exhibit "5".  The Code was later amended and re-numbered in 2002, and amended again in 2003, 2005, 2006 and 2015.  A copy of the current 2015 City of Grants Pass Municipal Code is attached hereto as Exhibit "6".

38.

According to the Code, the purpose of the SDC's was to pass the costs of developing and connecting properties to the City's utility systems to the owners of those properties when they connected to the systems.  CGPMC 3.10.020.  The SDC's are payable upon, and as a condition of, issuance of building permits or connection authorizations.  CGPMC 3.10.070.  And those who apply for building permits are obligated to pay the charges in full when they apply for the permit, and it is unlawful for anyone to continue construction or development of the property until the charge has been paid.  CGPMC 3.10.070.  And the City Manager shall not allow any connection to the water or wastewater system until all charges described in 3.10.070 of the Code, together will all other applicable fees and charges have been paid in full.  CGPMC 3.10.070(c).

39.

The Code specifically sets forth enforcement options where an SDC has not been paid, but nowhere does the Code, state that an unpaid SDC is treated as a continuing lien on the property.  Rather, the Code itself specifically distinguishes the difference between the SDC being treated as a "tax" versus a "fee for use".

40.

The SDC's function as a "fee for use" of utilities and not "taxes" or "proportional assessments" because they are not applied against all affected properties

SORENSON, RANSOM & FERGUSON & CLYDE, LLP
ATTORNEYS AT LAW
133 NW 'D' STREET
GRANTS PASS, OR  97526
(541) 476-3883    FAX (541) 474-4495

equally.  Rather, the collection of the SDCs are user charges specifically tied to the issuance of a building or development permit and are due and payable in full as a condition of the permit.  If a property owner never applies for connection to the utility system, then no charge would ever come due.  And if a property owner does apply for connection to the system, the SDC's charges are immediately due and payable, or if they are not paid in full, no permit is to issue.  Defendant City of Grants Pass contends that the SDC charges constitute a continuing lien against Plaintiff's property, Plaintiff contends otherwise.  Plaintiff requests that the Court declare that the SDC charges are not a continuing lien and declaring them void, fully satisfied and estopping Defendant City of Grants Pass from claiming any right or interest in the SDC's, as against Plaintiff's real property.

Count Two: Declaratory Judgment

41.

In the alternative to Plaintiff's Claims for Relief 1 through 5 and Plaintiff's Claim for Relief 6, Count One, even if the SDCs are liens held by Defendant City of Grants Pass, Plaintiff requests that the Court declare that the SCDs are void because Defendant City of Grants Pass failed to establish constructive notice for future owners of the real properties by either: 1) recording each SDC claim in the Official Records of Josephine County as required by ORS 93.643(1); or 2) maintaining a searchable electronic database as required by ORS 93.643(2)(b).

42.

Plaintiff is therefore a bona fide purchaser who acquired the property in good faith, in an arms length transaction and for fair market value and adequate

SORENSON, RANSOM & FERGUSON & CLYDE, LLP
ATTORNEYS AT LAW
133 NW 'D' STREET
GRANTS PASS, OR  97526
(541) 476-3883    FAX (541) 474-4495

consideration.  Plaintiff has no plain, speedy or adequate relief at law.  Plaintiff

contends that he is a bona fide purchaser who purchased the property without notice

and is not obligated to pay for the SDC charges.  Based on information and belief,

Defendant City of Grants Pass contends otherwise.  Plaintiff requests that the court

declare that Plaintiff is a bona fide purchaser and is not obligated to pay for the SDC

charges and declaring them void, fully satisfied and estopping Defendant City of

Grants Pass from claiming any right or interest in the SDC's, as against Plaintiff's real

property.

SEVENTH CLAIM FOR RELIEF
Declaratory Judgment

43.

Plaintiff realleges paragraphs 1 through 13 as above.

44.

In the alternative to Plaintiff's Claims for Relief 1 through 5, Plaintiff seeks a

declaration thatthe AFD's are not continuing liens secured by the property as claimed

by Defendant City of Grants Pass.

45.

On or about August 24, 2002, Defendant City of Grants Pass enacted Ordinance

No. 5149, amending the advanced financed district for "PUBLIC WATER, STORM

DRAIN AND STREET IMPROVEMENTS IN "N" STREET."  The amended Ordinance

allowed Defendant City of Grants Pass to establish AFD's for the purpose of collecting

reimbursement of the prorated share of the cost of installation of certain

improvements.  A copy of Ordinance No. 5149 is attached hereto as Exhibit "7".

SORENSON, RANSOM & FERGUSON & CLYDE, LLP
ATTORNEYS AT LAW
133 NW 'D' STREET
GRANTS PASS, OR  97526
(541) 476-3883    FAX (541) 474-4495

Page 14- FIRST AMENDED COMPLAINT

46.

Based upon information and belief, Defendant City of Grants Pass claims that AFD charges resulting from the enactment of the Ordinance functions as a lien against the benefitting property.

47.

To the contrary, in no place do the terms of Ordinance No. 5149 indicate that the AFD's constitute a continuing lien on the property.  The AFD's are a "fee for use" of utilities and improvements, not "taxes" or "proportional assessments," because they are not applied against all affected properties equally.  Furthermore, the Ordinance fails to describe when the AFD charges are due and owing, or to prescribe a specific rate of interest on any debt accruing thereunder.  Defendant City of Grants Pass contends that the AFD's constitute a continuing lien against Plaintiff's property, Plaintiff contends otherwise.  Plaintiff requests that the Court declare that the AFD's are not a continuing lien.

EIGHT CLAIM FOR RELIEF
Declaratory Judgment

48.

Plaintiff realleges paragraphs 1 through 13 as above.

49.

On or about February 26, 2004, Defendant City of Grants Pass enacted Ordinance No. 5215, which allowed Defendant City of Grants Pass to establish AFD's for water improvements.  A copy of Ordinance No. 5215 is attached hereto as Exhibit "8".

SORENSON, RANSOM & FERGUSON & CLYDE, LLP
ATTORNEYS AT LAW
133 NW 'D' STREET
GRANTS PASS, OR  97526
(541) 476-3883    FAX (541) 474-4495

Page 15- FIRST AMENDED COMPLAINT

50.

On or about February 26, 2004, Defendant City of Grants Pass enacted Ordinance No. 5217, which allowed Defendant City of Grants Pass to establish AFD's for storm improvements.  A copy of Ordinance No. 5217 is attached hereto as Exhibit "9".

51.

On or about February 26, 2004, Defendant City of Grants Pass enacted Ordinance No. 5218, which allowed Defendant City of Grants Pass to establish AFD's for landscaping improvements.  A copy of Ordinance No. 5218 is attached hereto as Exhibit "10".

52.

Based upon information and belief, Defendant City of Grants Pass claims that charges resulting from the enactment of each of the Ordinances functions as a continuing lien against the property.

53.

To the contrary, nowhere do any of the AFD Ordinances indicate that they constitute a continuing lien on the property.  Rather, each of the Ordinances indicates that the AFD's are user charges specifically tied to the issuance of a building permit, a development permit or connection to the public water system and are due and payable in full as a condition of either the issuance of the permit or connection to the system. As such, the AFD's function as a "fee for use" of utilities and not "taxes" or "proportional assessments," because they are not applied against all affected properties equally.

SORENSON, RANSOM & FERGUSON & CLYDE, LLP
ATTORNEYS AT LAW
133 NW 'D' STREET
GRANTS PASS, OR  97526
(541) 476-3883    FAX (541) 474-4495

54.

Furthermore, based on information and belief, Defendant City of Grants Pass claims to have authority to charge Plaintiff 8% simple interest per annum for any debts owed on the AFD's. However, section 4 of each of these Ordinances provides that repayment from the benefitted property "shall include annual simple interest at a rate of 4% from the date of adoption for this ordinance." Plaintiff seeks a declaration that the City of Grants Pass is charging interest in excess of the rate permitted by the ordinance.

55.

Plaintiff has no plain, speedy or adequate relief at law.

WHEREFORE, Plaintiffs request the following relief:

1.    On Plaintiff's First Claim for Relief, judgment against Defendant Chicago Title in the amount of $15,594.95, or such other amount as may be proven at trial;

2.    On Plaintiff's Second Claim for Relief, judgment against Defendant Chicago Title in the amount of $15,604.39 or such other amount as may be proven at trial;

3.    On Plaintiff's Third Claim for Relief, judgment against Defendant Chicago Title in the amount of $19,103.03 or such other amount as may be proven at trial;

4.    On Plaintiff's Fourth Claim for Relief, judgment against Defendant Chicago Title in the amount of $19,103.00 or such other amount as may be proven at trial;

///

SORENSON, RANSOM & FERGUSON & CLYDE, LLP
ATTORNEYS AT LAW
133 NW 'D' STREET
GRANTS PASS, OR  97526
(541) 476-3883    FAX (541) 474-4495

5.      On Plaintiff's Fifth Claim for Relief, for attorney fees on each prior Claim for Relief, pursuant to ORS 742.061, costs and disbursements; and

6.      In the alternative to all aforementioned Claims for Relief, on Plaintiff's Sixth Claim for a relief, Count One, Plaintiff prays for a judgment declaring that the SDC's are not liens on the Property, declaring them void, fully satisfied and estopping Defendant City of Grants Pass from claiming any right or interest in the SDC's, as against Plaintiff's real property.

7.      In the alternative to all aforementioned Claims for Relief, on Plaintiff's Sixth Claim for Relief, Count Two, Plaintiff prays for a judgment declaring that the SDC's liens are void, because Defendant City of Grants Pass failed to either 1) record the SDC lien claim in the Official Records of Josephine County as required by ORS 93.643(1); or 2) failed to maintain a searchable electronic database as required by ORS 93.643(2)(b) for the SDC liens to become public record and provide constructive notice, and declaring Plaintiff to be a bona fide purchaser in good faith, pursuant to ORS Chapter 93.

8.      In the alternative to all aforementioned Claims for Relief, on Plaintiff's Seventh Claim for Relief, Plaintiff prays for a judgment declaring that Ordinance No. 5149 does not create a continuing lien against Plaintiff's real property, and if any debt does exist, there is no interest due and owing the debt, as no rate of interest was ascribed to such debt in the Ordinance.

9.      In the alternative to all aforementioned Claims for Relief, on Plaintiff's Eighth Claim for Relief, Plaintiff prays for a judgment declaring that Ordinance Nos. 5215, 5217 and 5218 do not create a continuing liens against Plaintiff's real property,

SORENSON, RANSOM & FERGUSON & CLYDE, LLP
ATTORNEYS AT LAW
133 NW 'D' STREET
GRANTS PASS, OR  97526
(541) 476-3883    FAX (541) 474-4495

and if any debt does exist, it is limited to 4% simple interest per annum as prescribed

by the terms of each Ordinance.

     10.    For such other relief as may be adjudged to be just and equitable.

Dated this 12th day of April, 2016.

     SORENSON, RANSOM, FERGUSON & CLYDE, LLP


     /s/ Carl A. Clyde               
     Carl A. Clyde
     OSB No. 095782
     cclyde@roguevalleylaw.com
     Of Attorneys for Plaintiff

SORENSON, RANSOM & FERGUSON & CLYDE, LLP
ATTORNEYS AT LAW
133 NW 'D' STREET
GRANTS PASS, OR  97526
(541) 476-3883   FAX (541) 474-4495

Page 19- FIRST AMENDED COMPLAINT

# Ticor Title Insurance Company

## LOAN POLICY OF TITLE INSURANCE
### Issued by
### TICOR TITLE INSURANCE COMPANY

**Any notice of claim and any other notice or statement in writing required to be given to the Company under this Policy must be given to the Company at the address shown in Section 17 of the Conditions.**

### COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, TICOR TITLE INSURANCE COMPANY, a California corporation (the "Company") insures, as of Date of Policy and, to the extent stated in Covered Risks 11,13 and 14, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1. Title being vested other than as stated in Schedule A.

2. Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from

    (a) A defect in the Title caused by

        (i) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;

        (ii) failure of any person or Entity to have authorized a transfer or conveyance;

        (iii) a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;

        (iv) failure to perform those acts necessary to create a document by electronic means authorized by law;

        (v) a document executed under a falsified, expired, or otherwise invalid power of attorney;

        (vi) a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or

        (vii) a defective judicial or administrative proceeding.

    (b) The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.

    (c) Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.

3. Unmarketable Title.

4. No right of access to and from the Land.

5. The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

    (a) the occupancy, use, or enjoyment of the Land;

    (b) the character, dimensions, or location of any improvement erected on the Land;

    (c) the subdivision of land; or

    (d) environmental protection

    if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.

6. An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.

7. The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.

PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT

1

American Land Title Association Oregon Title Insurance Rating Organization (OTIRO)
ALTA Loan Policy OTIRO No. PL-05
6-17-2006

8.  Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.

9.  The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title. This Covered Risk includes but is not limited to insurance against loss from any of the following impairing the lien of the Insured Mortgage:

    (a)  forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;

    (b)  failure of any person or Entity to have authorized a transfer or conveyance;

    (c)  the Insured Mortgage not being properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;

    (d)  failure to perform those acts necessary to create a document by electronic means authorized by law;

    (e)  a document executed under a falsified, expired, or otherwise invalid power of attorney;

    (f)  a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or

    (g)  a defective judicial or administrative proceeding.

10. The lack of priority of the lien of the Insured Mortgage upon the Title over any other lien or encumbrance.

11. The lack of priority of the lien of the Insured Mortgage upon the Title

    (a)  as security for each and every advance of proceeds of the loan secured by the Insured Mortgage over any statutory lien for services, labor, or material arising from construction of an improvement or work related to the Land when the improvement or work is either

        (i)  contracted for or commenced on or before Date of Policy; or

        (ii) contracted for, commenced, or continued after Date of Policy if the construction is financed, in whole or in part, by proceeds of the loan secured by the Insured Mortgage that the Insured has advanced or is obligated on Date of Policy to advance; and

    (b)  over the lien of any assessments for street improvements under construction or completed at Date of Policy.

12. The invalidity or unenforceability of any assignment of the Insured Mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the Insured Mortgage in the named Insured assignee free and clear of all liens.

13. The invalidity, unenforceability, lack of priority, or avoidance of the lien of the Insured Mortgage upon the Title

    (a)  resulting from the avoidance in whole or in part, or from a court order providing an alternative remedy, of any transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction crating the lien of the Insured Mortgage because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws; or

    (b)  because the Insured Mortgage constitutes a preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws by reason of the failure of its recording in the Public Records

        (i)  to be timely, or

        (ii) to impart notice of its existence to a purchaser for value or to a judgment or lien creditor.

14. Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 13 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the Insured Mortgage in the Public Records.

The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by this Policy, but only to the extent provided in the Conditions.

Countersigned:

Issued By:
Ticor Title
744 NE 7th St.
P.O. Box 1960
Grants Pass, OR  97528-0166

**TICOR TITLE INSURANCE COMPANY**

By _____  President

Attest _____  Secretary

BY: _____
Authorized Signatory

American Land Title Association Oregon Title Insurance Rating Organization (OTIRO)
ALTA Loan Policy OTIRO No. PL-05

# EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

    (i) the occupancy, use, or enjoyment of the Land;

    (ii) the character, dimensions, or location of any improvement erected on the Land;

    (iii) the subdivision of land; or

    (iv) environmental protection;

    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.  Defects, liens, encumbrances, adverse claims, or other matters

    (a) created, suffered, assumed, or agreed to by the Insured Claimant;

    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

    (c) resulting in no loss or damage to the Insured Claimant;

    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or

    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5.  Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is

    (a) a fraudulent conveyance or fraudulent transfer: or

    (b) a preferential transfer for any reason not stated in Covered Risk 13(a) of this policy.

7.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

# CONDITIONS

1.  **DEFINITION OF TERMS**
    The following terms when used in this policy mean:

    (a) "Amount of Insurance": The amount stated in Schedule A, as may be increased or decreased by endorsement to this policy, increased by Section 8(b), or decreased by Sections 10 of these Conditions.

    (b) "Date of Policy": The date designated as "Date of Policy" in Schedule A.

    (c) "Entity": A corporation, partnership, trust, limited liability company, or other similar legal entity.

    (d) "Indebtedness": The obligation secured by the Insured Mortgage including one evidenced by electronic means authorized by law, and if that obligation is the payment of a debt, the Indebtedness is the sum of

        (i) the amount of the principal disbursed as of Date of Policy;

(ii) the amount of the principal disbursed subsequent to Date of Policy;

(iii) the construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the Land or related to the Land that the Insured was and continued to be obligated to advance at Date of Policy and at the date of the advance;

(iv) interest on the loan;

(v) the prepayment premiums, exit fees, and other similar fees or penalties allowed by law;

(vi) the expenses of foreclosure and any other costs of enforcement;

(vii) the amount advanced to assure compliance with laws or to protect the lien or the priority of the lien of the Insured Mortgage before the acquisition of the estate or interest in the Title;

(viii) the amounts to pay taxes and insurance; and

(ix) the reasonable amounts expended to prevent deterioration of improvements;

but the Indebtedness is reduced by the total of all payments and by any amount forgiven by an Insured.

(e) "Insured": The Insured named in Schedule A.

(i) The term "Insured" also includes

(A) the owner of the Indebtedness and each successor in ownership of the Indebtedness, whether the owner or successor owns the Indebtedness for its own account or as a trustee or other fiduciary, except a successor who is an obligor under the provisions of Section 12(c) of these Conditions;

(B) the person or Entity who has "control" of the "transferable record," if the Indebtedness is evidenced by a "transferable record," as these terms are defined by applicable electronic transactions law;

(C) successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization;

(D) successors to an Insured by its conversion to another kind of Entity;

(E) a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title

(1) if the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,

(2) if the grantee wholly owns the named Insured, or

(3) if the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity;

(F) any government agency or instrumentality that is an insurer or guarantor under an insurance contract or guaranty insuring or guaranteeing the Indebtedness secured by the Insured Mortgage, or any part of it, whether named as an Insured or not;

(ii) With regard to (A), (B), (C), (D), and (E) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured, unless the successor acquired the Indebtedness as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, or other matter insured against by this policy.

(f) "Insured Claimant": An Insured claiming loss or damage.

(g) "Insured Mortgage"; The Mortgage described in paragraph 4 of Schedule A.

(h) "Knowledge" or "Known": Actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.

(i) "Land": The land described in Schedule A, and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting sheets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is insured by this policy.

(j) "Mortgage": Mortgage, deed of trust, trust deed, or other security instrument, including one evidenced by electronic means authorized by law.

(k) "Public Records": Records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.

(l) "Title": The estate or interest described in Schedule A

(m) "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title or a prospective purchaser of the Insured Mortgage to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring the delivery of marketable title.

2. CONTINUATION OF INSURANCE

The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured after acquisition of the Title by an Insured or after conveyance by an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land; or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT

The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured of any claim of title or interest that is adverse to the Title or the lien of the Insured Mortgage, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title or the lien of the Insured Mortgage, as insured, is rejected as Unmarketable Title. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.

4. PROOF OF LOSS

In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance, or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

5. DEFENSE AND PROSECUTION OF ACTIONS

(a) Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action. It shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

(b) The Company shall have the right, in addition to the options contained in Section 7 of these Conditions, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title or the lien of the Insured Mortgage, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If the Company exercises its rights under this subsection, it must do so diligently.

(c)   Whenever the Company brings an action or ... a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves the right, in its sole discretion, to appeal any adverse judgment or order.

6.   **DUTY OF INSURED CLAIMANT TO COOPERATE**

(a)   In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title, the lien of the Insured Mortgage, or any other matter as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(b)   The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage. All information designated as confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured Claimant to submit for examination under oath, produce any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

7.   **OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY**

In case of a claim under this policy, the Company shall have the following additional options:

(a)   To Pay or Tender Payment of the Amount of Insurance or to Purchase the Indebtedness.

(i)   To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

(ii)   To purchase the Indebtedness for the amount of the Indebtedness on the date of purchase, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of purchase and that the Company is obligated to pay; or

When the Company purchases the Indebtedness, the Insured shall transfer, assign, and convey to the Company the Indebtedness and the Insured Mortgage, together with any collateral security.

Upon the exercise by the Company of either of the options provided for in subsections (a)(i) or (ii), all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in those subsections, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b)   To Pay or Otherwise Settle With Parties Other Than the Insured or With the Insured Claimant.

(i)   To pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy. In addition, the Company will pay any costs, attorneys' fees, and expenses incurred

by the Insured Claimant that were authorized by the Company up to the time of p...ent and that the Company is obligated to pay; or

(ii)   To pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

When the Company purchases the Indebtedness, the Insured shall transfer, assign, and convey to the Company the Indebtedness and the Insured Mortgage, together with any collateral security.

Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

8.   **DETERMINATION AND EXTENT OF LIABILITY**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a)   The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

(i)   the Amount of Insurance;

(ii)   the Indebtedness,

(iii)   the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

(iv)   if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

(b)   If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured,

(i)   the Amount of Insurance shall be increased by 10%, and

(ii)   the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(c)   In the event the Insured has acquired the Title in the manner described in Section 2 of these Conditions or has conveyed the Title, then the extent of liability of the Company shall continue as set forth in Section 8(a) of these Conditions.

(d)   In addition to the extent of liability under (a), (b), and (c), the Company will also pay those costs, attorneys' fees, and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

9.   **LIMITATION OF LIABILITY**

(a)   If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, or cures the claim of Unmarketable Title, or establishes the lien of the Insured Mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

(b)   In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title or to the lien of the Insured Mortgage, as insured.

(c)   The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

10.   **REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY**

(a)  All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Amount of Insurance by the amount of the payment. However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Amount of Insurance afforded under this policy except to the extent that the payments reduce the Indebtedness.

(b)  The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company except as provided in Section 2 of these Conditions.

## 11.  PAYMENT OF LOSS

When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within 30 days.

## 12.  RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT

(a)  The Company's Right to Recover

Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title or Insured Mortgage and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees, and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise, or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.

If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.

(b)  The Insured's Rights and Limitations

(i)  The owner of the Indebtedness may release or substitute the personal liability of any debtor or guarantor, extend or otherwise modify the terms of payment, release a portion of the Title from the lien of the Insured Mortgage, or release any collateral security for the Indebtedness, if it does not affect the enforceability or priority of the lien of the Insured Mortgage.

(ii)  If the Insured exercises a right provided in (b)(i), but has Knowledge of any claim adverse to the Title or the lien of the Insured Mortgage insured against by this policy, the Company shall be required to pay only that part of any losses insured against by this policy that shall exceed the amount, if any, lost to the Company by reason of the impairment by the Insured Claimant of the Company's right of subrogation.

(c)  The Company's Rights Against Noninsured Obligors

The Company's right of subrogation includes the Insured's rights against non-insured obligors including the rights of the Insured to indemnities, guaranties, other policies of insurance, or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

The Company's right of subrogation shall not be avoided by acquisition of the Insured Mortgage by an obligor (except an obligor described in Section l(e)(i)(F) of these Conditions) who acquires the Insured Mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond, and the obligor will not be an Insured under this policy.

## 13.  ARBITRATION

Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured. All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

## 14.  LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT

(a)  This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b)  Any claim of loss or damage that arises out of the status of the Title or lien of the Insured Mortgage or by any action asserting such claim shall be restricted to this policy.

(c)  Any amendment of or endorsement to this policy must be in writing and authenticated by an authorized person, or expressly incorporated by Schedule A of this policy.

(d)  Each endorsement to this policy issued at any time is made a part of this policy and is subject to all of its terms and provisions. Except as the endorsement expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsement, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.

## 15.  SEVERABILITY

In the event any provision of this policy, in whole or in part, is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision or such part held to be invalid, but all other provisions shall remain in full force and effect.

## 16.  CHOICE OF LAW; FORUM

(a)  Choice of Law: The Insured acknowledges the Company has underwritten the risks covered by this policy and determined the premium charged therefor in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies, or enforcement of policies of title insurance of the jurisdiction where the Land is located.

Therefore, the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title or the lien of the Insured Mortgage that are adverse to the Insured and to interpret and enforce the terms of this policy. In neither case shall the court or arbitrator apply its conflicts of law principles to determine the applicable law.

(b)  Choice of Forum: Any litigation or other proceeding brought by the Insured against the Company must be filed only in a state or federal court within the United States of America or its territories having appropriate jurisdiction.

## 17.  NOTICES, WHERE SENT

Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at

Ticor Title Insurance Company
P.O. Box 45023
Jacksonville, Florida 32232-5023
Attn: Claims Department.

Order No. 26-62822

## SCHEDULE A

| | | | |
|---|---|---|---|
| AMOUNT OF INSURANCE: | $135,000.00 | DATE OF POLICY: | May 1, 2008 |
| | | At: | 11:27 am |
| PREMIUM: | $350.00 | POLICY NUMBER: | 26-62822 |

1. **NAME OF INSURED:**

   Donald L. Olson and Annette M. Olson, Trustees of the Olson Living Trust

2. **THE ESTATE OR INTEREST IN THE LAND THAT IS ENCUMBERED BY THE INSURED MORTGAGE IS:**

   Fee.

3. **TITLE IS VESTED IN:**

   Charbonneau Properties, LLC, an Oregon Limited Liability Company

4. **THE INSURED MORTGAGE AND ITS ASSIGNMENTS, IF ANY, ARE DESCRIBED AS FOLLOWS:**

   Trust Deed, including the terms and provisions thereof, given to secure an indebtedness with interest thereon and such future advances as may be provided therein,

   | | |
   |---|---|
   | Grantor: | Charbonneau Properties, LLC, a Limited Liability Company |
   | Trustee: | AmeriTitle |
   | Beneficiary: | Donald L. Olson and Annette M. Olson, Trustees of the Olson Living Trust |
   | Amount: | $135,000.00 |
   | Dated: | April 28, 2008 |
   | Recorded: | May 1, 2008 |
   | Instrument No.: | 2008-007268 |

   in Josephine County, Oregon.

5. **THE LAND REFERRED TO IN THIS POLICY IS DESCRIBED AS FOLLOWS:**

   Lot 32, SEQUOIA VILLAGE, Phase 2, a Planned Community, Josephine County, Oregon.

Order No. 26-62822

## SCHEDULE B

## EXCEPTIONS FROM COVERAGE

Except as provided in Schedule B - Part II, this policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses that arise by reason of:

### PART I:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2. Facts, rights, interests or claims which are not shown by the Public Records but which could be ascertained by an inspection of the Land or by making inquiry of persons in possession thereof.

3. Easements, or claims of easement, not shown by the Public Records; reservations or exceptions in patents or in Acts authorizing the issuance thereof; water rights, claims or title to water.

4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the subject Land.

5. Any lien, or right to a lien, for services, labor, material, equipment rental or workers compensation heretofore or hereafter furnished, imposed by law and not shown by the Public Records.

6. Taxes for the fiscal year     2007-2008,
   Total amount:     $875.15
   Total unpaid balance:     $595.10, plus interest
   Account No.:     R344967 360521BD 819
   Millage Code:     01

7. Easement as reserved in Deed,
   For:     Irrigation Purposes
   Reserved by:     Grants Pass Irrigation District
   Recorded:     January 26, 1938
   Volume:     85     Page: 338 and 339
   in Josephine County, Oregon.

8. An Easement created by instrument, including the terms and provisions thereof,
   In favor of:     The California Oregon Power Company
   For:     Public Utilities
   Recorded:     August 18, 1953
   Volume:     169     Page: 14
   in Josephine County, Oregon.

Order No. 26-62822

9.   "Covenants and Agreement for Waiver of Remonstrance", including the terms and provisions thereof,
     Recorded:              September 8, 1995
     Instrument No.:        95-15105
     Records of Josephine County, Oregon.

10.  "Ordinance No. 5149" amending Advanced Financed District "N" Street for Public Water, Storm Drain
     and Street Improvements in "N" Street, including the terms and provisions thereof,
     Recorded:              September 6, 2002
     Instrument No.:        2002-018474
     Records of Josephine County, Oregon.

11.  "Ordinance No. 4649" creating Advanced Financed District for the "N" Street and Storm Improvements,
     including the terms and provisions thereof,
     Recorded:              April 4, 2003
     Instrument No.:        2003-007852
     Records of Josephine County, Oregon.

12.  "Ordinance No. 5215" creating Advanced Financed District WA4366 for Water Improvements on "N"
     Street, including the terms and provisions thereof,
     Recorded:              March 1, 2004
     Instrument No.:        2004-004634
     Records of Josephine County, Oregon.

13.  "Ordinance No. 5215" creating Advanced Financed District WA4366 for Storm Improvements on "N"
     Street, including the terms and provisions thereof,
     Recorded:              March 1, 2004
     Instrument No.:        2004-004636
     Records of Josephine County, Oregon.

14.  "Ordinance No. 5215" creating Advanced Financed District WA4366 for Landscape Improvements on
     "N" Street, including the terms and provisions thereof,
     Recorded:              March 1, 2004
     Instrument No.:        2004-004637
     Records of Josephine County, Oregon.

15.  Covenants, conditions and restrictions, but omitting covenants or restrictions, if any, based upon race,
     color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin,
     ancestry, or source of income, as set forth in applicable state or federal laws, except to the extent that
     said covenant or restriction is permitted by applicable law, imposed by instrument, including the terms
     and provisions thereof,
     Recorded:              January 18, 2007
     Instrument No.:        2007-001110
     in Josephine County, Oregon.

     Said covenants, conditions and restrictions contain among other things provisions for levies and
     assessments of the Sequoia Village Homeowners' Association Home Owner's Association.

Order No. 26-62822

"Declaration of Annexation of Phase 2 of Sequoia Village", including the terms and provisions thereof,
Recorded:                          April 20, 2007
Instrument No.:                    2007-007885
Records of Josephine County, Oregon.

16.    Party Wall Agreement, including the terms and provisions thereof,
Recorded:                          January 18, 2007
Instrument No.:                    2007-001110
in Josephine County, Oregon.

17.    The by-laws, including the terms and provisions thereof, of SEQUOIA VILLAGE, Phases 1 through 4, a
Planned Community, In Grants Pass, Oregon,
Recorded:                          April 27, 2007
Instrument No.:                    2007-008367
in Josephine County, Oregon.

18.    Easement as delineated or dedicated on the recorded plat,
For:                               Reciprocal Access/Maintenance and City Utilities

PART II:

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and
the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of
the Insured Mortgage:

a.    NONE

END OF EXCEPTIONS

American Land Title Association                    Oregon Title Insurance Rating Organization (OTIRO)
ALTA Loan Policy (6-17-2006)                                                       OTIRO No. PL-05
                                                                                Policy No. 26-62822

TICOR TITLE

This map and the accompanying
legal description are provided solely
to assist in locating the subject property.
Ticor Title assumes no liability for discrepancies.

SOFTWOOD                                WAY

SEQUOIA

VILLAGE

PC

PHASE 2

TRACT "B"
COMMON AREA

SUBJECT PROPERTY

# Ticor Title Insurance Company

## LOAN POLICY OF TITLE INSURANCE
### Issued by
### TICOR TITLE INSURANCE COMPANY

**Any notice of claim and any other notice or statement in writing required to be given to the Company under this Policy must be given to the Company at the address shown in Section 17 of the Conditions.**

### COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, TICOR TITLE INSURANCE COMPANY, a California corporation (the "Company") insures, as of Date of Policy and, to the extent stated in Covered Risks 11,13 and 14, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1. Title being vested other than as stated in Schedule A.

2. Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from

    (a) A defect in the Title caused by

        (i) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;

        (ii) failure of any person or Entity to have authorized a transfer or conveyance;

        (iii) a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;

        (iv) failure to perform those acts necessary to create a document by electronic means authorized by law;

        (v) a document executed under a falsified, expired, or otherwise invalid power of attorney;

        (vi) a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or

        (vii) a defective judicial or administrative proceeding.

    (b) The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.

    (c) Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.

3. Unmarketable Title.

4. No right of access to and from the Land.

5. The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

    (a) the occupancy, use, or enjoyment of the Land;

    (b) the character, dimensions, or location of any improvement erected on the Land;

    (c) the subdivision of land; or

    (d) environmental protection

    if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.

6. An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.

7. The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.

PLAINTIFF'S
EXHIBIT
2
PENGAD 800-631-6989

American Land Title Association Oregon Title Insurance Rating Organization (OTIRO)
ALTA Loan Policy OTIRO No. PL-05
6-17-2006

Form 74-OTIRO PL-05

8.  Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.

9.  The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title. This Covered Risk includes but is not limited to insurance against loss from any of the following impairing the lien of the Insured Mortgage:

   (a) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;

   (b) failure of any person or Entity to have authorized a transfer or conveyance;

   (c) the Insured Mortgage not being properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;

   (d) failure to perform those acts necessary to create a document by electronic means authorized by law;

   (e) a document executed under a falsified, expired, or otherwise invalid power of attorney;

   (f) a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or

   (g) a defective judicial or administrative proceeding.

10. The lack of priority of the lien of the Insured Mortgage upon the Title over any other lien or encumbrance.

11. The lack of priority of the lien of the Insured Mortgage upon the Title

   (a) as security for each and every advance of proceeds of the loan secured by the Insured Mortgage over any statutory lien for services, labor, or material arising from construction of an improvement or work related to the Land when the improvement or work is either

      (i) contracted for or commenced on or before Date of Policy; or

      (ii) contracted for, commenced, or continued after Date of Policy if the construction is financed, in whole or in part, by proceeds of the loan secured by the Insured Mortgage that the Insured has advanced or is obligated on Date of Policy to advance; and

   (b) over the lien of any assessments for street improvements under construction or completed at Date of Policy.

12. The invalidity or unenforceability of any assignment of the Insured Mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the Insured Mortgage in the named Insured assignee free and clear of all liens.

13. The invalidity, unenforceability, lack of priority, or avoidance of the lien of the Insured Mortgage upon the Title

   (a) resulting from the avoidance in whole or in part, or from a court order providing an alternative remedy, of any transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction crating the lien of the Insured Mortgage because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws; or

   (b) because the Insured Mortgage constitutes a preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws by reason of the failure of its recording in the Public Records

      (i) to be timely, or

      (ii) to impart notice of its existence to a purchaser for value or to a judgment or lien creditor.

14. Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 13 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the Insured Mortgage in the Public Records.

The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by this Policy, but only to the extent provided in the Conditions.

Countersigned:

Issued By:
Ticor Title
744 NE 7th St.
P.O. Box 1960
Grants Pass, OR  97528-0166

**TICOR TITLE INSURANCE COMPANY**

By _____

President

Attest _____

Secretary

BY: _Judy Lipett_
Authorized Signatory

American Land Title Association Oregon Title Insurance Rating Organization (OTIRO)
ALTA Loan Policy OTIRO No. PL-05

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

    (i) the occupancy, use, or enjoyment of the Land;

    (ii) the character, dimensions, or location of any improvement erected on the Land;

    (iii) the subdivision of land; or

    (iv) environmental protection;

    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3. Defects, liens, encumbrances, adverse claims, or other matters

    (a) created, suffered, assumed, or agreed to by the Insured Claimant;

    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

    (c) resulting in no loss or damage to the Insured Claimant;

    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or

    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is

    (a) a fraudulent conveyance or fraudulent transfer; or

    (b) a preferential transfer for any reason not stated in Covered Risk 13(a) of this policy.

7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

## CONDITIONS

1. **DEFINITION OF TERMS**
   The following terms when used in this policy mean:

   (a) "Amount of Insurance": The amount stated in Schedule A, as may be increased or decreased by endorsement to this policy, increased by Section 8(b), or decreased by Sections 10 of these Conditions.

   (b) "Date of Policy": The date designated as "Date of Policy" in Schedule A.

   (c) "Entity": A corporation, partnership, trust, limited liability company, or other similar legal entity.

   (d) "Indebtedness": The obligation secured by the Insured Mortgage including one evidenced by electronic means authorized by law, and if that obligation is the payment of a debt, the Indebtedness is the sum of

   (i) the amount of the principal disbursed as of Date of Policy;

(ii)  the amount of the principal disbursed subsequent to Date of Policy;

(iii)  the construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the Land or related to the Land that the Insured was and continued to be obligated to advance at Date of Policy and at the date of the advance;

(iv)  interest on the loan;

(v)  the prepayment premiums, exit fees, and other similar fees or penalties allowed by law;

(vi)  the expenses of foreclosure and any other costs of enforcement;

(vii)  the amount advanced to assure compliance with laws or to protect the lien or the priority of the lien of the Insured Mortgage before the acquisition of the estate or interest in the Title;

(viii)  the amounts to pay taxes and insurance; and

(ix)  the reasonable amounts expended to prevent deterioration of improvements;

but the Indebtedness is reduced by the total of all payments and by any amount forgiven by an Insured.

(e) "Insured": The Insured named in Schedule A.

(i)  The term "Insured" also includes

(A)  the owner of the Indebtedness and each successor in ownership of the Indebtedness, whether the owner or successor owns the Indebtedness for its own account or as a trustee or other fiduciary, except a successor who is an obligor under the provisions of Section 12(c) of these Conditions;

(B)  the person or Entity who has "control" of the "transferable record," if the Indebtedness is evidenced by a "transferable record," as these terms are defined by applicable electronic transactions law;

(C)  successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization;

(D)  successors to an Insured by its conversion to another kind of Entity;

(E)  a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title

(1)  if the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,

(2)  if the grantee wholly owns the named Insured, or

(3)  if the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity;

(F)  any government agency or instrumentality that is an insurer or guarantor under an insurance contract or guaranty insuring or guaranteeing the Indebtedness secured by the Insured Mortgage, or any part of it, whether named as an Insured or not;

(ii)  With regard to (A), (B), (C), (D), and (E) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured, unless the successor acquired the Indebtedness as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, or other matter insured against by this policy.

(f)  "Insured Claimant": An Insured claiming loss or damage.

(g)  "Insured Mortgage"; The Mortgage described in paragraph 4 of Schedule A.

(h)  "Knowledge" or "Known": Actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.

(i)  "Land": The land described in Schedule A, and affixed improvements that by law constitute property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting sheets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is insured by this policy.

(j)  "Mortgage": Mortgage, deed of trust, trust deed, or other security instrument, including one evidenced by electronic means authorized by law.

(k)  "Public Records": Records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.

(l)  "Title": The estate or interest described in Schedule A

(m)  "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title or a prospective purchaser of the Insured Mortgage to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring the delivery of marketable title.

2. **CONTINUATION OF INSURANCE**
The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured after acquisition of the Title by an Insured or after conveyance by an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land; or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

3. **NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT**
The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured of any claim of title or interest that is adverse to the Title or the lien of the Insured Mortgage, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title or the lien of the Insured Mortgage, as insured, is rejected as Unmarketable Title. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.

4. **PROOF OF LOSS**
In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance, or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

5. **DEFENSE AND PROSECUTION OF ACTIONS**
(a)  Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action. It shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

(b)  The Company shall have the right, in addition to the options contained in Section 7 of these Conditions, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title or the lien of the Insured Mortgage, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If the Company exercises its rights under this subsection, it must do so diligently.

(c)  Whenever the Company brings an action or a... a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves the right, in its sole discretion, to appeal any adverse judgment or order.

## 6. DUTY OF INSURED CLAIMANT TO COOPERATE

(a)  In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title, the lien of the Insured Mortgage, or any other matter as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(b)  The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage. All information designated as confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured Claimant to submit for examination under oath, produce any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

## 7. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY

In case of a claim under this policy, the Company shall have the following additional options:

(a)  To Pay or Tender Payment of the Amount of Insurance or to Purchase the Indebtedness.

   (i)  To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

   (ii)  To purchase the Indebtedness for the amount of the Indebtedness on the date of purchase, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of purchase and that the Company is obligated to pay; or

When the Company purchases the Indebtedness, the Insured shall transfer, assign, and convey to the Company the Indebtedness and the Insured Mortgage, together with any collateral security.

Upon the exercise by the Company of either of the options provided for in subsections (a)(i) or (ii), all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in those subsections, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b)  To Pay or Otherwise Settle With Parties Other Than the Insured or With the Insured Claimant.

   (i)  To pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy. In addition, the Company will pay any costs, attorneys' fees, and expenses incurred

by the Ins... Claimant that were authorized by the Company up to the time of p... ...nt and that the Company is obligated to pay; or

   (ii)  To pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

When the Company purchases the Indebtedness, the Insured shall transfer, assign, and convey to the Company the Indebtedness and the Insured Mortgage, together with any collateral security.

Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

## 8. DETERMINATION AND EXTENT OF LIABILITY

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a)  The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

   (i)  the Amount of Insurance;

   (ii)  the Indebtedness,

   (iii)  the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

   (iv)  if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

(b)  If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured,

   (i)  the Amount of Insurance shall be increased by 10%, and

   (ii)  the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(c)  In the event the Insured has acquired the Title in the manner described in Section 2 of these Conditions or has conveyed the Title, then the extent of liability of the Company shall continue as set forth in Section 8(a) of these Conditions.

(d)  In addition to the extent of liability under (a), (b), and (c), the Company will also pay those costs, attorneys' fees, and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

## 9. LIMITATION OF LIABILITY

(a)  If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, or cures the claim of Unmarketable Title, or establishes the lien of the Insured Mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

(b)  In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title or to the lien of the Insured Mortgage, as insured.

(c)  The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

## 10. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY

(a) All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Amount of Insurance by the amount of the payment. However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Amount of Insurance afforded under this policy except to the extent that the payments reduce the Indebtedness.

(b) The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company except as provided in Section 2 of these Conditions.

**11. PAYMENT OF LOSS**

When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within 30 days.

**12. RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT**

(a) The Company's Right to Recover

Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title or Insured Mortgage and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees, and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise, or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.

If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.

(b) The Insured's Rights and Limitations

(i) The owner of the Indebtedness may release or substitute the personal liability of any debtor or guarantor, extend or otherwise modify the terms of payment, release a portion of the Title from the lien of the Insured Mortgage, or release any collateral security for the Indebtedness, if it does not affect the enforceability or priority of the lien of the Insured Mortgage.

(ii) If the Insured exercises a right provided in (b)(i), but has Knowledge of any claim adverse to the Title or the lien of the Insured Mortgage insured against by this policy, the Company shall be required to pay only that part of any losses insured against by this policy that shall exceed the amount, if any, lost to the Company by reason of the impairment by the Insured Claimant of the Company's right of subrogation.

(c) The Company's Rights Against Noninsured Obligors

The Company's right of subrogation includes the Insured's rights against non-insured obligors including the rights of the Insured to indemnities, guaranties, other policies of insurance, or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

The Company's right of subrogation shall not be avoided by acquisition of the Insured Mortgage by an obligor (except an obligor described in Section l(e)(i)(F) of these Conditions) who acquires the Insured Mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond, and the obligor will not be an Insured under this policy.

**13. ARBITRATION**

Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured. All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

**14. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT**

(a) This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage that arises out of the status of the Title or lien of the Insured Mortgage or by any action asserting such claim shall be restricted to this policy.

(c) Any amendment of or endorsement to this policy must be in writing and authenticated by an authorized person, or expressly incorporated by Schedule A of this policy.

(d) Each endorsement to this policy issued at any time is made a part of this policy and is subject to all of its terms and provisions. Except as the endorsement expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsement, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.

**15. SEVERABILITY**

In the event any provision of this policy, in whole or in part, is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision or such part held to be invalid, but all other provisions shall remain in full force and effect.

**16. CHOICE OF LAW; FORUM**

(a) Choice of Law: The Insured acknowledges the Company has underwritten the risks covered by this policy and determined the premium charged therefor in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies, or enforcement of policies of title insurance of the jurisdiction where the Land is located.

Therefore, the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title or the lien of the Insured Mortgage that are adverse to the Insured and to interpret and enforce the terms of this policy. In neither case shall the court or arbitrator apply its conflicts of law principles to determine the applicable law.

(b) Choice of Forum: Any litigation or other proceeding brought by the Insured against the Company must be filed only in a state or federal court within the United States of America or its territories having appropriate jurisdiction.

**17. NOTICES, WHERE SENT**

Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at

Ticor Title Insurance Company
P.O. Box 45023
Jacksonville, Florida 32232-5023
Attn: Claims Department.

Order No. 26-62819

# SCHEDULE A

| | | | |
|---|---|---|---|
| AMOUNT OF INSURANCE: | $135,000.00 | DATE OF POLICY: | April 29, 2008 |
| | | At: | 03:38 pm |
| PREMIUM: | $350.00 | POLICY NUMBER: | 26-62819 |

1.   **NAME OF INSURED:**

Donald L. Olson and Annette M. Olson, Trustees of the Olson Living Trust

2.   **THE ESTATE OR INTEREST IN THE LAND THAT IS ENCUMBERED BY THE INSURED MORTGAGE IS:**

Fee.

3.   **TITLE IS VESTED IN:**

Charbonneau Properties, LLC, an Oregon Limited Liability Company

4.   **THE INSURED MORTGAGE AND ITS ASSIGNMENTS, IF ANY, ARE DESCRIBED AS FOLLOWS:**

Trust Deed, including the terms and provisions thereof, given to secure an indebtedness with interest thereon and such future advances as may be provided therein,

| | |
|---|---|
| Grantor: | Charbonneau Properties, LLC |
| Trustee: | AmeriTitle, an Oregon Corporation |
| Beneficiary: | Donald L. Olson and Annette M. Olson, Trustees of the Olson Living Trust |
| Amount: | $135,000.00 |
| Dated: | April 28, 2008 |
| Recorded: | April 29, 2008 |
| Instrument No.: | 2008-007139 |

in Josephine County, Oregon.

5.   **THE LAND REFERRED TO IN THIS POLICY IS DESCRIBED AS FOLLOWS:**

Lot 37, SEQUOIA VILLAGE, Phase 2, a Planned Community, Josephine County, Oregon.

Order No. 26-62819

## SCHEDULE B

## EXCEPTIONS FROM COVERAGE

Except as provided in Schedule B - Part II, this policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses that arise by reason of:

### PART I:

1.  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.  Facts, rights, interests or claims which are not shown by the Public Records but which could be ascertained by an inspection of the Land or by making inquiry of persons in possession thereof.

3.  Easements, or claims of easement, not shown by the Public Records; reservations or exceptions in patents or in Acts authorizing the issuance thereof; water rights, claims or title to water.

4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the subject Land.

5.  Any lien, or right to a lien, for services, labor, material, equipment rental or workers compensation heretofore or hereafter furnished, imposed by law and not shown by the Public Records.

6.  Taxes for the fiscal year     2007-2008,
    Total amount:               $887.27
    Total unpaid balance:       $603.34, plus interest
    Account No.:                R344972 360521BD 824
    Millage Code:               01

7.  Easement as reserved in Deed,
    For:                        Irrigation Purposes
    Reserved by:                Grants Pass Irrigation District
    Recorded:                   January 26, 1938
    Volume:                     85      Page: 338 and 339
    in Josephine County, Oregon.

8.  An Easement created by instrument, including the terms and provisions thereof,
    In favor of:                The California Oregon Power Company
    For:                        Public Utilities
    Recorded:                   August 18, 1953
    Volume:                     169     Page: 14
    in Josephine County, Oregon.

American Land Title Association
ALTA Loan Policy (6-17-2006)

Oregon Title Insurance Rating Organization (OTIRO)
OTIRO No. PL-05
Policy No. 26-62819

Order No. 26-62819

9.  "Covenants and Agreement for Waiver of Remonstrance", including the terms and provisions thereof,
    Recorded:                September 8, 1995
    Instrument No.:          95-15105
    Records of Josephine County, Oregon.

10. "Ordinance No. 5149" amending Advanced Financed District "N" Street for Public Water, Storm Drain
    and Street Improvements in "N" Street, including the terms and provisions thereof,
    Recorded:                September 6, 2002
    Instrument No.:          2002-018474
    Records of Josephine County, Oregon.

11. "Ordinance No. 4649" creating Advanced Financed District for the "N" Street and Storm Improvements,
    including the terms and provisions thereof,
    Recorded:                April 4, 2003
    Instrument No.:          2003-007852
    Records of Josephine County, Oregon.

12. "Ordinance No. 5215" creating Advanced Financed District WA4366 for Water Improvements on "N"
    Street, including the terms and provisions thereof,
    Recorded:                March 1, 2004
    Instrument No.:          2004-004634
    Records of Josephine County, Oregon.

13. "Ordinance No. 5215" creating Advanced Financed District WA4366 for Storm Improvements on "N"
    Street, including the terms and provisions thereof,
    Recorded:                March 1, 2004
    Instrument No.:          2004-004636
    Records of Josephine County, Oregon.

14. "Ordinance No. 5215" creating Advanced Financed District WA4366 for Landscape Improvements on
    "N" Street, including the terms and provisions thereof,
    Recorded:                March 1, 2004
    Instrument No.:          2004-004637
    Records of Josephine County, Oregon.

15. Covenants, conditions and restrictions, but omitting covenants or restrictions, if any, based upon race,
    color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin,
    ancestry, or source of income, as set forth in applicable state or federal laws, except to the extent that
    said covenant or restriction is permitted by applicable law, imposed by instrument, including the terms
    and provisions thereof,
    Recorded:                January 18, 2007
    Instrument No.:          2007-001110
    in Josephine County, Oregon.

    Said covenants, conditions and restrictions contain among other things provisions for levies and
    assessments of the Sequoia Village Homeowners' Association Home Owner's Association.

Order No. 26-62819

"Declaration of Annexation of Phase 2 of Sequoia Village", including the terms and provisions thereof,
Recorded:                    April 20, 2007
Instrument No.:             2007-007885
Records of Josephine County, Oregon.

16.   Party Wall Agreement, including the terms and provisions thereof,
Recorded:                    January 18, 2007
Instrument No.:             2007-001110
in Josephine County, Oregon.

17.   The by-laws, including the terms and provisions thereof, of D
Recorded:                    April 27, 2007
Instrument No.:             2007-008367
in Josephine County, Oregon.

18.   Easement as delineated or dedicated on the recorded plat,
For:                         Reciprocal Access/Maintenance and City Utilities

## PART II:

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:

a.    NONE

## END OF EXCEPTIONS

American Land Title Association
ALTA Loan Policy (6-17-2006)

Oregon Title Insurance Rating Organization (OTIRO)
OTIRO No. PL-05
Policy No. 26-62819



WAY

VILLAGE

N89°43'03"E    4
99.53'

37.02'

66.80'

N0°16'8"W    86.72'

86.68'

86.64'

86.59'

99.52'    3

19.00'

N0°24'32"W

99.52'    2

18.00'

37.79'    5    6
18.00'    7
18.00    23.00'    8    23.00'

25.00'

99.51'    1

N89°43'02"E

46'    SOFTWOOD

73.05'    15.34'    23.00'    18

821
0.08 Ac.    820
0.04Ac.    819
0.0

35.99'    SEQUOIA    44.99'

N    82.00'    82.00'

TICOR TITLE
This map and the accompanying
legal description are provided solely
to assist in locating the subject property.
Ticor Title assumes no liability for discrepancies.

N89°35'28"E    34
82.05'

23.00'    822
0.04 Ac.    23.00'

35    33
23.00'    18.

82.05'

216.10'    823
0.04 Ac.    23.00'    23.00'

36    N0°24'32"W

82.05'

15.00'    824
0.03 Ac.    SUBJECT PROPERTY    18.00'

37    VILLAGE

82.05'

16.00'    825
0.03 Ac.    18.00'

38

82.05'
N89°35'28"E    39
23.00'    826
0.04 Ac.    23.00'

82.05'

S0°24'32"E    CATHERINE

N89°35'28"E

28.05'    18.00'    18.00'    23.00'    23.00'    18.00'
827
0.06Ac.    828
0.04Ac.    829
0.04Ac.    830
0.04Ac.    831
0.04Ac.    832
0.04Ac.

34.70'    0°24'32"E    83.93'    83.93'    83.93'    83.90'    83.90'    83.90'

46'

# Ticor Title Insurance Company

## LOAN POLICY OF TITLE INSURANCE
### Issued by
### TICOR TITLE INSURANCE COMPANY

**Any notice of claim and any other notice or statement in writing required to be given to the Company under this Policy must be given to the Company at the address shown in Section 17 of the Conditions.**

### COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, TICOR TITLE INSURANCE COMPANY, a California corporation (the "Company") insures, as of Date of Policy and, to the extent stated in Covered Risks 11, 13 and 14, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1. Title being vested other than as stated in Schedule A.

2. Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from

   (a) A defect in the Title caused by

      (i) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;

      (ii) failure of any person or Entity to have authorized a transfer or conveyance;

      (iii) a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;

      (iv) failure to perform those acts necessary to create a document by electronic means authorized by law;

      (v) a document executed under a falsified, expired, or otherwise invalid power of attorney;

      (vi) a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or

      (vii) a defective judicial or administrative proceeding.

   (b) The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.

   (c) Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.

3. Unmarketable Title.

4. No right of access to and from the Land.

5. The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

   (a) the occupancy, use, or enjoyment of the Land;

   (b) the character, dimensions, or location of any improvement erected on the Land;

   (c) the subdivision of land; or

   (d) environmental protection

   if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.

6. An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.

7. The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.

PLAINTIFF'S
EXHIBIT
3
PENGAD 800-631-6989

American Land Title Association Oregon Title Insurance Rating Organization (OTIRO)
ALTA Loan Policy OTIRO No. PL-05
6-17-2006

Form 74-OTIRO PL-05

8.  Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.

9.  The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title. This Covered Risk includes but is not limited to insurance against loss from any of the following impairing the lien of the Insured Mortgage:

   (a)  forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;

   (b)  failure of any person or Entity to have authorized a transfer or conveyance;

   (c)  the Insured Mortgage not being properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;

   (d)  failure to perform those acts necessary to create a document by electronic means authorized by law;

   (e)  a document executed under a falsified, expired, or otherwise invalid power of attorney;

   (f)  a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or

   (g)  a defective judicial or administrative proceeding.

10.  The lack of priority of the lien of the Insured Mortgage upon the Title over any other lien or encumbrance.

11.  The lack of priority of the lien of the Insured Mortgage upon the Title

   (a)  as security for each and every advance of proceeds of the loan secured by the Insured Mortgage over any statutory lien for services, labor, or material arising from construction of an improvement or work related to the Land when the improvement or work is either

      (i)  contracted for or commenced on or before Date of Policy; or

      (ii)  contracted for, commenced, or continued after Date of Policy if the construction is financed, in whole or in part, by proceeds of the loan secured by the Insured Mortgage that the Insured has advanced or is obligated on Date of Policy to advance; and

   (b)  over the lien of any assessments for street improvements under construction or completed at Date of Policy.

12.  The invalidity or unenforceability of any assignment of the Insured Mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the Insured Mortgage in the named Insured assignee free and clear of all liens.

13.  The invalidity, unenforceability, lack of priority, or avoidance of the lien of the Insured Mortgage upon the Title

   (a)  resulting from the avoidance in whole or in part, or from a court order providing an alternative remedy, of any transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction crating the lien of the Insured Mortgage because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws; or

   (b)  because the Insured Mortgage constitutes a preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws by reason of the failure of its recording in the Public Records

      (i)  to be timely, or

      (ii)  to impart notice of its existence to a purchaser for value or to a judgment or lien creditor.

14.  Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 13 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the Insured Mortgage in the Public Records.

The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by this Policy, but only to the extent provided in the Conditions.

Countersigned:

Issued By:
Ticor Title
744 NE 7th St.
P.O. Box 1960
Grants Pass, OR  97528-0166

TICOR TITLE INSURANCE COMPANY

By _____

                                          President

Attest _____

                                          Secretary

BY: _____
Authorized Signatory

American Land Title Association Oregon Title Insurance Rating Organization (OTIRO)
ALTA Loan Policy OTIRO No. PL-05

EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

   (i) the occupancy, use, or enjoyment of the Land;

   (ii) the character, dimensions, or location of any improvement erected on the Land;

   (iii) the subdivision of land; or

   (iv) environmental protection;

   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3. Defects, liens, encumbrances, adverse claims, or other matters

   (a) created, suffered, assumed, or agreed to by the Insured Claimant;

   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

   (c) resulting in no loss or damage to the Insured Claimant;

   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or

   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is

   (a) a fraudulent conveyance or fraudulent transfer; or

   (b) a preferential transfer for any reason not stated in Covered Risk 13(a) of this policy.

7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

CONDITIONS

1. **DEFINITION OF TERMS**
   The following terms when used in this policy mean:

   (a) "Amount of Insurance": The amount stated in Schedule A, as may be increased or decreased by endorsement to this policy, increased by Section 8(b), or decreased by Sections 10 of these Conditions.

   (b) "Date of Policy": The date designated as "Date of Policy" in Schedule A.

   (c) "Entity": A corporation, partnership, trust, limited liability company, or other similar legal entity.

   (d) "Indebtedness": The obligation secured by the Insured Mortgage including one evidenced by electronic means authorized by law, and if that obligation is the payment of a debt, the Indebtedness is the sum of

   (i) the amount of the principal disbursed as of Date of Policy;

(ii)  the amount of the principal disbursed subsequent to Date of Policy;

(iii)  the construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the Land or related to the Land that the Insured was and continued to be obligated to advance at Date of Policy and at the date of the advance;

(iv)  interest on the loan;

(v)  the prepayment premiums, exit fees, and other similar fees or penalties allowed by law;

(vi)  the expenses of foreclosure and any other costs of enforcement;

(vii)  the amount advanced to assure compliance with laws or to protect the lien or the priority of the lien of the Insured Mortgage before the acquisition of these estate or interest in the Title;

(viii)  the amounts to pay taxes and insurance; and

(ix)  the reasonable amounts expended to prevent deterioration of improvements;

but the Indebtedness is reduced by the total of all payments and by any amount forgiven by an Insured.

(e)  "Insured": The Insured named in Schedule A.

(i)  The term "Insured" also includes

(A)  the owner of the Indebtedness and each successor in ownership of the Indebtedness, whether the owner or successor owns the Indebtedness for its own account or as a trustee or other fiduciary, except a successor who is an obligor under the provisions of Section 12(c) of these Conditions;

(B)  the person or Entity who has "control" of the "transferable record," if the Indebtedness is evidenced by a "transferable record," as these terms are defined by applicable electronic transactions law;

(C)  successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization;

(D)  successors to an Insured by its conversion to another kind of Entity;

(E)  a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title

(1)  if the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,

(2)  if the grantee wholly owns the named Insured, or

(3)  if the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity;

(F)  any government agency or instrumentality that is an insurer or guarantor under an insurance contract or guaranty insuring or guaranteeing the Indebtedness secured by the Insured Mortgage, or any part of it, whether named as an Insured or not;

(ii)  With regard to (A), (B), (C), (D), and (E) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured, unless the successor acquired the Indebtedness as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, or other matter insured against by this policy.

(f)  "Insured Claimant": An Insured claiming loss or damage.

(g)  "Insured Mortgage"; The Mortgage described in paragraph 4 of Schedule A.

(h)  "Knowledge" or "Known": Actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.

(i)  "Land": The land described in Schedule A, and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is insured by this policy.

(j)  "Mortgage": Mortgage, deed of trust, trust deed, or other security instrument, including one evidenced by electronic means authorized by law.

(k)  "Public Records": Records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.

(l)  "Title": The estate or interest described in Schedule A

(m)  "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title or a prospective purchaser of the Insured Mortgage to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring the delivery of marketable title.

2.  **CONTINUATION OF INSURANCE**

The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured after acquisition of the Title by an Insured or after conveyance by an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land; or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

3.  **NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT**

The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured of any claim of title or interest that is adverse to the Title or the lien of the Insured Mortgage, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title or the lien of the Insured Mortgage, as insured, is rejected as Unmarketable Title. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.

4.  **PROOF OF LOSS**

In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance, or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

5.  **DEFENSE AND PROSECUTION OF ACTIONS**

(a)  Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action. It shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

(b)  The Company shall have the right, in addition to the options contained in Section 7 of these Conditions, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title or the lien of the Insured Mortgage, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If the Company exercises its rights under this subsection, it must do so diligently.

Form 74-OTIRO PL-05

(c)  Whenever the Company brings an action or as... a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves the right, in its sole discretion, to appeal any adverse judgment or order.

6.  **DUTY OF INSURED CLAIMANT TO COOPERATE**

(a)  In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title, the lien of the Insured Mortgage, or any other matter as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(b)  The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage. All information designated as confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured Claimant to submit for examination under oath, produce any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

7.  **OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY**

In case of a claim under this policy, the Company shall have the following additional options:

(a)  To Pay or Tender Payment of the Amount of Insurance or to Purchase the Indebtedness.

(i)  To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

(ii)  To purchase the Indebtedness for the amount of the Indebtedness on the date of purchase, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of purchase and that the Company is obligated to pay; or

When the Company purchases the Indebtedness, the Insured shall transfer, assign, and convey to the Company the Indebtedness and the Insured Mortgage, together with any collateral security.

Upon the exercise by the Company of either of the options provided for in subsections (a)(i) or (ii), all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in those subsections, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b)  To Pay or Otherwise Settle With Parties Other Than the Insured or With the Insured Claimant.

(i)  To pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy. In addition, the Company will pay any costs, attorneys' fees, and expenses incurred

by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or

(ii)  To pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

When the Company purchases the Indebtedness, the Insured shall transfer, assign, and convey to the Company the Indebtedness and the Insured Mortgage, together with any collateral security.

Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

8.  **DETERMINATION AND EXTENT OF LIABILITY**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a)  The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

(i)  the Amount of Insurance;

(ii)  the Indebtedness,

(iii)  the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

(iv)  if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

(b)  If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured,

(i)  the Amount of Insurance shall be increased by 10%, and

(ii)  the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(c)  In the event the Insured has acquired the Title in the manner described in Section 2 of these Conditions or has conveyed the Title, then the extent of liability of the Company shall continue as set forth in Section 8(a) of these Conditions.

(d)  In addition to the extent of liability under (a), (b), and (c), the Company will also pay those costs, attorneys' fees, and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

9.  **LIMITATION OF LIABILITY**

(a)  If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, or cures the claim of Unmarketable Title, or establishes the lien of the Insured Mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

(b)  In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title or to the lien of the Insured Mortgage, as insured.

(c)  The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

10.  **REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY**

(a) All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Amount of Insurance by the amount of the payment. However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Amount of Insurance afforded under this policy except to the extent that the payments reduce the Indebtedness.

(b) The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company except as provided in Section 2 of these Conditions.

## 11. PAYMENT OF LOSS

When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within 30 days.

## 12. RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT

(a) The Company's Right to Recover

Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title or Insured Mortgage and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees, and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise, or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.

If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.

(b) The Insured's Rights and Limitations

(i) The owner of the Indebtedness may release or substitute the personal liability of any debtor or guarantor, extend or otherwise modify the terms of payment, release a portion of the Title from the lien of the Insured Mortgage, or release any collateral security for the Indebtedness, if it does not affect the enforceability or priority of the lien of the Insured Mortgage.

(ii) If the Insured exercises a right provided in (b)(i), but has Knowledge of any claim adverse to the Title or the lien of the Insured Mortgage insured against by this policy, the Company shall be required to pay only that part of any losses insured against by this policy that shall exceed the amount, if any, lost to the Company by reason of the impairment by the Insured Claimant of the Company's right of subrogation.

(c) The Company's Rights Against Noninsured Obligors

The Company's right of subrogation includes the Insured's rights against non-insured obligors including the rights of the Insured to indemnities, guaranties, other policies of insurance, or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

The Company's right of subrogation shall not be avoided by acquisition of the Insured Mortgage by an obligor (except an obligor described in Section 1(e)(i)(F) of these Conditions) who acquires the Insured Mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond, and the obligor will not be an Insured under this policy.

## 13. ARBITRATION

Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured. All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

## 14. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT

(a) This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage that arises out of the status of the Title or lien of the Insured Mortgage or by any action asserting such claim shall be restricted to this policy.

(c) Any amendment of or endorsement to this policy must be in writing and authenticated by an authorized person, or expressly incorporated by Schedule A of this policy.

(d) Each endorsement to this policy issued at any time is made a part of this policy and is subject to all of its terms and provisions. Except as the endorsement expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsement, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.

## 15. SEVERABILITY

In the event any provision of this policy, in whole or in part, is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision or such part held to be invalid, but all other provisions shall remain in full force and effect.

## 16. CHOICE OF LAW; FORUM

(a) Choice of Law: The Insured acknowledges the Company has underwritten the risks covered by this policy and determined the premium charged therefor in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies, or enforcement of policies of title insurance of the jurisdiction where the Land is located.

Therefore, the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title or the lien of the Insured Mortgage that are adverse to the Insured and to interpret and enforce the terms of this policy. In neither case shall the court or arbitrator apply its conflicts of law principles to determine the applicable law.

(b) Choice of Forum: Any litigation or other proceeding brought by the Insured against the Company must be filed only in a state or federal court within the United States of America or its territories having appropriate jurisdiction.

## 17. NOTICES, WHERE SENT

Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at

Ticor Title Insurance Company
P.O. Box 45023
Jacksonville, Florida 32232-5023
Attn: Claims Department.

Form 74-OTIRO PL-05

Order No. 26-60393

## SCHEDULE A

| | | | |
|---|---|---|---|
| AMOUNT OF INSURANCE: | $125,000.00 | DATE OF POLICY:<br>At: | August 30, 2007<br>10:31 a.m. |
| PREMIUM: | $100.00 | POLICY NUMBER: | 26-60393 |

1.    **NAME OF INSURED:**

Donald L. Olson and Annette M. Olson, Trustees of the Olson Living Trust as to aun undivided 50% interest and Donald J. Valco, Trustee of the Donald J. Valco Trust utad 1/11/99 as to an undivided 50%

2.    **THE ESTATE OR INTEREST IN THE LAND THAT IS ENCUMBERED BY THE INSURED MORTGAGE IS:**

Fee.

3.    **TITLE IS VESTED IN:**

Daniel Charbonneau, an estate in fee simple

4.    **THE INSURED MORTGAGE AND ITS ASSIGNMENTS, IF ANY, ARE DESCRIBED AS FOLLOWS:**

Trust Deed, including the terms and provisions thereof, given to secure an indebtedness with interest thereon and such future advances as may be provided therein,

| | |
|---|---|
| Grantor: | Daniel Charbonneau |
| Trustee: | AmeriTitle |
| Beneficiary: | Donald L. Olson and Annette M. Olson, Trustees of the Olson Living Trust as to aun undivided 50% interest and Donald J. Valco, Trustee of the Donald J. Valco Trust utad 1/11/99 as to an undivided 50% |
| Amount: | $125,000.00 |
| Dated: | August 27, 2007 |
| Recorded: | August 30, 2007 |
| Instrument No.: | 2007-017096 |

in Josephine County, Oregon.

5.    **THE LAND REFERRED TO IN THIS POLICY IS DESCRIBED AS FOLLOWS:**

Lot 42, SEQUOIA VILLAGE, Phase 2, a Planned Community, Josephine County, Oregon.

Order No. 26-60393

## SCHEDULE B

## EXCEPTIONS FROM COVERAGE

Except as provided in Schedule B - Part II, this policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses that arise by reason of:

### PART I:

1.  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.  Facts, rights, interests or claims which are not shown by the Public Records but which could be ascertained by an inspection of the Land or by making inquiry of persons in possession thereof.

3.  Easements, or claims of easement, not shown by the Public Records; reservations or exceptions in patents or in Acts authorizing the issuance thereof; water rights, claims or title to water.

4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the subject Land.

5.  Any lien, or right to a lien, for services, labor, material, equipment rental or workers compensation heretofore or hereafter furnished, imposed by law and not shown by the Public Records.

6.  Taxes for the fiscal year 2007-2008, a lien in an amount to be determined, but not yet payable.

7.  Easement as reserved in Deed,
    For:                    Irrigation Purposes
    Reserved by:            Grants Pass Irrigation District
    Recorded:               January 26, 1938
    Volume:                 85      Page:  338 and 339
    in Josephine County, Oregon.

8.  An Easement created by instrument, including the terms and provisions thereof,
    In favor of:            The California Oregon Power Company
    For:                    Public Utilities
    Recorded:               August 18, 1953
    Volume:                 169     Page:  14
    in Josephine County, Oregon.

9.  "Sewer Service Agreement", including the terms and provisions thereof,
    Recorded:               January 28, 1981
    Instrument No.:         81-01357
    Amended:                March 17, 1981
    Instrument No.:         81-04315
    Records of Josephine County, Oregon.

Order No. 26-60393

10. "Covenants and Agreement for Waiver of Remonstrance", including the terms and provisions thereof,
   Recorded:                September 8, 1995
   Instrument No.:          95-15105
   Records of Josephine County, Oregon.

11. "Ordinance No. 5149" amending Advanced Financed District "N" Street for Public Water, Storm Drain
   and Street Improvements in "N" Street, including the terms and provisions thereof,
   Recorded:                September 6, 2002
   Instrument No.:          2002-018474
   Records of Josephine County, Oregon.

12. "Ordinance No. 4649" creating Advanced Financed District for the "N" Street and Storm Improvements,
   including the terms and provisions thereof,
   Recorded:                April 4, 2003
   Instrument No.:          2003-007852
   Records of Josephine County, Oregon.

13. "Ordinance No. 4649" creating Advanced Financed District for the "N" Street and Storm Improvements,
   including the terms and provisions thereof,
   Recorded:                April 4, 2003
   Instrument No.:          2003-007852
   Records of Josephine County, Oregon.

14. "Ordinance No. 5215" creating Advanced Financed District WA4366 for Water Improvements on "N"
   Street, including the terms and provisions thereof,
   Recorded:                March 1, 2004
   Instrument No.:          2004-004634
   Records of Josephine County, Oregon.

15. "Ordinance No. 5215" creating Advanced Financed District WA4366 for Storm Improvements on "N"
   Street, including the terms and provisions thereof,
   Recorded:                March 1, 2004
   Instrument No.:          2004-004636
   Records of Josephine County, Oregon.

16. "Ordinance No. 5215" creating Advanced Financed District WA4366 for Landscape Improvements on
   "N" Street, including the terms and provisions thereof,
   Recorded:                March 1, 2004
   Instrument No.:          2004-004637
   Records of Josephine County, Oregon.

Order No. 26-60393

17. Covenants, conditions and restrictions, but omitting covenants or restrictions, if any, based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law, imposed by instrument, including the terms and provisions thereof,
Recorded:                          January 18, 2007
Instrument No.:                    2007-001110
in Josephine County, Oregon.

Said covenants, conditions and restrictions contain among other things provisions for levies and assessments of the Sequoia Village Homeowners' Association Home Owner's Association.

"Declaration of Annexation of Phase 2 of Sequoia Village", including the terms and provisions thereof,
Recorded:                          April 20, 2007
Instrument No.:                    2007-007885
Records of Josephine County, Oregon.

18. Party Wall Agreement, including the terms and provisions thereof,
Recorded:                          January 18, 2007
Instrument No.:                    2007-001110
in Josephine County, Oregon.

19. The by-laws, including the terms and provisions thereof, of SEQUOIA VILLAGE, Phases 1 through 4, a Planned Community, In Grants Pass, Oregon,
Recorded:                          April 27, 2007
Instrument No.:                    2007-008367
in Josephine County, Oregon.

20. Easement as delineated or dedicated on the recorded plat,
For:                               Reciprocal Access/Maintenance and City Utilities

21. The by-laws, including the terms and provisions thereof, of SEQUOIA VILLAGE, Phases 1 through 4, a Planned Community, In Grants Pass, Oregon,
Recorded:                          April 27, 2007
Instrument No.:                    2007-008367
in Josephine County, Oregon.

## PART II:

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:

a.    NONE

## END OF EXCEPTIONS

American Land Title Association
ALTA Loan Policy (6-17-2006)

Oregon Title Insurance Rating Organization (OTIRO)
OTIRO No. PL-05
Policy No. 26-60393

 **Ticor Title Insurance Company**

---

### LOAN POLICY OF TITLE INSURANCE
#### Issued by
#### TICOR TITLE INSURANCE COMPANY

**Any notice of claim and any other notice or statement in writing required to be given to the Company under this Policy must be given to the Company at the address shown in Section 17 of the Conditions.**

#### COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, TICOR TITLE INSURANCE COMPANY, a California corporation (the "Company") insures, as of Date of Policy and, to the extent stated in Covered Risks 11,13 and 14, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1.  Title being vested other than as stated in Schedule A.

2.  Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from

    (a)  A defect in the Title caused by

        (i)   forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;

        (ii)  failure of any person or Entity to have authorized a transfer or conveyance;

        (iii) a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;

        (iv)  failure to perform those acts necessary to create a document by electronic means authorized by law;

        (v)   a document executed under a falsified, expired, or otherwise invalid power of attorney;

        (vi)  a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or

        (vii) a defective judicial or administrative proceeding.

    (b)  The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.

    (c)  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.

3.  Unmarketable Title.

4.  No right of access to and from the Land.

5.  The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

    (a)  the occupancy, use, or enjoyment of the Land;

    (b)  the character, dimensions, or location of any improvement erected on the Land;

    (c)  the subdivision of land; or

    (d)  environmental protection

    if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.

6.  An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.

7.  The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.

**PLAINTIFF'S EXHIBIT**

4

PENGAD 800-631-6989

American Land Title Association Oregon Title Insurance Rating Organization (OTIRO)
ALTA Loan Policy OTIRO No. PL-05
6-17-2006

Form 74-OTIRO PL-05

8.  Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.

9.  The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title. This Covered Risk includes but is not limited to insurance against loss from any of the following impairing the lien of the Insured Mortgage:

    (a)  forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;

    (b)  failure of any person or Entity to have authorized a transfer or conveyance;

    (c)  the Insured Mortgage not being properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;

    (d)  failure to perform those acts necessary to create a document by electronic means authorized by law;

    (e)  a document executed under a falsified, expired, or otherwise invalid power of attorney;

    (f)  a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or

    (g)  a defective judicial or administrative proceeding.

10.  The lack of priority of the lien of the Insured Mortgage upon the Title over any other lien or encumbrance.

11.  The lack of priority of the lien of the Insured Mortgage upon the Title

    (a)  as security for each and every advance of proceeds of the loan secured by the Insured Mortgage over any statutory lien for services, labor, or material arising from construction of an improvement or work related to the Land when the improvement or work is either

        (i)  contracted for or commenced on or before Date of Policy; or

        (ii)  contracted for, commenced, or continued after Date of Policy if the construction is financed, in whole or in part, by proceeds of the loan secured by the Insured Mortgage that the Insured has advanced or is obligated on Date of Policy to advance; and

    (b)  over the lien of any assessments for street improvements under construction or completed at Date of Policy.

12.  The invalidity or unenforceability of any assignment of the Insured Mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the Insured Mortgage in the named Insured assignee free and clear of all liens.

13.  The invalidity, unenforceability, lack of priority, or avoidance of the lien of the Insured Mortgage upon the Title

    (a)  resulting from the avoidance in whole or in part, or from a court order providing an alternative remedy, of any transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction crating the lien of the Insured Mortgage because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws; or

    (b)  because the Insured Mortgage constitutes a preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws by reason of the failure of its recording in the Public Records

        (i)  to be timely, or

        (ii)  to impart notice of its existence to a purchaser for value or to a judgment or lien creditor.

14.  Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 13 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the Insured Mortgage in the Public Records.

The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by this Policy, but only to the extent provided in the Conditions.

Countersigned:

Issued By:
Ticor Title
744 NE 7th St.
P.O. Box 1960
Grants Pass, OR  97528-0166

**TICOR TITLE INSURANCE COMPANY**

By _____
                                        President

Attest _____
                                        Secretary

BY: _____
Authorized Signatory

American Land Title Association Oregon Title Insurance Rating Organization (OTIRO)
ALTA Loan Policy OTIRO No. PL-05
6-17-2006
Form 74-OTIRO PL-05

# EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

    (i)   the occupancy, use, or enjoyment of the Land;

    (ii)  the character, dimensions, or location of any improvement erected on the Land;

    (iii) the subdivision of land; or

    (iv)  environmental protection;

    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.  Defects, liens, encumbrances, adverse claims, or other matters

    (a) created, suffered, assumed, or agreed to by the Insured Claimant;

    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

    (c) resulting in no loss or damage to the Insured Claimant;

    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or

    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5.  Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is

    (a) a fraudulent conveyance or fraudulent transfer: or

    (b) a preferential transfer for any reason not stated in Covered Risk 13(a) of this policy.

7.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

## CONDITIONS

**1.  DEFINITION OF TERMS**
The following terms when used in this policy mean:

(a) "Amount of Insurance": The amount stated in Schedule A, as may be increased or decreased by endorsement to this policy, increased by Section 8(b), or decreased by Sections 10 of these Conditions.

(b) "Date of Policy": The date designated as "Date of Policy" in Schedule A.

(c) "Entity": A corporation, partnership, trust, limited liability company, or other similar legal entity.

(d) "Indebtedness": The obligation secured by the Insured Mortgage including one evidenced by electronic means authorized by law, and if that obligation is the payment of a debt, the Indebtedness is the sum of

(i)   the amount of the principal disbursed as of Date of Policy;

(ii) the amount of the principal disbursed subsequent to Date of Policy;

(iii) the construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the Land or related to the Land that the Insured was and continued to be obligated to advance at Date of Policy and at the date of the advance;

(iv) interest on the loan;

(v) the prepayment premiums, exit fees, and other similar fees or penalties allowed by law;

(vi) the expenses of foreclosure and any other costs of enforcement;

(vii) the amount advanced to assure compliance with laws or to protect the lien or the priority of the lien of the Insured Mortgage before the acquisition of the estate or interest in the Title;

(viii) the amounts to pay taxes and insurance; and

(ix) the reasonable amounts expended to prevent deterioration of improvements;

but the Indebtedness is reduced by the total of all payments and by any amount forgiven by an Insured.

(e) "Insured": The Insured named in Schedule A.

(i) The term "Insured" also includes

(A) the owner of the Indebtedness and each successor in ownership of the Indebtedness, whether the owner or successor owns the Indebtedness for its own account or as a trustee or other fiduciary, except a successor who is an obligor under the provisions of Section 12(c) of these Conditions;

(B) the person or Entity who has "control" of the "transferable record," if the Indebtedness is evidenced by a "transferable record," as these terms are defined by applicable electronic transactions law;

(C) successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization;

(D) successors to an Insured by its conversion to another kind of Entity;

(E) a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title

(1) if the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,

(2) if the grantee wholly owns the named Insured, or

(3) if the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity;

(F) any government agency or instrumentality that is an insurer or guarantor under an insurance contract or guaranty insuring or guaranteeing the Indebtedness secured by the Insured Mortgage, or any part of it, whether named as an Insured or not;

(ii) With regard to (A), (B), (C), (D), and (E) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured, unless the successor acquired the Indebtedness as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, or other matter insured against by this policy.

(f) "Insured Claimant": An Insured claiming loss or damage.

(g) "Insured Mortgage": The Mortgage described in paragraph 4 of Schedule A.

(h) "Knowledge" or "Known": Actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.

(i) "Land": The land described in Schedule A, and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting sheets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is insured by this policy.

(j) "Mortgage": Mortgage, deed of trust, trust deed, or other security instrument, including one evidenced by electronic means authorized by law.

(k) "Public Records": Records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.

(l) "Title": The estate or interest described in Schedule A

(m) "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title or a prospective purchaser of the Insured Mortgage to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring the delivery of marketable title.

## 2. CONTINUATION OF INSURANCE

The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured after acquisition of the Title by an Insured or after conveyance by an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land; or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

## 3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT

The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured of any claim of title or interest that is adverse to the Title or the lien of the Insured Mortgage, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title or the lien of the Insured Mortgage, as insured, is rejected as Unmarketable Title. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.

## 4. PROOF OF LOSS

In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance, or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

## 5. DEFENSE AND PROSECUTION OF ACTIONS

(a) Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action. It shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

(b) The Company shall have the right, in addition to the options contained in Section 7 of these Conditions, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title or the lien of the Insured Mortgage, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If the Company exercises its rights under this subsection, it must do so diligently.

Form 74-OTIRO PL-05

(c)    Whenever the Company brings an action or a. ; a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves the right, in its sole discretion, to appeal any adverse judgment or order.

## 6. DUTY OF INSURED CLAIMANT TO COOPERATE

(a)    In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title, the lien of the Insured Mortgage, or any other matter as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(b)    The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage. All information designated as confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured Claimant to submit for examination under oath, produce any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

## 7. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY

In case of a claim under this policy, the Company shall have the following additional options:

(a)    To Pay or Tender Payment of the Amount of Insurance or to Purchase the Indebtedness.

(i)    To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

(ii)    To purchase the Indebtedness for the amount of the Indebtedness on the date of purchase, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of purchase and that the Company is obligated to pay; or

When the Company purchases the Indebtedness, the Insured shall transfer, assign, and convey to the Company the Indepbedness and the Insured Mortgage, together with any collateral security.

Upon the exercise by the Company of either of the options provided for in subsections (a)(i) or (ii), all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in those subsections, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b)    To Pay or Otherwise Settle With Parties Other Than the Insured or With the Insured Claimant.

(i)    To pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy. In addition, the Company will pay any costs, attorneys' fees, and expenses incurred

by the Ins... d Claimant that were authorized by the Company up to the time of p... ent and that the Company is obligated to pay; or

(ii)    To pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

When the Company purchases the Indebtedness, the Insured shall transfer, assign, and convey to the Company the Indebtedness and the Insured Mortgage, together with any collateral security.

Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

## 8. DETERMINATION AND EXTENT OF LIABILITY

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a)    The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

(i)    the Amount of Insurance;

(ii)    the Indebtedness;

(iii)    the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

(iv)    if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

(b)    If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured,

(i)    the Amount of Insurance shall be increased by 10%, and

(ii)    the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(c)    In the event the Insured has acquired the Title in the manner described in Section 2 of these Conditions or has conveyed the Title, then the extent of liability of the Company shall continue as set forth in Section 8(a) of these Conditions.

(d)    In addition to the extent of liability under (a), (b), and (c), the Company will also pay those costs, attorneys' fees, and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

## 9. LIMITATION OF LIABILITY

(a)    If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, or cures the claim of Unmarketable Title, or establishes the lien of the Insured Mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

(b)    In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title or to the lien of the Insured Mortgage, as insured.

(c)    The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

## 10. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY

(a) All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Amount of Insurance by the amount of the payment. However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Amount of Insurance afforded under this policy except to the extent that the payments reduce the Indebtedness.

(b) The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company except as provided in Section 2 of these Conditions.

## 11. PAYMENT OF LOSS

When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within 30 days.

## 12. RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT

(a) The Company's Right to Recover

Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title or Insured Mortgage and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees, and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise, or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.

If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.

(b) The Insured's Rights and Limitations

(i) The owner of the Indebtedness may release or substitute the personal liability of any debtor or guarantor, extend or otherwise modify the terms of payment, release a portion of the Title from the lien of the Insured Mortgage, or release any collateral security for the Indebtedness, if it does not affect the enforceability or priority of the lien of the Insured Mortgage.

(ii) If the Insured exercises a right provided in (b)(i), but has Knowledge of any claim adverse to the Title or the lien of the Insured Mortgage insured against by this policy, the Company shall be required to pay only that part of any losses insured against by this policy that shall exceed the amount, if any, lost to the Company by reason of the impairment by the Insured Claimant of the Company's right of subrogation.

(c) The Company's Rights Against Noninsured Obligors

The Company's right of subrogation includes the Insured's rights against non-insured obligors including the rights of the Insured to indemnities, guaranties, other policies of insurance, or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

The Company's right of subrogation shall not be avoided by acquisition of the Insured Mortgage by an obligor (except an obligor described in Section 1(e)(i)(F) of these Conditions) who acquires the Insured Mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond, and the obligor will not be an Insured under this policy.

## 13. ARBITRATION

Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured. All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

14. **LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT**

(a) This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage that arises out of the status of the Title or lien of the Insured Mortgage or by any action asserting such claim shall be restricted to this policy.

(c) Any amendment of or endorsement to this policy must be in writing and authenticated by an authorized person, or expressly incorporated by Schedule A of this policy.

(d) Each endorsement to this policy issued at any time is made a part of this policy and is subject to all of its terms and provisions. Except as the endorsement expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsement, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.

## 15. SEVERABILITY

In the event any provision of this policy, in whole or in part, is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision or such part held to be invalid, but all other provisions shall remain in full force and effect.

## 16. CHOICE OF LAW; FORUM

(a) Choice of Law: The Insured acknowledges the Company has underwritten the risks covered by this policy and determined the premium charged therefor in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies, or enforcement of policies of title insurance of the jurisdiction where the Land is located.

Therefore, the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title or the lien of the Insured Mortgage that are adverse to the Insured and to interpret and enforce the terms of this policy. In neither case shall the court or arbitrator apply its conflicts of law principles to determine the applicable law.

(b) Choice of Forum: Any litigation or other proceeding brought by the Insured against the Company must be filed only in a state or federal court within the United States of America or its territories having appropriate jurisdiction.

## 17. NOTICES, WHERE SENT

Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at

Ticor Title Insurance Company
P.O. Box 45023
Jacksonville, Florida 32232-5023
Attn: Claims Department.

Form 74-OTIRO PL-05

Order No. 26-64437

# SCHEDULE A

| | |
|---|---|
| AMOUNT OF INSURANCE: $175,000.00 | DATE OF POLICY: November 19, 2008<br>At: 03:42 pm |
| PREMIUM: $415.00 | POLICY NUMBER: 26-64437 |

1.  **NAME OF INSURED:**

    Donald L. Olson and Annette M. Olson, Trustees of the Olson Living Trust  its successors and assigns as may be included within the definition of insured in Section 1 (a).

2.  **THE ESTATE OR INTEREST IN THE LAND THAT IS ENCUMBERED BY THE INSURED MORTGAGE IS:**

    Fee.

3.  **TITLE IS VESTED IN:**

    Charbonneau Properties, LLC, an Oregon Limited Liability Company

4.  **THE INSURED MORTGAGE AND ITS ASSIGNMENTS, IF ANY, ARE DESCRIBED AS FOLLOWS:**

    Trust Deed, including the terms and provisions thereof, given to secure an indebtedness with interest thereon and such future advances as may be provided therein,

    | | |
    |---|---|
    | Grantor: | Charbonneau Properties, LLC an Oregon Limited Liability |
    | Trustee: | Amerititle, an Oregon Corporation |
    | Beneficiary: | Donald L. Olson and Annette M. Olson, Trustees of the Olson Living Trust |
    | Amount: | $175,000.00 |
    | Dated: | November 18, 2008 |
    | Recorded: | November 19, 2008 |
    | Instrument No.: | 2008-017530 |

    in Josephine County, Oregon.

5.  **THE LAND REFERRED TO IN THIS POLICY IS DESCRIBED AS FOLLOWS:**

    Lot 47, SEQUOIA VILLAGE, Phase 2, a Planned Community, Josephine County, Oregon.

Order No. 26-64437

## SCHEDULE B

## EXCEPTIONS FROM COVERAGE

Except as provided in Schedule B - Part II, this policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses that arise by reason of:

### PART I:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2. Facts, rights, interests or claims which are not shown by the Public Records but which could be ascertained by an inspection of the Land or by making inquiry of persons in possession thereof.

3. Easements, or claims of easement, not shown by the Public Records; reservations or exceptions in patents or in Acts authorizing the issuance thereof; water rights, claims or title to water.

4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the subject Land.

5. Any lien, or right to a lien, for services, labor, material, equipment rental or workers compensation heretofore or hereafter furnished, imposed by law and not shown by the Public Records.

6. Easement as reserved in Deed,
   For:                     Irrigation Purposes
   Reserved by:             Grants Pass Irrigation District
   Recorded:                January 26, 1938
   Volume:                  85      Page:  338 and 339
   in Josephine County, Oregon.

7. An Easement created by instrument, including the terms and provisions thereof,
   In favor of:             The California Oregon Power Company
   For:                     Public Utilities
   Recorded:                August 18, 1953
   Volume:                  169    Page:  14
   in Josephine County, Oregon.

8. "Covenants and Agreement for Waiver of Remonstrance", including the terms and provisions thereof,
   Recorded:                September 8, 1995
   Instrument No.:          95-15105
   Records of Josephine County, Oregon.

Order No. 26-64437

9. "Ordinance No. 5149" amending Advanced Financed District "N" Street for Public Water, Storm Drain and Street Improvements in "N" Street, including the terms and provisions thereof,
   Recorded:                     September 6, 2002
   Instrument No.:               2002-018474
   Records of Josephine County, Oregon.

10. "Ordinance No. 4649" creating Advanced Financed District for the "N" Street and Storm Improvements, including the terms and provisions thereof,
   Recorded:                     April 4, 2003
   Instrument No.:               2003-007852
   Records of Josephine County, Oregon.

11. "Ordinance No. 4649" creating Advanced Financed District for the "N" Street and Storm Improvements, including the terms and provisions thereof,
   Recorded:                     April 4, 2003
   Instrument No.:               2003-007852
   Records of Josephine County, Oregon.

12. "Ordinance No. 5215" creating Advanced Financed District WA4366 for Water Improvements on "N" Street, including the terms and provisions thereof,
   Recorded:                     March 1, 2004
   Instrument No.:               2004-004634
   Records of Josephine County, Oregon.

13. "Ordinance No. 5215" creating Advanced Financed District WA4366 for Storm Improvements on "N" Street, including the terms and provisions thereof,
   Recorded:                     March 1, 2004
   Instrument No.:               2004-004636
   Records of Josephine County, Oregon.

14. "Ordinance No. 5215" creating Advanced Financed District WA4366 for Landscape Improvements on "N" Street, including the terms and provisions thereof,
   Recorded:                     March 1, 2004
   Instrument No.:               2004-004637
   Records of Josephine County, Oregon.

15. "Developer Installed Agreement for Public Improvements", including the terms and provisions thereof,
   Recorded:                     April 21, 2006
   Instrument No.:               2006-008359
   Records of Josephine County, Oregon.

16. "Temporary Easement" for installation of utilities, including the terms and provisions thereof,
   Recorded:                     October 20, 2006
   Instrument No.:               2006-021040
   Records of Josephine County, Oregon.

Order No. 26-64437

17. Easement as delineated or dedicated on the recorded plat,
   For:                              Storm Drain, Water Line and Access
   Affects:                          as set forth on Sequoia Village Phase 1

18. Covenants, conditions and restrictions, but omitting covenants or restrictions, if any, based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law, imposed by instrument, including the terms and provisions thereof,
   Recorded:                         January 18, 2007
   Instrument No.:                   2007-001110
   in Josephine County, Oregon.

   Said covenants, conditions and restrictions contain among other things provisions for levies and assessments of the Sequoia Village Homeowners' Association Home Owner's Association.

   "Declaration of Annexation of Phase 2 of Sequoia Village", including the terms and provisions thereof,
   Recorded:                         April 20, 2007
   Instrument No.:                   2007-007885
   Records of Josephine County, Oregon.

19. Party Wall Agreement, including the terms and provisions thereof,
   Recorded:                         January 18, 2007
   Instrument No.:                   2007-001110
   in Josephine County, Oregon.

20. Easement as delineated or dedicated on the recorded plat,
   For:                              Reciprocal Access/Maintenance and City Utilities

21. The by-laws, including the terms and provisions thereof, of SEQUOIA VILLAGE, Phases 1 through 4, a Planned Community, In Grants Pass, Oregon,
   Recorded:                         April 27, 2007
   Instrument No.:                   2007-008367
   in Josephine County, Oregon.

## PART II:

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:

a.    NONE

## END OF EXCEPTIONS

American Land Title Association
ALTA Loan Policy (6-17-2006)

Oregon Title Insurance Rating Organization (OTIRO)
OTIRO No. PL-05
Policy No. 26-64437



SDC (ORGINAL ORDINANCE)

ORDINANCE NO. 4708

AN ORDINANCE REPEALING SECTION 8.08.030 OF THE GRANTS PASS
MUNICIPAL CODE, AND CREATING CHAPTER 8.09 PERTAINING TO SYSTEM
DEVELOPMENT CHARGES FOR UTILITY SERVICE.

WHEREAS:

1.  The 1989 session of the Oregon Legislature has enacted
    legislation establishing standards for the development
    of System Development Charges; and

2.  The existing system connection fees for the City of
    Grants Pass qualify as System Development Charges under
    the terms of the statute; and

3.  The Legislature has dictated the terms and conditions
    under which System Development Charges may be levied
    and collected; and

4.  The capacity of the water and wastewater systems of the
    City of Grants Pass have been constructed by existing
    system users for the benefit of future growth, and the
    new connections to the system should share the costs
    equitably and rationally.

NOW, THEREFORE, THE CITY OF GRANTS PASS HEREBY ORDAINS:

    Section 1.   Section 8.08.030 of the Municipal Code of the
City of Grants Pass is repealed.

    Section 2.   Chapter 8.09 is created to read as follows:

Chapter 8.09

SYSTEM DEVELOPMENT CHARGES

Sections:

    8.09.010   Definitions
    8.09.020   Purpose
    8.09.030   Scope
    8.09.040   Systems Development Charge Established
    8.09.050   Methodology
    8.09.060   Compliance with State Law
    8.09.070   Collection of Charge
    8.09.080   Credits
    8.09.090   Appeal Procedures
    8.09.100   Prohibited Connection
    8.09.110   Enforcement

PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
5

8.09.010 Definitions.  The following words and phrases, as used in chapter 8.09 of the Grants Pass Municipal code shall have the following definitions and meanings:

A.   Capital Improvements.  Public facilities or assets used for the following:

   1.  Water supply, treatment, storage or major transmission as identified in the adopted masterplan for the water utility.

   2.  Sanitary sewerage treatment capacity, interceptor sewers, transmission and pumping facilities as identified in the masterplan for the wastewater utility.

B.   Development.  The construction, alteration or enlargement of a building or existing use, the addition of facilities or making a physical change in the use of a structure or land which alters the usage of any capital improvements or which will contribute to the need for additional capital or enlarged improvements to the utility system.

C.   Qualified Public Improvement.  That portion of a required capital improvement that is beyond the facilities necessary to serve the development and in excess of the minimum development standards; and is identified in the adopted masterplan of the water or wastewater utility.  Improvements required to serve a development of land as identified in the Development Code of the City of Grants Pass and required from the developer prior to the completion of a development are not included in the definition of this term to the extent such improvements are sized or established to meet the needs created by a development.

D.   Reimbursement Fee.  A fee for costs associated with the capital improvements constructed or under construction on the date the fee is adopted in accord with this ordinance.

E.   Systems Development Charge.  A reimbursement fee assessed or collected at any of the times specified in Section 8.09.070.  It shall not include new service installation fees as defined in 8.08.020, since such fees are designed by the City only to reimburse the City for the costs for such connections.  Nor shall the System Development Charge include costs for capital improvements which by City policy, the development code, or state statute, are paid by assessments or fees in lieu of assessments for projects of special benefit to a property.  Advance financing fees collected for prior construction of specific improvements are similarly not included in this definition.

8.09.020 Purpose.  The purpose of the systems development charge is to reimburse the rate payers for the capacity of systems developed to serve the growth of the community and to impose an equitable share of the public costs of capital improvements upon

A.  The systems development charge is payable upon, and as a condition of, issuance of:
   1.  A building, plumbing, or a development permit for a development as defined in this chapter.
   2.  A permit or other authorization to connect to the water or sanitary sewer system.

B.  If development is commenced or connection is made to the water system or sanitary sewer system without an appropriate permit or authorization, the systems development charge is immediately payable upon the earliest date that a permit was required, and it will be unlawful for anyone to continue with the construction or use constituting a development until the charge has been paid.  Penalties applied for commencing or connecting shall be as described here, and as further identified in section 8.09.110 of this code.

C.  Any and all persons causing a development or making application for a permit, or otherwise responsible for the development, are jointly and severally obligated to pay the charge, and the City Manager may collect the charges from any individual, partnership, corporation, or person involved with the development.  The City Manager shall not allow any connection to the water or wastewater system until all charges described in this section, together with all other applicable fees and charges described in this code, shall have been paid in full.

D.  All system development charges shall be paid in full when due or in accord with the provisions of ORS 223.208 when local improvements districts have been formed.

8.09.080  Credits.  As required by statute, the City of Grants Pass shall allow credits against system development charges for the construction of qualified public improvements to the following extent:

A.  When development occurs on a parcel previously connected to municipal utilities that gives rise to a system development charge, the charge applicable to the existing use shall be calculated.  If the charge is than the system development charge for the proposed use, the difference between the system development charge for the existing use and the system development charge for the proposed use shall be the charge required of the development.  If the change in use results in a charge for the proposed use being less than the system development charge for the existing use, no system development charge shall be required; however, no refund or credit shall be given.

B.  A credit shall be given for the cost of a qualified

public improvement associated with the development.  If a qualified public improvement is located partially on and partially off the parcel of land that is the subject of the approval, or if the improvement is contained within the parcel but sized to serve areas exterior to the subject development, the credit shall be given only for the cost of the portion of the improvement not attributable wholly to the development.

C.  Applying the methodology adopted by resolution, the City shall grant a credit for a capital improvement constructed as part of the development that reduces the development's demand upon existing capital improvements or the need for replacement of existing capacities.  All such facilities must be identified on the masterplan applicable to the utility identified for construction.

D.  In situations where the amount of credit exceeds the amount of the system development charge, the excess credit is not transferable to another development.  It may be transferred to another phase of the original development plan submitted, providing such phased development is contiguous to the development for which credits are granted, an is a continuation of the scope of the project originally filed by the developer with the city.

E.  Credit shall not be transferable from one type of capital improvement to another, all water related credits may be utilized exclusively for water related  charges and all sanitary sewer credits exclusively for sanitary sewer.

8.09.090  Appeal Procedures.  In accord with the statutory requirements for appeal procedures, the following will be the process for the City of Grants Pass:

A.  A person aggrieved by a decision required or permitted to be made by the City Manager or designee under this code, or a person challenging the propriety of an expenditure of systems development charge revenues may appeal the decision or expenditure by filing a written appeal with the Finance Officer of the City for consideration by the Council.  Such appeal shall describe with particularity the decision or the expenditure from which the person appeals and shall include all information required in this section.

B.  An appeal of an expenditure must be filed within two years of the date of the alleged improper expenditure. Appeals of any other decision must be filed within 10 working days of the date of the decision.

C.  The appeal shall state:
    1.  The name and address of the appellant;
    2.  The nature of the determination being appealed;
    3.  The reason the determination is challenged;

the developments that create the need or consume provided
capacity.

8.09.030 Scope.  The systems development charge imposed by this
chapter is separate from and in addition to any applicable tax,
assessment, charge, fee in lieu of assessment, or fee otherwise
provided by contract or law imposed as a condition of
development.  A systems development charge is to be considered in
the nature of a charge for service rendered or facility capacity
consumed which has been previously provided for by the taxpayers
and ratepayers of the utility systems.  Proceeds from the fees
shall be utilized exclusively to provide system capacity to
replace that consumed, or to extinguish existing debt incurred to
provide capacity.

8.09.040 Systems Development Charge Established.  A systems
development charge is hereby imposed upon all development within
the City and all development outside the boundary of the city
that connects to or otherwise uses the sanitary sewer system, or
water system of the City.  The City Manager is authorized to make
interpretations of this chapter, subject to appeal to the City
Council.  Charges shall be established by resolution in accord
with section 8.42, and applicable subsections, of this code and
in accord with the methodologies identified in section 8.09.050
of this code.

8.09.050 Methodology.  The methodology used to establish system
development charges shall be to consider the cost of the existing
facilities, prior contributions by rate payers and tax payers,
the value of unused capacity, rate-making principles employed to
finance publicly owned capital improvements, and other factors
related to the cost of providing the utility capacity.  The
methodology shall promote the objective that future systems users
shall contribute an equitable share of the cost of existing
facilities, and contribute to the eventual replacement of
capacities consumed to provide service.  Method of adoption and
the features of adopted methodologies shall include:

A.  Specific methodological approaches shall be established
by resolution, and shall include a provision for a credit to
the reimbursement fee for qualified public improvements
constructed by the developer.

B.  Fees required as a portion of a local improvement
district, a charge in lieu of a local improvement district
assessment, or the cost of complying with requirements or
conditions imposed by a land use decision are separate from
and in addition to the systems development charge and shall
not be used as a credit against such charge.

C.  The formulas and calculations used to compute specific
systems development charges shall be based upon a computed
consumption of system capacity and typical conditions and
relationships between classes of users of the systems

capacity.  Whenever the impact of individual developments present special or unique situations such that the calculated fee is disproportionate to the actual impact of the development, alternate fee calculations may be approved or required of the developer by the City Manager.  The burden to establish special and unique circumstances as defined in this section shall be solely the responsibility of the developer.  "Special and unique" shall mean circumstances which are beyond those described in the resolution adopted by the council establishing the fees and methodology, to an extent not less than 25% of the capacity consumption calculations of the adopted methodology.  All data submitted to support alternate calculations under this provision shall be site specific.  Major or unique developments may require special analyses to determine alternatives to the standard methodology.  When such analysis is required, the developer shall be solely responsible for calculating and submitting the anticipated system charges, utilizing the methodology adopted for the affected utility.

D.  The City Manager shall annually review all fees established by this chapter, and shall review methodologies not less than once each three years.  To the extent these reviews warrant changes, the manager shall recommend such change to the City Council.

E.  When a written appeal is filed challenging the methodology adopted by the Council, the City Manager shall prepare a written report and recommendation within twenty (20) working days of receipt for presentation to the Council within fifty (50) days of the the receipt of the appeal.  The Council shall by resolution, approve, modify or reject the report and recommendation of the City Manager, or may adopt a revised methodology by resolution.  Any legal action contesting the City Council decision in the appeal shall be filed within sixty (60) days of the Council decision.  For appeals of other than methodology, see 8.09.090.

8.09.060 Compliance with State Law.  All revenues received from the systems development charges shall be budgeted and expended as provided by state law, and shall be exclusively for the benefit of the utility for which the fees are collected.  Such revenues and expenditures shall be for provision of system capacity, inclusive of administrative, engineering, and similar costs defined by state law, or the payment of current or future debt, and shall be accounted for as required by state law. Financial reporting shall be included in the City Comprehensive Annual Financial Report.

8.09.070  Collection of System Development Charges.  The collection of system development charges shall be in accord with the following:

  4. The remedy sought by the appellant; and
  5. The specifics of the situation under consideration.
  6. The date of the determination or expenditure.
An appellant who fails to file such a statement within the
time permitted waives rights to objections, and the appeal
shall be automatically dismissed.

D. Unless the appellant and the City agree in writing to a
longer period, an appeal shall be heard within thirty (30)
days of the receipt of the written appeal. At least 10
working days prior to the hearing, the City shall mail
notice of the time and location thereof to the appellant.

E. The City Council shall hear and determine the appeal on
the basis of the appellant's written statement and any
additional evidence submitted at the hearing. At the
hearing, the appellant may present testimony and oral
argument personally or by counsel. The City may present
written or oral testimony at this same hearing. The rules
of evidence as used by courts of law do not apply.

F. The appellant shall carry the burden of proving that the
determination being appealed is incorrect and what the
correct determination should be, of that the expenditure was
improper.

G. The City Council shall render its decision within 15
days after the hearing date and the decision of the Council
shall be final. The decision shall be in writing but
written findings shall not be made or required unless the
Council elects to make findings for presidential purposes.
Any legal action contesting the Council decision on the
appeal shall be filed within 60 days of the Council
decision.

Appeals of methodology are determined in the manner described in
section 8.09.050.

8.09.100 Prohibited Connection. From and after the effective
date of this ordinance, no person may connect any premises for
service, or cause the same to be connected, to any sanitary sewer
or portion of the water system unless the appropriate system
development charge has been paid and all other provisions
governing the payment of fees and charges have been met.

8.09.110 Enforcement and Penalties. Any service connected to
the City water or sanitary sewer system after the effective date
of this ordinance for which a fee is due hereunder and has not
paid said fee, shall be subject to immediate termination of
service, reimbursement of all costs incurred by the city
associated with the identification, termination, reconnection,
and compliance requirements, and a fee of $250.00 per day for
each day of violation. These costs shall be penalties, and shall
be levied in addition to any fees or charges incurred through the

prosecution of the unlawful act of connecting to the utility system.

Section 3.  This ordinance shall become effective at the time prescribed by charter after the reading and consideration of this ordinance as prescribed.

ADOPTED by the Council of the City of Grants Pass, Oregon, in regular session, this _12th_ day of _July_, 1991.

SUBMITTED to and _approved_ by the Mayor of the City of Grants Pass, Oregon, this _12th_ day of _July_, 1991.

_____
Mayor

ATTEST:

_____
Finance Director

ord102

City of Grants Pass Municipal Code

## Title 3

## SYSTEM DEVELOPMENT CHARGES

### Chapters:

| | |
|---|---|
| 3.10 | System Development Charges |
| 3.11 | Water System Development Charges |
| 3.20 | Sewer System Development Charges |
| 3.30 | Transportation System Development Charges |
| 3.40 | Parks System Development Charges |
| 3.45 | Park Development System Development Charge |
| 3.50 | Storm Water and Open Space System Development Charges |

This Chapter has been created by Ord. 4708 §2, 1991.  This Chapter has been amended by Ord. 5101 §1, 2002 (changing numbering system from Title 8 to Title 3), Ord. 5196, 2003, Ord. 5214, 2004 Ord. 5236, 2004 Ord. 5289, 2005, Ord. 5389, 2006, Ord. 5511, 2010, Ord. 15-5634, 2015.

PLAINTIFF'S
EXHIBIT
6

PENGAD 800-631-6989

# City of Grants Pass Municipal Code

## Chapter 3.10

### SYSTEM DEVELOPMENT CHARGES

Sections:

| | |
|---|---|
| 3.10.010 | Definitions. |
| 3.10.020 | Purpose. |
| 3.10.030 | Scope. |
| 3.10.040 | System Development Charges Established |
| 3.10.050 | Methodology. |
| 3.10.060 | Compliance with State Law. |
| 3.10.070 | Collection of System Development Charges.  (Ord. 5007 §1, 2000) |
| 3.10.080 | Credits. |
| 3.10.090 | Appeal Procedures. |
| 3.10.100 | Prohibited Connection. |
| 3.10.110 | Enforcement. |
| 3.10.200 | Annual Cost of Living Adjustments for System Development Charges. |

This Chapter has been amended by Ord. 5101, 2002; Res. 4805, 2004; Res. 4917, 2005; Ord 5389 12/06/06; Ord 5511 3/3/10).

# City of Grants Pass Municipal Code

3.10.010  Definitions.

The following words and phrases, as used in Chapter 3.10 of the Grants Pass Municipal Code shall have the following definitions and meanings.

A.    Capital Improvements.  Public facilities or assets used for the following:

  1.    Water supply, treatment, storage, or major transmission as identified in the adopted master plan for the water utility.

  2.    Sanitary sewerage treatment capacity, interceptor sewers, transmission and pumping facilities as identified in the master plan for the wastewater utility.

B.    Development.  The construction, alteration or enlargement of a building or existing use, the addition of facilities or making a physical change in the use of a structure or land which alters the usage of any capital improvements or which will contribute to the need for additional capital or enlarged improvements to the utility system.

C.    Qualified Public Improvement.  That portion of a required capital improvement that is beyond the facilities necessary to serve the development and in excess of the minimum development standards and is identified in the adopted master plan of the water or wastewater utility.  Improvements required to serve a development of land as identified in the Development Code of the City of Grants Pass and required from the developer prior to the completion of a development are not included in the definition of this term to the extent such improvements are sized or established to meet the needs created by a development.

D.    Reimbursement Fee.  A fee for costs associated with the capital improvements constructed or under construction on the date the fee is adopted in accord with this ordinance.

E.    System Development Charges.  A reimbursement fee assessed or collected at any of the times specified in Section 3.10.070.  It shall not include new service installation fees as defined in Section 8.08.020, since such fees are designed by the City only to reimburse the City for the costs for such connections.  Nor shall the System Development Charges include costs for capital improvements, which by City policy the Development Code or State Statute are paid by assessments or fees in lieu of assessments for projects of special benefit to a property.  Advance financing fees collected for prior construction of specific improvements are similarly not included in this definition.

City of Grants Pass Municipal Code

3.10.020  Purpose.

The purpose of the System Development Charges is to reimburse the rate payers for the capacity of systems developed to serve the growth of the community and to impose an equitable share of the public costs of capital improvements upon the developments that create the need or consume provided capacity.

3.10.030  Scope.

The System Development Charges imposed by this chapter is separate from and in addition to any applicable tax, assessment, charge, fee in lieu of assessment, or fee otherwise provided by contract or law imposed as a condition of development.  A System Development Charges is to be considered in the nature of a charge for service rendered or facility capacity consumed which has been previously provided for by the taxpayers and ratepayers of the utility systems.  Proceeds from the fees shall be utilized exclusively to provide system capacity to replace that consumed, or to extinguish existing debt incurred to provide capacity.

3.10.040  System Development Charges Established.

A System Development Charge is hereby imposed upon all development within the City and all development outside the boundary of the City that connects to or otherwise uses the sanitary sewer system, or water system of the City.  The City Manager is authorized to make interpretations of this chapter, subject to appeal to the City Council.  Charges shall be established by resolution in accord with Section 8.42, and applicable subsections, of this Code and in accord with the methodologies identified in Section 3.10.050 of this Code.

3.10.050  Methodology.

The methodology used to establish System Development Charges shall be to consider the cost of the existing facilities, prior contributions by rate payers and tax payers, the value of unused capacity, rate-making principles employed to finance publicly owned capital improvements, and other factors related to the cost of providing the utility capacity.  The methodology shall promote the objective that future system users shall contribute an equitable share of the cost of existing facilities, and contribute to the eventual replacement of capacities consumed to provide service.  Method of adoption and the features of adopted methodologies shall include:

A.      Specific methodological approaches shall be established by resolution, and shall include a provision for a credit to the reimbursement fee for qualified public improvements constructed by the developer.

City of Grants Pass Municipal Code

B.    Fees required as a portion of a Local Improvement District, a charge in lieu of a Local Improvement District assessment, or the cost of complying with requirements or conditions imposed by a land use decision are separate from and in addition to the System Development Charges and shall not be used as a credit against such charge.

C.    The formulas and calculations used to compute specific System Development Charges shall be based upon a computed consumption of system capacity and typical conditions and relationships between classes of users of the systems capacity.  Whenever the impacts of individual developments present special or unique situations such that the calculated fee is disproportionate to the actual impact of the development, alternate fee calculations may be approved or required of the developer by the City Manager.  The burden to establish special and unique circumstances as defined in this section shall be solely the responsibility of the developer.  "Special and unique" shall mean circumstances which are beyond those described in the resolution adopted by the Council establishing the fees and methodology, to an extent not less than 25% of the capacity consumption calculations of the adopted methodology.  All data submitted to support alternate calculations under this provision shall be site specific. Major or unique developments may require special analyses to determine alternatives to the standard methodology.  When such analysis is required, the developer shall be solely responsible for calculating and submitting the anticipated System Charges, utilizing the methodology adopted for the affected utility.

D.    The City Manager shall annually review all fees established by this chapter, and shall review methodologies not less than once each three years.  To the extent these reviews warrant changes, the Manager shall recommend such change to the City Council.

E.    When a written appeal is filed challenging the methodology adopted by the Council, the City Manager shall prepare a written report and recommendation within 20 working days of receipt for presentation to the Council within 50 days of the date of the receipt of the appeal.  The Council shall by resolution, approve, modify or reject the report and recommendation of the City Manager, or may adopt a revised methodology by resolution.  Any legal action contesting the City Council decision in the appeal shall be filed within 60 days of the Council decision. For appeals of other than methodology, see 3.10.090.

3.10.060  Compliance with State Law.

All revenues received from the System Development Charges shall be budgeted and expended as provided by state law, and shall be exclusively for the benefit of the utility for which the fees are collected.  Such revenues and expenditures shall be

City of Grants Pass Municipal Code

for provision of system capacity, inclusive of administrative, engineering, and similar costs defined by state law, or the payment of current or future debt, and shall be accounted for as required by state law. Financial reporting shall be included in the City Comprehensive Annual Financial Report.

3.10.070  Collection of System Development Charges.

The collection of System Development Charges shall be in accord with the following:

A.    The System Development Charges are payable upon, and as a condition of, issuance of:

   1.    A building, plumbing, or a development permit for a development as defined in this chapter.

   2.    A permit or other authorization to connect to the water or sanitary sewer system, except as provided in Subsection E of this section.
   (Ord. 5007 §1, 2000)

B.    If development is commenced or connection is made to the water system or sanitary sewer system without an appropriate permit or authorization, the System Development Charges are immediately payable upon the earliest date that a permit was required, and it will be unlawful for anyone to continue with the construction or use constituting a development until the charge has been paid.

   Penalties applied for commencing or connecting shall be as described here, and as further identified in Section 3.10.110 of this Code.

C.    Any and all persons causing a development or making application for a permit, or otherwise responsible for the development, are jointly and severally obligated to pay the charge, and the City Manager may collect the charges from any individual, partnership, corporation, or person involved with the development. The City Manager shall not allow any connection to the water or wastewater system until all charges described in this Section, together with all other applicable fees and charges described in this Code, shall have been paid in full.

D.    All System Development Charges shall be paid in full when due, or in accord with the provisions of ORS 223.208 when Local Improvement Districts have been formed.

# City of Grants Pass Municipal Code

E.  The City Manager or his designated representative is authorized to negotiate standby water utilization agreements. Any such agreement must be authorized by resolution of the City Council. The City Council may permit the waiver of System Development Charges if all of the following conditions are met: (Ord. 5007 §1, 2000)

  1.  No human consumption, domestic utilization, or livestock use is permitted from the connection; (Ord. 5007 §1, 2000)

  2.  Water utilization is restricted to avert peak day and peak hour demand; (Ord. 5007 §1, 2000)

  3.  Water connection is subject to termination or interruption at the sole discretion of the City; (Ord. 5007 §1, 2000)

  4.  The water connection is not in conjunction with any other utilization of municipal water on the property served; (Ord. 5007 §1, 2000)

  5.  The water system connection is not for fire protection or fire flow systems; (Ord. 5007 §1, 2000)

  6.  Municipal water is not the primary source of supply for the intended use. (Ord. 5007 §1, 2000)

## 3.10.080  Credits.

As required by statute, the City of Grants Pass shall allow credits against System Development Charges for the construction of qualified public improvements to the following extent:

A.  When development occurs on a parcel previously connected to municipal utilities that gives rise to System Development Charges, the charge applicable to the existing use shall be calculated. If the charge is than the System Development Charge for the proposed use, the difference between the System Development Charges for the existing use and the System Development Charges for the proposed use shall be the charge required of the development. If the change in use results in a charge for the proposed use being less than the System Development Charges for the existing use, no System Development Charges shall be required; however, no refund or credit shall be given.

B.  A credit shall be given for the cost of a qualified public improvement associated with the development. If a qualified public improvement is located partially on and partially off the parcel of land that is the subject of the approval, or if the improvement is contained within the parcel but sized to

City of Grants Pass Municipal Code

serve areas exterior to the subject development, the credit shall be given only for the cost of the portion of the improvement not attributable wholly to the development.

C.    Applying the methodology adopted by resolution, the City shall grant a credit for a capital improvement constructed as part of the development that reduces the development's demand upon existing capital improvements or the need for replacement of existing capacities. All such facilities must be identified on the master plan applicable to the utility identified for construction.

D.    In situations where the amount of credit exceeds the amount of the System Development Charges, the excess credit is not transferable to another development. It may be transferred to another phase of the original development plan submitted, providing such phased development is contiguous to the development for which credits are granted, and is a continuation of the scope of the project originally filed by the developer with the City.

E.    Credit shall not be transferable from one type of capital improvement to another, all water related credits may be utilized exclusively for water related charges and all sanitary sewer credits exclusively for sanitary sewer.

### 3.10.090  Appeal Procedures.

In accord with the statutory requirements for appeal procedures, the following will be the process for the City of Grants Pass:

A.    A person aggrieved by a decision required or permitted to be made by the City Manager or designee under this Code, or a person challenging the propriety of an expenditure of a System Development Charges revenue may appeal the decision or expenditure by filing a written appeal with the Finance Officer of the City for consideration by the Council. Such appeal shall describe with particularity the decision or the expenditure from which the person appeals and shall include all information required in this Section.

B.    An appeal of expenditure must be filed within 2 years of the date of the alleged improper expenditure. Appeals of any other decision must be filed in accordance with the appeal procedures for the type of SDC under appeal. (Ord. 5511 §3, 2010)

C.    The appeal shall state:

    1.    The name and address of the appellant; and
    2.    The nature of the determination being appealed; and
    3.    The reason the determination is challenged; and

City of Grants Pass Municipal Code

    4.    The remedy sought by the appellant; and

    5.    The specifics of the situation under consideration; and

    6.    The date of the determination or expenditure.

An appellant who fails to file such a statement within the time permitted waives rights to objections, and the appeal shall be automatically dismissed.

D.    Unless the appellant and the City agree in writing to a longer period, an appeal shall be heard within 30 days of the receipt of the written appeal. At least 10 working days prior to the hearing, the City shall mail notice of the time and location thereof to the appellant.

E.    The City Council shall hear and determine the appeal on the basis of the appellant's written statement and any additional evidence submitted at the hearing. At the hearing, the appellant may present testimony and oral argument personally or by counsel. The City may present written or oral testimony at this same hearing. The rules of evidence as used by courts of law do not apply.

F.    The appellant shall carry the burden of proving that the determination being appealed is incorrect and what the correct determination should be, of that the expenditure was improper.

G.    The City Council shall render its decision within 15 days after the hearing date and the decision of the Council shall be final. The decision shall be in writing but written findings shall not be made or required unless the Council elects to make findings for presidential purposes. Any legal action contesting the Council decision on the appeal shall be filed within 60 days of the Council decision. Appeals of methodology are determined in the manner described in Section 3.10.050.

## 3.10.100  Prohibited Connection.

From and after the effective date of this ordinance, no person may connect any premises for service, or cause the same to be connected, to any sanitary sewer or portion of the water system unless the appropriate System Development Charges have been paid and all other provisions governing the payment of fees and charges have been met.

City of Grants Pass Municipal Code

3.10.110  Enforcement and Penalties.

Any service connected to the City water or sanitary sewer system after the effective date of this ordinance for which a fee is due hereunder and has not paid said fee, shall be subject to immediate termination of service, reimbursement of all costs incurred by the City associated with the identification, termination, reconnection, and compliance requirements, and a fee of $250 per day for each day of violation. These costs shall be penalties, and shall be levied in addition to any fees or charges incurred through the prosecution of the unlawful act of connecting to the utility system.

3.10.200    Annual Adjustments for System Development Charges.

Notwithstanding any cost of living increase provisions to the contrary or absence thereof, the system development charges for water, sewer, storm drainage water and open space, transportation, and parks shall be increased annually on January 1 of each year beginning January 1, 2007.  Any prior cost of living increases shall be incorporated in the charges prior to calculating the updated system development charges. (Ord. 5389 12/06/06).

3.10.300        Calculation of Cost of Living Increase:

The cost of living increase noted in section 3.10.200 shall be determined by averaging the 12 month cost of living figures beginning with the immediately previous October and averaging it with the prior 11 months (e.g., January 1, 2007 cost of living increase is determined by averaging the cost of living figures for each month from November 2005 through October 2006.)  The cost of living figures noted herein shall be the U.S. Bureaus of Labor and Statistics, Cost of Living Index, CPI-U, All Cities publication for each month, November through October.  (Ord. 5389, 12/06/06).

City of Grants Pass Municipal Code

## Chapter 3.11

### WATER SYSTEM DEVELOPMENT CHARGES

Adopted by Ord. No. 5302, 2005.  Amended by Ord. No. 5312, 2005; Ord 5389 12/06/06

| | |
|---|---|
| 3.11.010 | Definitions |
| 3.11.020 | Water SDC Calculation Methodology |
| 3.11.100 | Determination of Reimbursement Charge |
| 3.11.200 | Determination of Improvement Charge |
| 3.11.300 | Combined Water System Development Charge |
| 3.11.400 | Water System Development Charges Payable |
| 3.11.500 | Allocation of Water System Development Charge |
| 3.11.600 | Annual Adjustments for System Development Charges |
| 3.11.700 | Credits for Water Improvement System Development Charges |

# City of Grants Pass Municipal Code

3.11.010    Definitions

Commercial.  Development which does not qualify as residential, multi-family, or public/quasi-public.

Development. Any man-made change to improved or unimproved real estate, including but not limited to construction, installation or change of a building or other structure, land division and partition, establishment or termination of a right of access, storage on the land, drilling and site alteration such as that due to land surface paving, excavation or clearing.

Multi-family. Dwellings served by a water meter with two or more living units in a single building, except where the units are defined as commercial occupancies under the Uniform Building Code.

Public/Quasi-Public. Development used to house government, schools (both public and private), and non-profit corporations and which meet all of the following criteria.

A.    Not more than 10% of the building is used for the sale, manufacture, production, repair, or service of a product sold to third persons, whether or not sold by the water customer of this class; and

B.    Not more than 10% of the building is used for residential purposes.

Residential.  Single family dwellings, including mobile homes, modular homes and manufactured homes, located on a single lot intended for occupancy by a single family, which contain separate kitchen, bedroom and bathroom facilities.
Water System.  Includes all water service provided by the City of Grants Pass, both within and outside the City limits, and includes water service provided to any special service district.

Water System Development Charge (Water SDC).  A charge to water service customers which is composed of a combination of reimbursement fee, improvement fee and administrative cost recovery and is assessed or collected at the time of increased usage of water system capacity and capital improvements.  Water SDCs do not include connection or hook-up fees that reimburse the City for the cost of inspecting and installing connections to water capital improvements.

3.11.020    Water SDC Calculation Methodology

Except as specifically modified herein, the provisions of Chapter 3.10 shall apply to the method for calculating Water SDCs and other sections of this Chapter.  The methodology in this Chapter incorporates the adopted 2005 Water Capital

## City of Grants Pass Municipal Code

Improvement Plan and the 2005 Financial Consulting Solutions Group "Water and Sewer SDC Study" for the City of Grants Pass.

3.11.100    Determination of Reimbursement Charge

The water reimbursement fee is based on the following calculations:

Cost of the Existing Water System.

The cost of existing capacity for the calculation of Water SDCs has been based on the original cost of the water capital facilities as recorded in the City's financial records. The cost of system capacity has then been determined to exclude local distribution costs by removing the cost of all water mains of 8 inch diameter or less. For water mains of sizes larger than 8 inch diameter, partial costs were included based on capacity provided in excess of that provided by an 8 inch main. The net outstanding debt obligation, determined as the total debt outstanding less utility cash and investments, was then subtracted from the cost. The following table summarizes the cost of the existing water system.

| Total Water Plant-in-Service (6/30/2004) | $52,936,290 |
| Less: Local Distribution Costs | $26,497,049 |
| Net Water Plant-in-Service | $26,439,241 |
| Less: Net Debt Outstanding | ($1,748,274) |
| Cost of Existing Water Capacity | $24,690,966 |

City of Grants Pass Municipal Code

Determination of System Capacity.

The current water demand and current water customer base were used to define unit customer demands.  The capacity of the water treatment facility was then determined based on unit customer demands.  The following table summarizes the water capacity determination:

| | |
|---|---|
| Current Peak Day Water Demand (gallons per day)(A) | 10,500,000 |
| Current Customer Base (Equivalent Service Units)(B) | 11,468 |
| Average Peak Day Demand per Equivalent Service Unit (gallons per day)(C=A/B) | 915.6 |
| Capacity of Water Treatment Facility (million gallons per day)(D) | 18,500,000 |
| Capacity of Water Treatment Facility (Equivalent Service Units)(E=D/C) | 19,659 |

Cost of the Available Existing Surplus Capacity in the Water System.

The cost of available existing surplus capacity was determined by defining the share of the cost of existing capacity available to serve future growth.  In general, a facility with capacity sufficient to meet planned future demands without further expansion was allocated by dividing the cost according to the proportion of treatment capacity available in excess of current demands.  For specific facilities with less remaining capacity, particularly storage reservoirs, less capacity remained available to serve growth, and reduced allocations were made accordingly.  For higher pressure zones, a reduced storage allocation was determined, consistent with the greater need for new storage.  The following table summarizes the determination of cost of excess existing water system capacity.

| | Pressure Zones 1, 2 and 3 | Pressure Zones 4 and 5 (or higher) |
|---|---|---|
| Total Cost of Existing Water Capacity | $24,690,966 | $24,690,966 |
| Less: Capacity Attributable to Existing Customers | $14,260,963 | $15,330,874 |
| Net Cost of Excess Existing Capacity | $10,430,003 | $ 9,360,092 |

City of Grants Pass Municipal Code

<u>Determination of the Reimbursement Portion of the Water SDC</u>.

The reimbursement portion of the Water SDC is determined by dividing the net cost of excess existing capacity by the growth which can be served by the system. The following table summarizes the determination of the water reimbursement fee.

|  | Pressure Zones 1, 2 and 3 | Pressure Zones 4 and 5 (or higher) |
|---|---|---|
| Net Cost of Excess Existing Capacity | $10,430,003 | $ 9,360,092 |
| Divided by Available Future Capacity (Equivalent Service Units) | 8,191 | 8,191 |
| Water Reimbursement Fee | $1,273 | $1,142 |

3.11.200 <u>Determination of Improvement Charge</u>

<u>Cost of Future Water System Capacity</u>.

The adopted water capital improvement program provides the basis for the cost of future system capacity. For each project, a project cost is estimated based on current construction and related costs. Replacement projects and projects which correct existing deficiencies have been excluded from the cost basis. The resulting total is then reduced by available SDC funds to determine a net cost of future system expansion. The value of outstanding SDC credits is then added. The following table summarizes the cost of future system capacity for the water system.

| | |
|---|---|
| Total Water Capital Improvement Plan | $25,767,125 |
| Less: Replacement/Correction Projects | ($6,578,209) |
| Water Capacity Capital Costs | $19,188,916 |
| Less: Available SDC Fund Balance | ($   804,260) |
| Plus: Outstanding SDC Credits | $          0 |
| Cost of Future Capacity-Expanding Water Improvements | $18,384,656 |

City of Grants Pass Municipal Code

Determination of System Capacity.

The current water demand and current water customer base were used to define unit customer demands. The capacity of the water treatment facility was then determined based on unit customer demands. The following table summarizes the water capacity determination.

| | |
|---|---|
| Current Peak Day Water Demand (gallons per day)(A) | 10,500,000 |
| Current Customer Base (Equivalent Service Units)(B) | 11,468 |
| Average Peak Day Demand per Equivalent Service Unit (gallons per day)(C=A/B) | 915.6 |

Cost of Future System Expansion.

The cost of future system capacity is allocated between existing and future customers to determine the cost of future system expansion. For each eligible project, costs are generally allocated by dividing the cost according to the proportion of total system capacity available in excess of current demands. For storage facilities, a separate allocation was developed to reflect the higher cost of providing added storage exclusively for growth in certain higher pressure zones. The following table summarizes the cost of future system expansion improvements for the water system.

| | Pressure Zones 1, 2 and 3 | Pressure Zones 4 and 5 (or higher) |
|---|---|---|
| Total Cost of Future Water System Capacity | $18,384,656 | $18,384,656 |
| Less: Capacity Attributable to Existing Customers | $10,080,331 | $ 5,952,081 |
| Net Cost of Future Water System Capacity | $ 8,304,325 | $12,432,575 |

City of Grants Pass Municipal Code

<u>Determination of the Improvement Portion of the Water SDC.</u>

The water improvement fee is determined by dividing the net cost of future water
system capacity by the growth which can be served by the system.  The following
table summarizes the determination of the water improvement fee.

|  | Pressure Zones 1, 2 and 3 | Pressure Zones 4 and 5 (or higher) |
|---|---|---|
| Net Cost of Future Water System Capacity | $ 8,304,325 | $12,432,575 |
| Divided by Available Future Capacity (Equivalent Service Units) | <u>8,191</u> | <u>8,191</u> |
| Water Improvement Fee | $1,014 | $1,518 |

3.11.300      <u>Water System Development Charge Administrative Cost Recovery</u>

The water system development charge shall include a recovery of annual
administrative and accounting costs by the application of a cost recovery factor of
1.5%.  The administrative cost recovery charge is determined by dividing annual
water SDC accounting and administrative costs, including fee determination, of
$7,500 by estimated average annual water SDC revenues of $500,000.

3.11.400      <u>Combined Water System Development Charge</u>

The water system development charge is imposed based on potential water
demand, as determined by meter flow capacity and residential living units.  The
water system development charge shall be applied as follows:

A.      All Residential Development.  The water system development charge shall be
        the greater of the charge based on water meter size or the charge based on
        residential living units, according to the following schedules as distinguished
        by water pressure zone (service area):

City of Grants Pass Municipal Code

| Pressure Zones 1, 2 and 3 | | | | |
|---|---|---|---|---|
| | Reimbursement | Improvement | Administration | Total |
| Water Meter Size | | | | |
| ¾ Inch | $1,273 | $1,014 | $34 | $2,321 |
| 1 Inch | $3,183 | $2,535 | $86 | $5,804 |
| 1.5 Inch | $6,367 | $5,069 | $172 | $11,607 |
| 2 Inch | $10,187 | $8,111 | $274 | $18,572 |
| 3 Inch | $20,373 | $16,221 | $549 | $37,144 |
| 4 Inch | $31,833 | $25,346 | $858 | $58,037 |
| 6 Inch | $63,667 | $50,691 | $1,715 | $116,074 |
| 8 Inch | $101,867 | $81,106 | $2,745 | $185,718 |
| 10 Inch | $146,434 | $116,590 | $3,945 | $266,969 |
| Residential Living Units | | | | |
| Single Family Detached Living Units (per residence) | $1,273 | $1,014 | $34 | $2,321 |
| 2- to 4-plex (per living unit) | $1,019 | $811 | $27 | $1,857 |
| Multi-Family Residences (per living unit) | $815 | $649 | $22 | $1,486 |
| Accessory Dwelling Units (per additional unit) | $815 | $649 | $22 | $1,486 |

City of Grants Pass Municipal Code

| Pressure Zones 4 and 5 (or higher) | | | | |
|---|---|---|---|---|
| | Reimbursement | Improvement | Administration | Total |
| **Water Meter Size** | | | | |
| ¾ Inch | $1,143 | $1,518 | $40 | $2,700 |
| 1 Inch | $2,857 | $3,795 | $100 | $6,751 |
| 1.5 Inch | $5,714 | $7,589 | $200 | $13,502 |
| 2 Inch | $9,142 | $12,143 | $319 | $21,604 |
| 3 Inch | $18,284 | $24,285 | $639 | $43,207 |
| 4 Inch | $28,568 | $37,946 | $998 | $67,511 |
| 6 Inch | $57,136 | $75,891 | $1,995 | $135,022 |
| 8 Inch | $91,418 | $121,426 | $3,193 | $216,036 |
| 10 Inch | $131,413 | $174,549 | $4,589 | $310,551 |
| **Residential Living Units** | | | | |
| Single Family Detached Living Units (per residence) | $1,143 | $1,518 | $40 | $2,700 |
| 2- to 4-plex (per living unit) | $914 | $1,214 | $32 | $2,160 |
| Multi-Family Residences (per living unit) | $731 | $971 | $26 | $1,728 |
| Accessory Dwelling Units (per additional unit) | $731 | $971 | $26 | $1,728 |

## City of Grants Pass Municipal Code

B.   **Commercial and Public Development.**  The water system development charge shall be based on the size of the water meter.  The water system development charge shall not apply to separate fire service lines or meters, unless such service is the sole water service provided to the development by the City.  The following schedule of charges shall apply, as distinguished by water pressure zone (service area):

| Pressure Zones 1, 2 and 3 | | | |
|---|---|---|---|
| | Reimbursement | Improvement | Administration | Total |
| Water Meter Size | | | | |
| ¾ Inch | $1,273 | $1,014 | $34 | $2,321 |
| 1 Inch | $3,183 | $2,535 | $86 | $5,804 |
| 1.5 Inch | $6,367 | $5,069 | $172 | $11,607 |
| 2 Inch | $10,187 | $8,111 | $274 | $18,572 |
| 3 Inch | $20,373 | $16,221 | $549 | $37,144 |
| 4 Inch | $31,833 | $25,346 | $858 | $58,037 |
| 6 Inch | $63,667 | $50,691 | $1,715 | $116,074 |
| 8 Inch | $101,867 | $81,106 | $2,745 | $185,718 |
| 10 Inch | $146,434 | $116,590 | $3,945 | $266,969 |
| Pressure Zones 4 and 5 (or higher) | | | |
| | Reimbursement | Improvement | Administration | Total |
| Water Meter Size | | | | |
| ¾ Inch | $1,143 | $1,518 | $40 | $2,700 |
| 1 Inch | $2,857 | $3,795 | $100 | $6,751 |
| 1.5 Inch | $5,714 | $7,589 | $200 | $13,502 |
| 2 Inch | $9,142 | $12,143 | $319 | $21,604 |
| 3 Inch | $18,284 | $24,285 | $639 | $43,207 |
| 4 Inch | $28,568 | $37,946 | $998 | $67,511 |
| 6 Inch | $57,136 | $75,891 | $1,995 | $135,022 |
| 8 Inch | $91,418 | $121,426 | $3,193 | $216,036 |
| 10 Inch | $131,413 | $174,549 | $4,589 | $310,551 |

City of Grants Pass Municipal Code

3.11.500    Water System Development Charges Payable

The water system development charges established in this ordinance shall be effective for all new building, plumbing, or development permits, as defined in Chapter 8.09 of the Municipal Code, issued on or after September 1, 2005.

A.    Water SDCs shall be charged and payable for new development as set forth in this Chapter and as set forth in Chapter 3.10.

B.    Water SDCs shall be charged and payable for the alteration, expansion, or replacement of any development as set forth in this Chapter and as set forth in Chapter 3.10, if the alteration, expansion or replacement results in an increased demand on water system capacity as compared to the prior use of the system. The amount of the Water SDC to be paid shall be the difference between the rate for the proposed development and the rate that would be imposed for the development prior to the alteration, expansion, or replacement. If the difference is less than zero, no Water SDC will be charged and no credit will be given.

3.11.600    Annual Adjustments for Water System Development Charges.

System development charges for water service shall be adjusted annually for cost of living as set forth in Sections 3.10.200 et seq.  (Created by Ord. No. 5312, 2005; Ord. 5389 12/06/06).

3.11.700    Credits for Water Improvement System Development Charge

A.    Subject to the approval by the City Council, the City of Grants Pass may grant a credit against the Water Improvement System Development Charge for the contribution of construction or land or both for any qualified transmission improvements or qualified reservoir improvements or both.

1.    Prior to issuance of a building or development permit, the applicant may submit to the City, a proposed plan and estimate of value of construction or land or both which the applicant desires to contribute to the City as a credit to offset a cash payment for a Water Improvement System Development Charge. The proposal shall include all of the following:

a.    A designation of the development for which the proposed plan is being submitted; and

City of Grants Pass Municipal Code

       b.     A legal description of any land proposed to be contributed and a written appraisal based on comparable sales of similar property between unrelated properties; and

       c.     A time schedule for completion of the plan.

2.     The principle factors the City will use to determine the eligibility and value of a proposal as a credit against a Water Improvement System Development Charge shall include but are not limited to the following:

       a.     The size and location of the improvement; and

       b.     The extent to which the proposal satisfies capital improvement requirements identified in the 2005 Water Capital Improvement Plan; and

       c.     The extent to which the proposed improvements are in excess of those required as a condition of land use approval.

3.     If the City Council approves the proposed contribution, it shall establish the amount to be allowed as a credit to the Water Improvement System Development Charge.  The credit shall be applied to the portion of the SDC paid for the transmission System or the portion of the SDC paid for the reservoir system, depending on the character and extent of the qualified improvements.

4.     The Credit can only be applied to the current development including all phasing.

5.     Any applicant who submits a proposed plan pursuant to this Section and desires the immediate issuance of a building permit or development permit shall pay the applicable Water Improvement System Development Charge charges.  Any difference between the amount paid and the amount credited shall be refunded up to the limit of the credit allowed in section 6.

6.     Transmission component.  The maximum S.D.C. credit for qualified transmission improvements is 78% of the Water Improvement System Development Charge.  (Water and Sewer SDC Study, 2005).

City of Grants Pass Municipal Code

7.    Reservoir Component.

a.    The Water Improvement System Development Charge credit for qualified reservoir improvements is only available for property located in zone 4 or zone 5.

b.    The maximum credit for qualified reservoir improvements is limited to the reservoir surcharge added to the Water Improvement System Development Charge for zones 4 and 5 applicable to the development.

B.    The City Manager shall be responsible for all recording and accounting associated with the distribution of credits.

City of Grants Pass Municipal Code

## CHAPTER 3.20

### SEWER  SYSTEM  DEVELOPMENT  CHARGES

Amended by Ord. No. 5301, 2005, Ord. No, 5313, 2005

Sections:

| | |
|---|---|
| 3.20.010 | Definitions. |
| 3.20.020 | Sewer SDC Calculation Methodology. |
| 3.20.030 | Determination of Reimbursement Charge. |
| 3.20.040 | Determination of Improvement Charge. |
| 3.20.045 | Sewer System Development Charge Administrative Cost Recovery |
| 3.20.050 | Combined Sewer System Development Charge. |
| 3.20.075 | Sewer System Development Charges Payable. |
| 3.20.210 | Annual Adjustments for Sewer System Development Charges. |
| 3.20.300 | Credits for Sewer Improvement System Development Charges |

City of Grants Pass Municipal Code

3.20.010  Definitions.

Commercial.  Development which does not qualify as residential, multi-family, or public/quasi-public.

Development.  Any man-made change to improved or unimproved real estate, including but not limited to construction, installation or change of a building or other structure, land division and partition, establishment or termination of a right of access, storage on the land, drilling and site alteration such as that due to land surface paving, excavation or clearing.

High Strength Commercial.  Commercial development which the City determines to contribute sewage of a strength materially higher than that of domestic uses, consisting of typical concentrations of biochemical oxygen demand (BOD) or suspended solids (SS) in excess of 400 milligrams per liter (mg/l, or parts per million).  High strength commercial activities shall include: auto steam cleaning; bakery; hotel/motel with dining facilities; industrial or commercial laundry; Supermarket with garbage grinder or food service; mortuary; restaurant; or any other commercial activity which the Utilities Director determines to typically contribute sewage in excess of the strength standard.

Multi-family.  Dwellings served by a water meter with two or more living units in a single building, except where the units are defined as commercial occupancies under the Uniform Building Code.

Normal Strength Commercial.  Commercial development which the City determines to contribute sewage of a strength consistent with that of domestic uses, consisting of typical concentrations of biochemical oxygen demand (BOD) or suspended solids (SS) no greater than 400 milligrams per liter (mg/l) or 400 parts per million.

Public/Quasi-Public.  Development used to house government, schools (both public and private), and non-profit corporations and which meet all of the following criteria:

A.     Not more than 10% of the building is used for the sale, manufacture, production, repair, or service of a product sold to third persons, whether or not sold by the sewer customer of this class; and

B.     The sewer discharge consists of typical domestic waste; and

City of Grants Pass Municipal Code

C.    Not more than 10% of the building is used for residential purposes.

Residential.  Single family dwellings, including mobile homes, modular homes, and manufactured homes, located on a single lot intended for occupancy by a single family which contain separate kitchen, bedroom, and bathroom facilities.

Sewer System.  Includes all sewer service provided by the City of Grants Pass, both within and outside the City limits, and includes sewer service provided to any special service district.

Sewer System Development Charge (Sewer SDC).  A charge to sewer service customers which is composed of a combination of reimbursement fee and improvement fee and administrative cost recovery and is assessed or collected at the time of increased usage of sewer system capacity and capital improvements. Sewer System Development Charges do not include connection or hook-up fees that reimburse the City for the cost of inspecting and installing connections to sewer capital improvements.

### 3.20.020  Sewer SDC Calculation Methodology.

Except as specifically modified herein, the provisions of Chapter 3.10 shall apply to the method for calculating Sewer SDCs and other sections of this Chapter.  The methodology in this Chapter incorporates the adopted 2005 Sewer Capital Improvement Plan and the 2005 Financial Consulting Solutions Group "Water and Sewer SDC Study" for the City of Grants Pass.

### 3.20.030  Determination of Reimbursement Charge.

The sewer reimbursement fee is based on the following calculations:

Cost of the Existing Sewer System.

The cost of existing capacity for the calculation of SDCs has been based on the original cost of the sewer capital facilities as recorded in the City's financial records. The cost of system capacity has then been determined to exclude local collection costs by removing the cost of all sewer mains of 8 inch diameter or less.  For sewer mains of sizes larger than 8 inch diameter, partial costs were included based on capacity provided in excess of that provided by an 8 inch main.  The net outstanding debt obligation, determined as the total debt outstanding less utility cash and investments, was then subtracted from the cost.  The following table summarizes the cost of the existing sewer system:

City of Grants Pass Municipal Code

| Total Sewer Plant-in-Service (6/30/2004) | $36,885,344 |
|---|---|
| Less: Local Collection Costs | $11,470,529 |
| Net Sewer Plant-in-Service | $25,414,815 |
| Less: Net Debt Outstanding | ($ 3,317,450) |
| Cost of Existing Sewer Capacity | $22,097,365 |

Determination of System Capacity.

The current and planned capacity of the sewer treatment facility, expressed in terms of sewer connections in the sewer system plan, were used as the basis for unit customer demands for sewer treatment. The planned capacity of the sewer collection and transmission system was based on the same unit customer demands, with customers of the Redwood Sanitary Sewer Service District excluded, as those customers do not use the City collection and transmission system. The following table summarizes the sewer capacity determination.

| | Treatment | Collection & Transmission |
|---|---|---|
| Planned System Capacity (connections) (A) | 18,800 | 15,040 |
| Current System Customer Base (connections)(B) | 11,700 | 10,011 |
| Current Treatment Capacity (connections) (C) | 12,500 | n/a |
| Remaining Capacity in Existing System (D=(C-B)/C) | 6% | n/a |
| Available Capacity in Planned System (E=(A-B)/A) | 38% | 33% |

Cost of the Available Existing Surplus Capacity in the Sewer System.

The cost of available existing surplus capacity was determined by defining the share of the cost of existing capacity available to serve future growth. For the treatment facility, limited capacity remains available prior to planned plant expansion. For the collection system, available capacity is determined by the proportion of planned capacity in excess of current demands. The following table summarizes the determination of cost of excess existing sewer system capacity.

City of Grants Pass Municipal Code

|  | Treatment | Collection & Transmission |
|---|---|---|
| Total Cost of Existing Sewer Capacity | $21,023,344 | $ 1,074,021 |
| Less: Capacity Attributable to Existing Customers | $18,641,526 | $   714,895 |
| Net Cost of Excess Existing Capacity | $ 2,381,818 | $   359,126 |

Determination of Reimbursement Sewer System Development Charge.

The sewer reimbursement fee is determined by dividing the net cost of excess existing capacity by the growth which can be served by the planned system. The following table summarizes the determination of the sewer reimbursement fee. The treatment charge is applicable to customers of Redwood Sanitary Sewer Service District or any other agencies or service areas which do not rely on the City's collection system. The total charge is applicable to customers served in the City's service area.

|  | Treatment | Collection & Transmission | Total |
|---|---|---|---|
| Net Cost of Excess Existing Capacity | $2,381,818 | $359,126 |  |
| Divided by Available Future Capacity (Equivalent Service Units) | 10,970 | 7,727 |  |
| Sewer Reimbursement Fee | $217 | $46 | $   263 |

3.20.040     Determination of Improvement Charge

Cost of Future Sewer System Capacity.

The adopted sewer capital improvement plan provides the basis for the cost of future system capacity. For each project, a project cost is estimated based on current construction and related costs. Replacement projects and projects which correct existing deficiencies are excluded from the cost basis. The resulting total is then reduced by available SDC funds to determine a net cost of future system expansion. The value of outstanding SDC credits is then added. The following table summarizes the cost of future system capacity for the sewer system:

City of Grants Pass Municipal Code

| | |
|---|---|
| Total Sewer Capital Improvement Plan | $34,602,000 |
| Less: Replacement/Correction Projects | ($10,604,000) |
| Sewer Capacity Capital Costs | $23,998,000 |
| Less: Available SDC Fund Balance | ($         0) |
| Plus: Outstanding SDC Credits | $         0 |
| Cost of Future Capacity-Expanding Sewer Improvements | $23,998,000 |

Determination of System Capacity.

The current and planned capacity of the sewer treatment facility, expressed in terms of sewer connections in the sewer system plan, were used as the basis for unit customer demands for sewer treatment. The planned capacity of the sewer collection and transmission system was based on the same unit customer demands, with customers of the Redwood Sanitary Sewer Service District excluded, as those customers do not use the City collection and transmission system. The following table summarizes the sewer capacity determination.

| | Treatment | Collection & Transmission |
|---|---|---|
| Planned System Capacity (connections) (A) | 18,800 | 15,040 |
| Current System Customer Base (connections)(B) | 11,700 | 10,011 |
| Current Treatment Capacity (connections) (C) | 12,500 | n/a |
| Remaining Capacity in Existing System (D=(C-B)/C) | 6% | n/a |
| Available Capacity in Planned System (E=(A-B)/A) | 38% | 33% |

Cost of Future System Expansion.

The cost of future sewer system capacity is allocated between existing and future customers to determine the cost of future system expansion. For each eligible project, costs are generally allocated by dividing the cost according to the proportion of total planned system capacity available in excess of current demands. For certain specific treatment expansion projects, costs were assigned entirely to growth. The following table summarizes the cost of future system expansion improvements for the sewer system:

City of Grants Pass Municipal Code

|  | Treatment | Collection & Transmission |
|---|---|---|
| Total Cost of Future Sewer System Capacity | $14,698,000 | $ 9,300,000 |
| Less: Capacity Attributable to Existing Customers | $272,585 | $ 3,092,297 |
| Net Cost of Future Sewer System Capacity | $14,425,415 | $ 6,207,703 |

Determination of Improvement Sewer System Development Charge.

The sewer improvement fee is determined by dividing the net cost of future sewer system capacity by the growth which can be served by the system. The following table summarizes the determination of the sewer improvement fee. The treatment charge is applicable to customers of Redwood Sanitary Sewer Service District or any other agencies or service areas which do not rely on the City's collection system. The total charge is applicable to customers served in the City's service area.

|  | Treatment | Collection & Transmission | Total |
|---|---|---|---|
| Net Cost of Future Sewer System Capacity | $14,425,415 | $ 6,207,703 |  |
| Divided by Available Future Capacity (Equivalent Service Units) | 10,970 | 7,727 |  |
| Sewer Improvement Fee | $1,315 | $ 803 | $2,118 |

3.20.045    Sewer System Development Charge Administrative Cost Recovery

The Sewer SDC shall include a recovery of annual administrative and accounting costs by the application of a cost recovery factor of 1.5%. The administrative cost recovery charge is determined by dividing annual Sewer SDC accounting and administrative costs, including fee determination, of $7,500 by estimated average annual Sewer SDC revenues of $500,000.

City of Grants Pass Municipal Code

3.20.050  Combined Sewer System Development Charge

The Sewer SDC shall include the sewer reimbursement fee, sewer improvement fee, and administrative cost recovery.  It is imposed based on estimated sewage volume, as determined by equivalent residential units.  For customers served by Redwood Sanitary Sewer Service District (RSSSD), only the treatment portion of the charge will apply, as RSSSD has a separately authorized collection system charge.  The Sewer SDC shall be applied as follows:

All Residential Development.

The Sewer SDC shall be based on equivalent residential living units, as determined by completion of a residential sewer use certification form.  The charge will be imposed according to the following schedule:

| City Service Area | | | | |
|---|---|---|---|---|
| | Reimbursement | Improvement | Administration | Total |
| Residential Living Units | | | | |
| Each Equivalent Residential Unit or fraction thereof | $263 | $2,118 | $74 | $2,455 |

| RSSSD Service Area (Treatment Only; does not include RSSSD Collection SDC) | | | | |
|---|---|---|---|---|
| | Reimbursement | Improvement | Administration | Total |
| Residential Living Units | | | | |
| Each Equivalent Residential Unit or fraction thereof | $217 | $1,315 | $34 | $1,566 |

Commercial and Public Development.

The Sewer SDC shall be based on equivalent residential living units, as determined by completion of a non-residential sewer use certification form (Included in that form is an adjustment factor for high strength sewage generators).  The charge will be imposed according to the following schedule:

City of Grants Pass Municipal Code

| City Service Area | | | |
|---|---|---|---|
| | Reimbursement | Improvement | Administration | Total |
| Each Equivalent Residential Unit or fraction thereof | $263 | $2,118 | $74 | $2,455 |

| RSSSD Service Area (Treatment Only; does not include RSSSD Collection SDC) | | | |
|---|---|---|---|
| | Reimbursement | Improvement | Administration | Total |
| Each Equivalent Residential Unit or fraction thereof | $217 | $1,315 | $34 | $1,566 |

### 3.20.075  Sewer System Development Charges Payable

The Sewer SDCs established in this ordinance shall be effective for all new building, plumbing, or development permits, as defined in Chapter 3.10 of the Municipal Code, issued on or after August 1, 2005.

A.    Sewer SDCs shall be charged and payable for new development, as set forth in 3.20.050.

B.    Sewer SDCs shall be charged and payable for the alteration, expansion, or replacement of any development as set forth in 3.20.050, if the alteration, expansion, or replacement results in an increased demand on sewer system capacity as compared to the prior use of the system.  The amount of the SDC to be paid shall be the difference between the rate for the proposed development and the rate that would be imposed for the development prior to the alteration, expansion, or replacement.  If the difference is less than zero, no SDC will be charged and no credit will be given.

### 3.20.210  Annual Adjustments for Sewer System Development Charges.

System development charges for sewer service shall be adjusted annually for cost of living as set forth in Sections 3.10.200 et seq.  Created by Ord. No. 5313, 2005; Ord. 5389 12/06/06).

City of Grants Pass Municipal Code

3.20.300    Credits for Sewer improvement System Development Charge

A.    Subject to the approval by the City Council, the City of Grants Pass may grant a credit against the Sewer Improvement System Development Charge for the contribution of construction or land or both for any qualified collection improvements.

1.    Prior to issuance of a building or development permit, the applicant may submit to the City, a proposed plan and estimate of value of construction or land or both which the applicant desires to contribute to the City as credit to offset a cash payment for a Sewer Improvement System Development Charge. The proposal shall include all of the following:

a.    A designation of the development for which the proposed plan is being submitted; and

b.    A legal description of any land proposed to be contributed and a written appraisal based on comparable sales of similar property between unrelated properties; and

c.    A time schedule for completion of the plan.

2.    The principle factors the City will use to determine the eligibility and value of a proposal as a credit against a Sewer Improvement System Development Charge shall include but are not limited to the following:

a.    The size and location of the improvement; and

b.    The extent to which the proposal satisfies capital improvement requirements identified in the 2005 Sewer Capital Improvement Plan; and

c.    The extent to which the proposed improvements are in excess of those required as a condition of land use approval.

3.    If the City Council approves the proposed contribution, it shall establish the amount to be allowed as a credit to the Sewer Improvement System Development Charge.  The credit shall be applied to the portion of the SDC paid for the collection system.  The maximum SDC credit for qualified collection improvement is limited to the SDC paid for the collection system.

City of Grants Pass Municipal Code

4. The Credit can only be applied to the current development including all phasing.

5. Any applicant who submits a proposed plan pursuant to this Section and desires the immediate issuance of a building permit or development permit shall pay the applicable Sewer Improvement System Development Charge charges. Any difference between the amount paid and the amount credited shall be refunded to the applicant up to but not exceeding the amount of the Sewer Improvement System Development Charge for the Collection components.

6. The decision of the City Council as to whether to accept the proposed plan of contribution and the value of such contribution shall be in writing and issued to the applicant.

B. The City Manager shall be responsible for all recording and accounting associated with the distribution of credits.

City of Grants Pass Municipal Code

## Chapter 3.30

### TRANSPORTATION SYSTEM DEVELOPMENT CHARGE

Sections:

| | |
|---|---|
| 3.30.010 | Findings. |
| 3.30.020 | Definitions. |
| 3.30.030 | Transportation System Development Charge Established. |
| 3.30.032 | Annual Adjustments for System Development Charges. |
| 3.30.033 | Total Fees Adopted. |
| 3.30.040 | Compliance with State Law. |
| 3.30.042 | Categories and Trip Calculation |
| 3.30.047 | Principles of Categorization. |
| 3.30.048 | Calculation of Charges. |
| 3.30.050 | Collection of Charge. |
| 3.30.060 | Exemptions. |
| 3.30.070 | Credits. |
| 3.30.080 | Appeal Procedures. |
| 3.30.090 | Construction. |
| 3.30.110 | Severability. |
| 3.30.200 | Annual Adjustments for Transportation System Development Charges. |

Added new chapter 6.47 by Ord. 4985 §15 1999 (Ord. 5101 §12 2001 changed to Chapter 3.30) Revised Ord. 15-5634 2015.

City of Grants Pass Municipal Code

### 3.30.010  Findings.

A.     The Transportation System Development Charge (SDC) established herein is intended to be a charge upon the act of development by whomever seeks the development.  It is a fee for service because it is the residential and business development which requires essential municipal services based upon the nature of the development.  The timing and the extent of development is within the control and discretion of the developer.  (Ord. 5023 §1, 2000)

B.     The Transportation SDC imposed in this Chapter is not a tax on property or on a property owner as a direct consequence of ownership of property within the meanings of Section II.b., Article XI of the Oregon Constitution or the legislation implementing that section.  The Transportation SDC is not a fee supplanting any property tax based system as envisioned in Article XI of the Oregon Constitution.

C.     If the Transportation SDC herein imposed is viewed under Section II.b., Article XI of the Oregon Constitution as a tax against property or against a property owner as a direct consequence of ownership of that property, it is an incurred charge within the meaning of that Section and the statutes implementing it because:

   1.     It allows the owner to control the quantity of the service by determining the extent of development to occur upon the property.

   2.     It allows the owner to determine when the service is to be initiated or increased by controlling when the development occurs.

   3.     State law and the Ordinances of the City of Grants Pass require the owner to provide certain basic utility services to the property when it is developed for human occupancy.  The provision of these basic services is a routine obligation of the owner of the affected property and essential to the health and safety of the community.

D.     Among the basic services required of every property with a structure designed for human occupancy (except ancillary buildings) are street facilities to accommodate and control motorized vehicular traffic, pedestrian traffic, and bicycle traffic.

E.     The Transportation SDC imposed in this Chapter is based upon the actual costs of providing planned transportation capital improvements and does not impose charges on persons not receiving a service and imposing a burden upon the City's existing transportation system.

City of Grants Pass Municipal Code

F.    The Transportation SDC imposed by this Chapter is separate from and in addition to any applicable tax, assessment, charge, fee, in lieu of assessment or fee otherwise provided by law or imposed as a condition of development. A Transportation SDC is to be considered in the nature of a charge for consumption of existing capacity and a service to be rendered.

G.    The Transportation SDC is an incurred charge for the acquisition and capital development of facilities to accommodate and control motorized vehicular traffic, pedestrian traffic, and bicycle traffic. This is a new program to protect the capacity for current and future users of this system and as such does not represent a product or service that was wholly or partially paid for by ad valorem taxes on October 15, 1999, or thereafter. No shift, transference, or conversion of programs previously financed by property tax will occur.

H.    In accord with those findings, no public vote is required for the adoption of this Transportation SDC.

3.30.020    Definitions.

A.    As used in this Chapter, except where the context otherwise requires, the words and phrases defined below have the meaning identified. For any definitions not complete or modified in this section, the general definitions of Chapter 30 of the Grants Pass Development Code apply. In cases of conflict, the specific provisions of this chapter will apply:

1.    Development" means a development which thereby increases the use of any transportation facility or which creates the need for additional transportation facilities beyond those in place October 15, 1999, and shall be determined by the necessity for a building permit or a development permit. Any act defined as "Development" in Article 30.020 of the Grants Pass Development Code shall not apply to this section to the extent that the definition includes land division, partitions, rights of access, storage, drilling or any site alteration.

2.    "Residential Development" means any development designed to be occupied by a family or individual as defined in Article 30 of the Grants Pass Development Code for living and sleeping, and which may or may not include cooking and eating facilities.

3.    "Business Development" means a building designed for use by a commercial or industrial business.

4.    "Non-Profit" development as utilized in this ordinance shall refer to religious, social service and eleemosynary activities possessing a designation from the Federal Internal Revenue Service Section 501(c)(3).

City of Grants Pass Municipal Code

5.    "Categories of Uses" means the grouping and categorization of development into similar categories to establish relative traffic impacts for groups of developments.

6.    "Mixed Use" development means the inclusion of more than one separate category of development use within one building or identified development.

7.    "Transportation Capital Improvement(s)" means all City transportation facilities to accommodate and control motorized vehicular traffic, pedestrian traffic, and bicycle traffic.

8.    "Transportation System Development Charge (Transportation SDC)" means a fee for costs associated with transportation capital improvements acquired, which is assessed or collected at any of the times specified in Section 3.30.050.  Transportation SDC does not include:

   a.    Any fees assessed or collected as part of a local improvement district;

   b.    A charge in lieu of a local improvement district assessment; or

   c.    The cost of complying with requirements or conditions imposed upon a land use decision or limited land use decision.

9.    "Qualified Public Improvements" means a capital improvement that is identified in the Grants Pass Urban Area *Transportation Systems Development Charge Methodology, attached as Exhibit "1",* which may be amended from time to time.

3.30.030    Transportation System Development Charge Established.

A.    Effective October 15, 1999, a Transportation System Development Charge is hereby imposed upon all development within the corporate limits of the City of Grants Pass, Josephine County, as defined in this Code.

B.    Said charge will also be imposed upon development in accord with this Code within the unincorporated Urban Growth Boundary of the City of Grants Pass pursuant to the intergovernmental agreement between the City of Grants Pass and Josephine County entitled "Intergovernmental Agreement for the Orderly Management of the Grants Pass Urban Growth Boundary Area," dated August 5, 1998.

City of Grants Pass Municipal Code

C.    The fee imposed as a Transportation System Development Charge shall be established and amended from time to time by City Council resolution, said fee not shifting, transferring or converting any governmental product or service wholly or partially financed from ad valorem taxes.

D.    Fees are established by classification of land use and development intensity.

3.30.032   Annual Adjustments for System Development Charges.

The City Council may annually adjust the System Development Charges for Transportation Service. The method of adjustment will be the U. S. Bureau of Labor and Statistics, Cost of Living Index, CPI-U, All Cities, October publication. The City Council will consider a resolution annually to determine whether or not to apply a cost of living to the system Development charges. The Council may elect to apply the cost of living index, modify to any level lower than the published index, or not to apply the index in any one year. The cost of living in any one-year shall not exceed a total of 2.5%. Action not to apply the index in any one year, or period of years, will not prohibit the Council from elected to apply the index in ensuing years. Application of the index shall be accumulated during any period of City Council permitted phasing of adopted fees.

3.30.033   Total Fees Adopted.

The City Council establishes the fee for Transportation to be that fee identified in the referenced methodology. The Council may elect to discount the fee to permit a phasing schedule for implementing total fees, however, each year of the diminishment of the fee discount shall not be considered to be an increase as identified in state law. The cumulative cost of living increase shall be applied to total fees to the extent adopted by the City Council, and any phasing schedule may be modified by Resolution.

3.30.040   Compliance with State Law.

A.    The revenues received from the Transportation System Development Charge shall be deposited in an account named "Transportation SDC Fund." This activity shall be budgeted and accounted for as provided by state law.

B.    The capital improvement plan required by state law as the basis for expending revenues from the improvement fees portion of the Transportation System Development Charge shall be the Grants Pass Urban Area *Transportation Systems Development Charge Methodology)*, attached as Exhibit "1", which may from time to time be amended.

City of Grants Pass Municipal Code

3.30.042      Categories and Trip Calculation.

The Institute of Transportation Engineers, Trip Generation Report is used as the basis for measuring "trips generated"  Average daily trip generation count for calculating the Transportation System Development charge will be based on average vehicle trip ends on a weekday.

A.      In order to more accurately account for vehicle trips generated by each specific land use, the City shall use the latest edition of the ITE (Institute of Transportation Engineers) *Trip Generation Handbook,* including the *Pass-By and Diverted Linked Trips* studies contained in the associated ITE recommended practice, to determine the number of vehicle trips to attribute to each land use (e.g., code 210 – Single-family Detached Housing…). Ord. 5562 §19 2012

B.      The Community Development Director or designee will calculate trips based on the Land Use and Title that best fits the Development. (If there is not a corresponding land use, title, or category in the ITE Report, the City will use the most similar land use and title to measure trip generation).  Use and determination of the land use codes are subject to interpretation by the City of Grants Pass.

C.      If the ITE Trip Generation Report includes multiple measures that can be used to determine average daily trip generation including area, the measure of square footage (area) will be used.

D.      If the ITE Trip Generation Report includes a.m. and p.m. average weekday trip generation information, the average of the two measures will be used. Ord. 5562 §19 2012

E.      The Director may consider an alternative trip calculation when a report is supplied by a licensed traffic engineer and said alternative is reviewed and approved by the City Engineer.

F.      The ITE codes may be amended to reflect a "local trip rate" for particular ITE code categories when supported by a local study supplied by a licensed traffic engineer after being reviewed and approved by the City Engineer and the City Council.

G.      Final determination of the land use category and ITE reference code to be used for the purpose of assessing Transportation System Development Charges is made by the Community Development Director.

City of Grants Pass Municipal Code

3.30.047        Principles of Categorization.

A.      The use of categories of development is based on the representation of the developer or principal owner of interest in a project at the time a project is proposed or altered to a sufficient extent to require a building or development permit in accord with the Grants Pass City Development Code.

1.      In assigning categories of use during the building permit process or the development process the City shall rely on the representation of the principal owner or developer of the project on the intended uses, so long as such uses are permitted in the Development Code.

2.      Each building is categorized based on the primary activity of the establishment that will, or does, occupy the building or site. The primary activity will be established by the relative number of transactions or visits from the general public rather than the volume of sales or dollars.

3.      Where distinct and separate economic activities are performed at a single physical location, or in a single building, each activity may be treated as a separate establishment and independently categorized if such activity constitutes an impact of 15 or more traffic trip ends per day in accord with the classification system adopted in this Code.

4.      Incidental uses within a building or site shall be determined on the basis of the nature of the business as a whole rather than the specific use of a particular portion of the building or site. As examples, an office in a retail store shall all be classified retail, the shipping and receiving area of a retail outlet that is predominantly retail shall all be classified retail. Similar incidental uses shall all be classified in accordance with the primary use of the building or site.

5.      Free standing buildings and structures for which a development permit is required in Grants Pass City Development Code shall be categorized directly in the category of use as defined in this Code. When such a use is combined with six or more independently owned and operated enterprises, it shall be a shopping center, even if those independently owned and operated businesses are contained in leased area within a single structure, unless such buildings are exclusively for use as office space or in the exclusive ownership of governmental, non-profit, or eleemosynary organizations, in which case they shall be classified as office, government, or non-profit respectly.

City of Grants Pass Municipal Code

6.    Occupancy or change of occupancy shall not create liability under this Code unless such change of occupancy requires a building permit or development permit in accord with the Grants Pass City Development Code.

7.    Free standing uses operated by non-profit organizations as defined in this Code that are not physically attached to the primary location of service provision shall be classified by their intended functional use. As an example, a day care constructed and operated by a Church at a site other than the church primary location shall be classified as a day care and charged the fee for day care.

8.    Outside sales areas, as defined in the Grants Pass City Development Code and otherwise permitted in the appropriate zone, will not be included in the calculation of square footage for this Code.

3.30.048    Calculation of Charges.

All developments as defined in this ordinance and subject to the transportation system development charge shall be established in one or more categories in accordance with this Code.   The ITE code(s) shall be utilized to determine the number of trips for category and use.  Such determination may be made, by square footage, residential units, or other methodology adopted.  The trip rate is multiplied by the square footage, unit number or other applicable indicator, the product of which is multiplied by the cost per trip adopted by Resolution of the City Council.

A.    Whenever reference is made to square footage, it shall apply to gross square footage of the building or development.

B.    Mixed use developments shall have each discrete use calculated in accordance with this Code.  The total System Development Charge shall be the sum of each category of use.

C.    Where categories are not clear the City shall identify the most similar category and the rationale for such a determination.  Any aggrieved party may utilize the appeal procedures of this Code to seek adjustments or change as identified in this Code.

3.30.050    Collection of Charge.

A.    The Transportation System Development Charge is due and payable upon issuance of a building permit, or prior to occupancy, for the following:

City of Grants Pass Municipal Code

    1.    New on-site residential construction or expansion which creates additional residential units.

    2.    Any construction creating or expanding residential units for more than four families, which requires the issuance of a Development Permit.

    3.    Any construction which creates a new business building, which required the issuance of a Development Permit.

    4.    Any construction which expands or remodels a business building, which includes an increase in the number of vehicle trips which will be generated and which required the issuance of a Building Permit or Development Permit. Only those newly created vehicle trips will be used to generate the Transportation System Development Charge.

B.    The Transportation System Development Charge is due and payable upon issuance of the first manufactured home placement permit granted upon an individual building lot.

C.    In the case of a manufactured dwelling park or mobile home park, fifty percent (50%) of the Transportation System Development Charge shall be due and payable for all spaces in the manufactured home park at the time land use approval is granted. The remaining balance of the Transportation System Development Charge shall be due and payable at the time the placement permit is granted for each space.

D.    The owner(s) of vacant lots or spaces within an existing manufactured home park that has received all necessary land use approvals prior to October 15, 1999, shall pay a Transportation System Development Charge of 100% of the applicable Transportation System Development Charge for each space at the time the placement permit is granted for that lot or space.

E.    If a development is commenced without appropriate permit, the Transportation System Development Charge is immediately payable.

F.    The City Building Official shall collect the Transportation System Development Charge from the building/placement permit applicant, the person required to apply for the building/placement permit, the owner of the real property upon which the development occurs or any person having received benefit from the development. The Building Official shall not issue any permit or allow construction described in Section 3.30.050 until the charge has been paid, or arrangements for payment made.

G.    The conversion of existing buildings from one use to another shall require the

City of Grants Pass Municipal Code

payment of a transportation system development charge only if the new use is required to obtain a building permit or development permit prior to occupancy and the new use will increase the traffic movements and impacts when compared to the prior use.  Such conversions shall be required to pay only the incremental increase in traffic impacts in accord with the classification of the proposed use and the utilization that was either in effect October 15, 1999, or for which an SDC has been previously paid.

H.  Where a structure which is benefited by transportation capital improvements is destroyed or removed, no Transportation System Development Charge shall be imposed for the replacement of the structure, provided however, to the extent that any replacement expands, alters, or increases traffic volumes, an incremental fee as described in this Code shall be due and payable.

I.  The Transportation System Development Charges may be subject to the payment in installments under the provisions of the Bancroft Bonding Act of the State of Oregon.

City of Grants Pass Municipal Code

3.30.060    Exemptions.

A.    Exemptions to the Transportation System Development Charge are as follows:

    1.    All pending building/placement permit applications for existing lots of record submitted prior to October 15, 1999.

    2.    All existing structures for which a building/placement permit has been issued and which were established and existing prior to October 15, 1999.

    3.    Garages (attached or detached), and other detached non-habitable accessory buildings.

    4.    All local governments.  Local government for this Code includes school districts, county governmental facilities, city facilities, and facilities owned and operated by special districts formed under Oregon Law as local governments, or any Chapter 190 combination governmental entity controlled by local governments.

B.    Any development which is exempt from the Transportation System Development Charge by reason of its intended use shall lose such exemption immediately upon a change in use to a type of development which is not exempt from the Transportation System Development Charge obligation.  Upon such loss of exemption, the Transportation System Development Charge shall be immediately due and payable upon the entire development which was previously exempt when any action is taken with the structure that requires the issuance of a building or development permit.

3.30.070    Credits.

A.    Subject to the approval by the City Council, the City of Grants Pass may grant a credit against the Transportation System Development Charge for the contribution of construction or land or both for any qualified public improvements.

    1.    Prior to issuance of a building or development permit, the applicant may submit to the City, a proposed plan and estimate of value of land or construction or both which the applicant desires to contribute to the City as a full or partial offset to a cash payment for a Transportation System Development Charge. The proposal shall include all of the following:

        a.    A designation of the development for which the proposed plan is being submitted; and

City of Grants Pass Municipal Code

      b.    A legal description of any land proposed to be contributed and a written appraisal based on comparable sales of similar property between unrelated properties; and

      c.    A time schedule for completion of the plan.

2.    The principle factors the City will use to determine the eligibility and value of a proposal as a credit against a Transportation System Development Charge shall include but are not limited to the following:

      a.    The size and location of the improvement; and

      b.    The cost of maintenance; and

      c.    The extent to which the proposal satisfies capital improvement requirements identified in the *Grants Pass Urban Area Master Transportation Plan* (adopted 1997); and

      d.    The extent to which the proposed improvements are in excess of those required as a condition of land use approval.

3.    If the City Council approves the proposed contribution, it shall establish the amount to be allowed as a credit to the Transportation System Development Charge.  The credit can only be applied to the current development including all phasing.

4.    Any applicant who submits a proposed plan pursuant to this Section and desires the immediate issuance of a building permit or development permit shall pay the applicable Transportation System Development Charge charges.  Any difference between the amount paid and the amount credited shall be refunded to the applicant up to but not exceeding the amount of the Transportation System Development Charge.

5.    The decision of the City Council as to whether to accept the proposed plan of contribution and the value of such contribution shall be in writing and issued to the applicant.

B.    The City Manager shall be responsible for all recording and accounting associated with the distribution of credits.

City of Grants Pass Municipal Code

3.30.080    Appeal Procedures.

A.    Parties challenging the methodology for establishing the Transportation System
Development Charge must appeal the methodology by filing a Notice of Appeal
with the City Manager within 60 days of passage of the Ordinance adopting this
Chapter.  Such appeals shall describe with particularity the portion of the
methodology, calculations or assumptions which are being asked for
reconsideration.  The filing of such an appeal shall temporarily stay the payment
of any Transportation System Development Charge until the appeal is
determined upon determination of the appeal and subject to legal action
pursuant to ORS 233.304(5). All Transportation System Development Charges
due as a result of developments occurring subsequent to the effective date of
this ordinance, and not otherwise exempt, shall be immediately due and
payable.

B.    An appeal of expenditure must be filed with the City Manager within two years of
the date of alleged improper expenditure. Appeals of any other decision may be
filed once the findings of fact or final decision for a land use decision (including
all appeals) has been signed and is effective.  When the land use decision
includes a building permit, the appeal period ends fourteen days from the date
the building permit is ready to be issued.  The same fourteen (14) day appeal
period applies to all other building permits where a final determination for a
transportation system development charge is made.  Prior to the formal appeal
provisions of this Code, any applicant may file a written request for re-
determination with the Director of Community Development.  Such a request
may be filed without fee, and shall result in the written determination by the
Director of the category of use and determination of fee for any development
subject to this Code.  Any party still aggrieved may pursue the further appeal
described in this Code. (Ord. 5511 §3, 2010)

C.    An appeal fee, established by Council resolution, shall accompany all appeals of
Transportation System Development Categorization or Trip Calculation, or
expenditures from the Transportation SDC Fund account.

D.    The Notice of Appeal shall state:

1.    The name and address of the applicant; and

2.    The address or tax lot of the subject property; and

3.    The nature of the determination being appealed; and

4.    If issued, the date the building/placement permit or development permit
was issued; and

## City of Grants Pass Municipal Code

5.    If paid, the date the Transportation System Development Charge was paid and the amount of payment; and

6.    A detailed description of the reasons the determination is incorrect; and

7.    A detailed description of what the correct determination of the system development charge should be.

An applicant who fails to correctly file an appeal within the time permitted waives the objections and the appeal shall be dismissed.

E.    Unless the appellant and the City agree to a longer period, an appeal shall be heard within 30 days of the receipt of the Notice of Appeal. At least 7 days prior to the hearing, the City shall mail notice of the time and location thereof to the appellant. No further public notification shall be required.

F.    The City Council shall hear and determine the appeal on the basis of the appellant's written statement and any additional evidence the City Council deems appropriate. At the hearing, the appellant may present testimony and oral argument personally or by counsel. The rules of evidence as used by courts of law do not apply. This is not a land use action.

G.    The appellant shall carry the burden of proving that the determination being appealed is incorrect and what the correct determination should be.

H.    The City Council shall issue a written decision within 20 days after the hearing date and that decision shall be final. The Council may affirm, amend, modify, or reverse the determination being appealed, with such findings adopted by resolution of the City Council. The City Council may increase, decrease, or make no changes in the categorization, calculation, or application of the Transportation System Development Charge.

I.    The decision of the City Council shall be final.

### 3.30.090   Construction.

The rules of statutory construction contained in ORS Chapter 174 are adopted and by this reference made a part of this Chapter.

City of Grants Pass Municipal Code

3.30.110   Severability.

The invalidity of a portion of this Chapter shall not affect the validity of the remainder.

3.30.200   Annual Adjustment for Transportation System Development Charges.

System development charges for transportation shall be adjusted annually for cost of living as set forth in Sections 3.10.200 et seq.  (Ord. 5389 12/06/06).

City of Grants Pass Municipal Code

Chapter 3.40

PARKS SYSTEM DEVELOPMENT CHARGE

Sections:

3.40.010      Findings.
3.40.020      Definitions.
3.40.030      Parks System Development Charge Established.
3.40.040      Compliance with State Law.
3.40.050      Collection of Charge.
3.40.060      Exemptions.
3.40.070      Credits.
3.40.080      Appeal Procedures.
3.40.090      Construction.
3.40.110      Prohibited Construction.
3.40.120      Severability.
3.40.200      Annual Adjustments for Parks System Development Charges.

City of Grants Pass Municipal Code

3.40.010  Findings.

   A.    The Parks System Development Charge (SDC) established herein is intended to be a charge upon the act of development by whomever seeks the development. It is a fee for service because it is the residential and business development which requires essential municipal services based upon the nature of the development.  The timing and the extent of development is within the control and discretion of the developer.

   B.    The Parks SDC imposed in this Chapter is not a tax on property or on a property owner as a direct consequence of ownership of property within the meanings of Section II.b., Article XI of the Oregon Constitution or the legislation implementing that section.  The Parks SDC is not a fee supplanting any property tax based system as envisioned in Article XI of the Oregon Constitution.

   C.    If the Parks SDC herein imposed is viewed under Section II.b., Article XI of the Oregon Constitution as a tax against property or against a property owner as a direct consequence of ownership of that property, it is an incurred charge within the meaning of that Section and the statutes implementing it because:

       1.    It allows the owner to control the quantity of the service by determining the extent of development to occur upon the property.

       2.    It allows the owner to determine when the service is to be initiated or increased by controlling when the development occurs.

       3.    State law and the Ordinances of the City of Grants Pass require the owner to provide certain basic utility services to the property when it is developed for human occupancy.  The provision of these basic services is a routine obligation of the owner of the affected property and essential to the health and safety of the community.

   D.    Among the basic services required of every property with a structure designed for human occupancy (except ancillary buildings) are parks, open space, recreation facilities, and trails.

   E.    The Parks SDC imposed in this Chapter is based upon the actual costs of providing existing or planned parks capital improvements and does not impose charges on persons not receiving a service and imposing a burden upon the City's existing parks.

City of Grants Pass Municipal Code

F.    The Parks SDC imposed by this Chapter is separate from and in addition to any applicable tax, assessment, charge, fee, in lieu of assessment or fee otherwise provided by law or imposed as a condition of development.  A Parks SDC is to be considered in the nature of a charge for consumption of existing capacity and a service to be rendered.

G.    The Parks SDC is an incurred charge for the acquisition and capital development of the park, trail, open space, and recreation system.  This is a new program to protect the capacity for current and future users of this system and as such does not represent a product or service that was wholly or partially paid for by Ad Valorem taxes on June 30, 1995 or thereafter.  No shift, transference, or conversion of programs previously financed by property tax will occur.

H.    In accord with those findings, no public vote is required for the adoption of this Parks SDC.

3.40.020  Definition.

A.    As used in this Chapter, except where the context otherwise requires, the words and phrases have the following meaning:

1.    "Development" means a development which thereby increases the use of any parks or which creates the need for additional parks.

2.    "Residential Development" means any development designed to be occupied by a family or individual for living and sleeping.  May or may not include cooking and eating facilities.

3.    "Business Development" means a building designed for use by a commercial or industrial business.

4.    "Parks Capital Improvement(s)" means all City parks, trails, open space, and recreation centers which are used or designed for recreational purposes including real property acquired for ownership, access, or use for current or future expansion or creation of parks, trails, or open space.

5.    "Parks System Development Charge (Parks SDC)" means a fee for costs associated with parks capital improvements acquired, which is assessed or collected at any of the times specified in Section 6.47.050.  Parks SDC does not include:

City of Grants Pass Municipal Code

    a.    Any fees assessed or collected as part of a local improvement district;

    b.    A charge in lieu of a local improvement district assessment; or

    c.    The cost of complying with requirements or conditions imposed upon a land use decision or limited land use decision.

    6.    "Qualified Public Improvements" means a capital improvement that is identified in the Grants Pass Park and Recreation Master Plan adopted which may from time to time be amended.

### 3.40.030  Parks System Development Charge Established.

**A.**    Effective June 30, 1997, a Parks System Development Charge is hereby imposed upon all development within the corporate limits of the City of Grants Pass/Josephine County.

**B.**    Immediately upon execution or modification of an intergovernmental agreement between the City of Grants Pass and Josephine County, which provides for the collection and distribution of this Parks System Development Charge, said charge will also be imposed upon all development within the unincorporated Urban Growth Boundary of the City of Grants Pass.

**C.**    The fee imposed as a Parks System Development Charge shall be established and amended from time to time by City Council resolution, said fee not shifting, transferring or converting any governmental product or service wholly or partially financed from ad valorem taxes.
(This Chapter has been amended by Res. 4805, 2004)

### 3.40.040  Compliance with State Law.

**A.**    The revenues received from the Parks System Development Charge shall be deposited in an account named "Parks Land Activity." This activity shall be budgeted and accounted for as provided by state law.

**B.**    The capital improvement plan required by state law as the basis for expending revenues from the improvement fees portion of the Parks System Development Charge shall be the Grants Pass Parks and Recreation Master Plan (1984) which may from time to time be amended.

City of Grants Pass Municipal Code

3.40.050  Collection of Charge.

A.    The Parks System Development Charge is due and payable upon issuance of a
building permit for the following:

1.    New on-site residential construction or expansion which creates
additional residential units.

2.    Any construction creating or expanding residential units for more than
four families, which requires the issuance of a Development Permit.

3.    Any construction which creates a new business building or enlarges a
business building, which required the issuance of a Development Permit.

B.    The Parks System Development Charge is due and payable upon issuance of
the first manufactured home placement permit granted upon an individual
building lot.

C.    In the case of a manufactured home park, fifty percent (50%) of the Parks
System Development Charge shall be due and payable for all spaces in the
manufactured home park at the time land use approval is granted.  The
remaining balance of the Parks System Development Charge shall be due and
payable at the time the placement permit is granted for each space.

D.    The owner(s) of vacant lots or spaces within an existing manufactured home
park that has received all necessary land use approvals prior to June 30, 1997,
shall pay a Parks System Development Charge of 100% of the applicable Parks
System Development Charge for each space at the time the placement permit is
granted for that lot or space.

E.    If a development is commenced without appropriate permit, the Parks System
Development Charge is immediately payable.

F.    The City Building Official shall collect the Parks System Development Charge
from the building/placement permit applicant, the person required to apply for
the building/placement permit, the owner of the real property upon which the
development occurs or any person having received benefit from the
development.  The Building Official shall not issue any permit or allow
construction described in Section 6.47.050 until the charge has been paid in full.

G.    Where a structure which is benefited by parks capital improvements is
destroyed or removed, no Parks System Development Charge shall be imposed
for the replacement of the structure.

City of Grants Pass Municipal Code

H.    The Parks System Development Charges may be subject to the payment in installments under the provisions of the Bancroft Bonding Act of the State of Oregon.

### 3.40.060  Exemptions.

A.    Exemptions to the Parks System Development Charge are as follows:

1.    All pending building/placement permit applications for existing lots of record submitted prior to June 30, 1997.

2.    All existing structures for which a building/placement permit has been issued and which were established and existing prior to June 30, 1997.

3.    Garages (attached or detached), and other detached non-habitable accessory buildings.

4.    All local, state and federal governments and political subdivisions.

B.    Any residential development which is exempt from the Parks System Development Charge by reason of its intended use shall lose such exemption immediately upon a change in use to a type of development which is not exempt from the Parks System Development Charge obligation.  Upon such loss of exemption, the Parks System Development Charge shall be immediately due and payable upon the entire residential development which was previously exempt.

### 3.40.070  Credits.

A.    Subject to the approval by the City Council, the City of Grants Pass may grant a credit against the Parks System Development Charge for the contribution of construction or land or both for any qualified public improvements.

1.    Prior to issuance of a building or development permit, the applicant may submit to the City, a proposed plan and estimate of value of land or construction or both which the applicant desires to contribute to the City as a full or partial offset to a cash payment for a Parks System Development Charge.  The proposal shall include all of the following:

a.    A designation of the development for which the proposed plan is being submitted; and

City of Grants Pass Municipal Code

    b.    A legal description of any land proposed to be contributed and a written appraisal based on comparable sales of similar property between unrelated properties; and

    c.    A time schedule for completion of the plan.

2.    The principle factors the City will use to determine the eligibility and value of a proposal as a credit against a Parks System Development Charge shall include but are not limited to the following:

    a.    The size and location of the improvement; and

    b.    The cost of maintenance; and

    c.    The extent to which the proposal satisfies capital improvement requirements identified in the Parks and Recreation Master Plan; and

    d.    The extent to which the proposed improvements are in excess of those required as a condition of land use approval.

3.    If the City Council approves the proposed contribution, it shall establish the amount to be allowed as a credit to the Parks System Development Charge.  The credit can only be applied to the current development including all phasing.

4.    Any applicant who submits a proposed plan pursuant to this Section and desires the immediate issuance of a building permit or development permit shall pay the applicable Parks System Development Charge charges.  Any difference between the amount paid and the amount credited shall be refunded to the applicant up to but not exceeding the amount of the Parks System Development Charge.

5.    The decision of the City Council as to whether to accept the proposed plan of contribution and the value of such contribution shall be in writing and issued to the applicant.

B.    The City Manager shall be responsible for all recording and accounting associated with the distribution of credits.

City of Grants Pass Municipal Code

3.40.080  Appeal Procedures.

A.  Parties challenging the methodology for establishing the Parks System
Development Charge must appeal the methodology by filing a Notice of Appeal
with the City Manager within 60 days of passage of the Ordinance adopting this
Chapter.  Such appeals shall describe with particularity the portion of the
methodology, calculations or assumptions which are being asked for
reconsideration.  The filing of such an appeal shall temporarily stay the payment
of any Parks System Development Charge until the appeal is determined upon
determination of the appeal and subject to legal action pursuant to ORS
223.304(5).  All Parks System Development Charges due as result of residential
developments occurring subsequent to the effective date of this ordinance, and
not otherwise exempt, shall be immediately due and payable.

B.  An appeal of expenditure must be filed with the City Manager within two years of
the date of alleged improper expenditure.  Appeals of any other decision may be
filed once the findings of fact or final decision for a land use decision (including
all appeals) has been signed and is effective.  When the land use decision
includes a building permit, the appeal period ends fourteen (14) days from the
date the building permit is ready to be issued.  The same fourteen (14) day
appeal period applies to all other building permits where a final determination for
a parks system development charge is made.
(Ord. 5511 §3, 2010)

C.  An appeal fee, established by Council resolution, shall accompany all appeals of
Parks System Development Charges or expenditures from the Parks Lands
Activity account.

D.  The Notice of Appeal shall state:

   1.  The name and address of the applicant; and

   2.  The address or tax lot of the subject property; and

   3.  The nature of the determination being appealed; and

   4.  If issued, the date the building/placement permit or development
permit was issued; and

   5.  If paid, the date the Parks System Development Charge was paid and the
amount of payment; and

   6.  A detailed description of the reasons the determination is incorrect; and

City of Grants Pass Municipal Code

   7.   . A detailed description of what the correct determination of the appeal
        should be.

E.   An applicant who fails to correctly file an appeal within the time permitted waives
     the objections and the appeal shall be dismissed.

F.   Unless the appellant and the City agree to a longer period, an appeal shall be
     heard within 30 days of the receipt of the Notice of Appeal.  At least 7 days prior
     to the hearing, the City shall mail notice of the time and location thereof to the
     appellant.

G.   The City Council shall hear and determine the appeal on the basis of the
     appellant's written statement and any additional evidence the City Council
     deems appropriate.  At the hearing, the appellant may present testimony and
     oral argument personally or by counsel.  The rules of evidence as used by
     courts of law do not apply.

H.   The appellant shall carry the burden of proving that the determination being
     appealed is incorrect and what the correct determination should be.

I.   The City Council shall issue a written decision within 20 days after the hearing
     date and that decision shall be final.  The Council may affirm, amend, modify, or
     reverse the determination being appealed.

## 3.40.090  Construction.

The rules of statutory construction contained in ORS Chapter 174 are adopted and by
this reference made a part of this Chapter.

## 3.40.100  Prohibited Construction.

No development or intensification of use may be made unless the applicable Parks
System Development Charge has been paid.

## 3.40.110  Severability.

The invalidity of a portion of this Chapter shall not affect the validity of the remainder.

## 3.40.200   Annual Adjustments for System Development Charges.

System development charges for parks shall be adjusted annually for cost of living
as set forth in Sections 3.10.200 et seq.  (Ord. 5389 12/06/06).

City of Grants Pass Municipal Code

Chapter 3.45

PARK DEVELOPMENT SYSTEM DEVELOPMENT CHARGE

Sections:

| 3.45.010 | Findings. |
|---|---|
| 3.45.020 | Definitions. |
| 3.45.030 | Park Development System Development Charge Established. |
| 3.45.040 | Compliance with State Law. |
| 3.45.050 | Collection of Charge. |
| 3.45.060 | Exemptions. |
| 3.45.070 | Credits. |
| 3.45.080 | Appeal Procedures. |
| 3.45.090 | Construction. |
| 3.45.100 | Prohibited Construction. |
| 3.45.110 | Severability. |

City of Grants Pass Municipal Code

3.45.010  Findings.

A. The Park Development System Development Charge (SDC) established herein is intended to be a charge upon the act of development by whoever seeks the development. It is a fee for service because it is the residential and business development which requires essential municipal services based upon the nature of the development. The timing and the extent of development is within the control and discretion of the developer.

B. The Park Development SDC imposed in this Chapter is not a tax on property or on a property owner as a direct consequence of ownership of property within the meanings of Section II.b., Article XI of the Oregon Constitution or the legislation implementing that section. The Park Development SDC is not a fee supplanting any property tax based system as envisioned in Article XI of the Oregon Constitution.

C. If the Park Development SDC herein imposed is viewed under Section II.b., Article XI of the Oregon Constitution as a tax against property or against a property owner as a direct consequence of ownership of that property, it is an incurred charge within the meaning of that Section and the statutes implementing it because:

   1. It allows the owner to control the quantity of the service by determining the extent of development to occur upon the property.

   2. It allows the owner to determine when the service is to be initiated or increased by controlling when the development occurs.

   3. State law and the ordinances of the City of Grants Pass require the owner to provide certain basic utility services to the property when it is developed for human occupancy. The provision of these basic services is a routine obligation of the owner of the affected property and essential to the health and safety of the community.

D. Among the basic services required of every property with a structure designed for human occupancy (except ancillary buildings) are parks, open space, recreation facilities, and trails.

E. The Park Development SDC imposed in this Chapter is based upon the actual costs (adjusted to 2006 dollars) of providing existing parks capital improvements and does not impose charges on persons not receiving a service and imposing a burden upon the City's existing parks.

City of Grants Pass Municipal Code

F.    The Park Development SDC imposed by this Chapter is separate from and in addition to any applicable tax, assessment, charge, fee, in lieu of assessment or fee otherwise provided by law or imposed as a condition of development. A Park Development SDC is to be considered in the nature of a charge for consumption of existing capacity and a service to be rendered.

G.    The Park Development SDC is an incurred charge for the capital development of the park, trail and open space system. This is a new program to protect the capacity for current and future users of this system and as such does not represent a product or service that was wholly or partially paid for by Ad Valorem taxes on June 30, 1995 or thereafter. No shift, transference, or conversion of programs previously financed by property tax will occur.

H.    In accord with those findings, no public vote is required for the adoption of this Park Development SDC.

3.45.020  Definition.

A.    As used in this Chapter, except where the context otherwise requires, the words and phrases have the following meaning:

1.    "Development" means a development which increases the use of any parks or which creates the need for additional parks.

2.    "Residential Development" means any development designed to be occupied by a family or individual for living and sleeping which may or may not include cooking and eating facilities.

3.    "Business Development" means a development designed for use by a commercial or industrial business.

4.    "Parks Capital Improvement(s)" means all City parks, trails, open space, and recreation centers which are used or designed for recreational purposes including real property acquired for ownership, access, or use for current or future expansion or creation of parks, trails, or open space.

5.    "Park Development System Development Charge (Park Development SDC)" means a fee for costs associated with parks capital improvements, which is assessed or collected at any of the times specified in Section 3.45.050. Park Development SDC does not include:

a.    Any fees assessed or collected as part of a local improvement district;

City of Grants Pass Municipal Code

    b.    A charge in lieu of a local improvement district assessment; or

    c.    The cost of complying with requirements or conditions imposed upon a land use decision or limited land use decision.

6.    "Qualified Public Improvements" means a capital improvement that is identified in the Grants Pass Park and Recreation Master Plan (adopted 1984) which may from time to time be amended.

## 3.45.030  Park Development SDC Established.

A.    Effective January 1, 2007, a Park Development SDC is hereby imposed upon all development within the corporate limits of or administered by the City of Grants Pass/Josephine County.

B.    Based upon the intergovernmental agreement between the City of Grants Pass and Josephine County, said charge will also be imposed upon all development within the unincorporated Urban Growth Boundary of the City of Grants Pass.

C.    The fee imposed as a Park Development SDC shall be established and amended from time to time by City Council resolution, said fee not shifting, transferring or converting any governmental product or service wholly or partially financed from ad valorem taxes.

## 3.45.040  Compliance with State Law.

A.    The revenues received from the Park Development SDC shall be deposited in an account named "Park Development Activity."  This activity shall be budgeted and accounted for as provided by state law.

B.    The capital improvement plan required by state law as the basis for expending revenues from the improvement fees portion of the Park Development SDC shall be Qualified Public Improvements.

## 3.45.050  Collection of Charge.

A.    The Park Development SDC is due and payable upon issuance of a building permit for the following:

1.    Any residential construction or expansion which creates additional residential units.  If the construction does not create additional residential units, no Park Development SDC is due.

City of Grants Pass Municipal Code

    2.     Any construction which creates a new business building or enlarges an existing business building, which requires the issuance of a Development Permit.   If the construction does not create a new building or enlarge an existing business building, no Park Development SDC is due.

B.     The Park Development SDC is due and payable upon issuance of a manufactured home placement permit granted upon an individual building lot.

C.     In the case of a manufactured home park, the Park Development SDC shall be due and payable for each and every space in the manufactured home park at the time the placement permit is issued.

D.     If a development is commenced without the appropriate permit(s), the Park Development SDC is immediately due and payable.

E.     The City Building Official shall collect the Park Development SDC from the building/placement permit applicant, the person required to apply for the building/placement permit, the owner of the real property upon which the development occurs or any person having received benefit from the development.  The Building Official shall not issue any permit or allow construction described in Section 3.45.050 until the Park Development SDC has been paid in full.

F.     Where a structure which is benefited by parks capital improvements is destroyed, no Park Development SDC shall be imposed for the replacement of the structure.

G.     The Park Development SDCs may be subject to the payment in installments under the provisions of the Bancroft Bonding Act of the State of Oregon.

<u>3.45.060  Exemptions</u>.

A.     The following are exempt from the Park Development SDC:

    1.     All pending building/placement permit applications for existing lots of record submitted prior to March 24, 2007.

    2.     All existing structures for which a building/placement permit has been issued and which were established and existing prior to March 24, 2007.

    3.     Garages (attached or detached), and detached uninhabitable accessory buildings.

    4.     All local, state and federal governments

City of Grants Pass Municipal Code

B.    Any development which is exempt from the Park Development SDC by
reason of its intended use shall lose such exemption immediately upon a
change in use to a type of development which is not exempt from the Park
Development SDC obligation.  Upon such loss of exemption, the Park
Development SDC shall be immediately due and payable upon the entire
development which was previously exempt.

3.45.070  Credits.

A.    The City Council may grant a credit against the Park Development SDC for the
contribution of construction for any Qualified Public Improvements subject to the
following considerations:

    1.    Prior to issuance of a building or development permit, the applicant may
submit to the City, a proposed plan and estimate of value of
development to a public park which the applicant desires to contribute to
the City as a full or partial offset to a cash payment for a Park
Development SDC.  The proposal shall include all of the following:

        a.    A designation of the development for which the proposed plan is
being submitted; and
        b.    A time schedule for completion of the plan.

    2.    The principle factors the City will use to determine the eligibility and value
of a proposal as a credit against a Park Development SDC shall include
but are not limited to the following:

        a.    The size and location of the improvement;
        b.    The cost of maintenance;
        c.    The extent to which the proposal satisfies capital improvement
requirements identified in the Parks and Recreation Master Plan or
is equivalent to said requirements;
        d.    The extent to which the proposed improvements are in excess of
those required as a condition of land use approval.

    3.    If the City Council approves the proposed contribution, it shall establish
the amount to be allowed as a credit to the Park Development SDC.  The
credit can only be applied to the current development including all
phasing.

    4.    Any applicant who submits a proposed plan pursuant to this Section and
desires the immediate issuance of a building permit or development
permit shall pay the applicable Park Development SDC charges.  Any

City of Grants Pass Municipal Code

difference between the amount paid and the amount credited shall be refunded to the applicant up to but not exceeding the amount of the Park Development SDC.

5.    The decision of the City Council as to whether to accept the proposed plan of contribution and the value of such contribution shall be in writing and issued to the applicant, and at the sole discretion of the City.

B.    The City Manager shall be responsible for all recording and accounting associated with the distribution of credits.

3.45.080  Appeal Procedures.

A.    Parties challenging the methodology for establishing the Park Development SDC must appeal the methodology by filing a Notice of Appeal with the City Manager within 60 days of passage of the Ordinance adopting this Chapter. Such appeal shall describe with particularity the portion of the methodology, calculations or assumptions which are being asked for reconsideration.  The filing of such an appeal shall temporarily stay the payment of any Park Development SDC until determination of the appeal and subject to legal action pursuant to ORS 223.304(5).

B.    An appeal of expenditure must be filed with the City Manager within two years of the date of alleged improper expenditure.  Appeals of any other decision may be filed once the findings of fact or final decision for a land use decision (including all appeals) has been signed and is effective.  When the land use decision includes a building permit, the appeal period ends fourteen (14) days from the date the building permit is ready to be issued.  The same fourteen (14) day appeal period applies to all other building permits where a final determination for a parks development system development charge is made. (Ord. 5511 §3, 2010)

C.    An appeal fee, established by Council resolution, shall accompany all appeals of Park Development SDC's or expenditures from the Parks Lands Activity account.

D.    The Notice of Appeal shall set forth the following:

1.    The name and address of the appellant
2.    The address or tax lot of the subject property
3.    The nature of the determination being appealed
4.    (If issued) the date the building/placement permit or development permit was issued;

City of Grants Pass Municipal Code

5.    (If paid) the date the Park Development SDC was paid and the amount of payment;

6.    A detailed description of the reasons the determination is incorrect;

7.    A detailed description of what the correct determination of the appeal should be.

An appellant who fails to correctly and completely file an appeal within the time permitted waives the objections and the appeal shall be dismissed.

E.    Unless the appellant and City agree to a longer period, an appeal shall be heard within 30 days of the receipt of the Notice of Appeal. At least 10 days prior to the hearing, the City shall mail notice of the time and location thereof to the appellant.

F.    The City Council shall hear and determine the appeal on the basis of the appellant's written statement and any additional evidence the City Council deems appropriate. At the hearing, the appellant may present testimony and oral argument personally or by counsel. The rules of evidence as used by courts of law do not apply.

F.    The appellant shall carry the burden of proving that the determination being appealed is incorrect and what the correct determination should be.

G.    The City Council shall issue a written decision within 20 days after the hearing date and that decision shall be final. The Council may affirm, amend, modify, or reverse the determination being appealed.

3.45.090  Construction.

The rules of statutory construction contained in ORS Chapter 174 are adopted and by this reference made a part of this Chapter.

3.45.110  Severability.

The invalidity of a portion of this Chapter shall not affect the validity of the remainder.

## City of Grants Pass Municipal Code

This Chapter was created by Ord. 5214, 2004
This Chapter was admended by Ord. 5386 12/06/06

### Chapter 3.50

### STORM WATER AND OPEN SPACE SYSTEM DEVELOPMENT CHARGE

Sections:

| | |
|---|---|
| 3.50.010 | Findings. |
| 3.50.020 | Definitions. |
| 3.50.030 | Storm Drainage System Development Charge Established. |
| 3.50.040 | Compliance with State Law. |
| 3.50.050 | Identification of Storm Drainage Basins. |
| 3.50.060 | Adoption of Calculation Data. |
| 3.50.070 | Principles of Categorization. |
| 3.50.080 | Calculation of Charges. |
| 3.50.090 | Collection of Charge. |
| 3.50.100 | Exemptions. |
| 3.50.110 | Credits and Construction in Lieu. |
| 3.50.120 | Appeal Procedures. |
| 3.50.130 | Construction. |
| 3.50.140 | Prohibited Construction. |
| 3.50.150 | Severability. |
| 3.50.200 | Annual adjustments for Storm Drainage Water and Open Space System Development Charges. |

City of Grants Pass Municipal Code

## 3.50.010  Findings.

A.    The Storm Drainage Water and Open Space System Development Charge (SDC) established herein is intended to be a charge upon the act of development by whomever seeks the development.  It is a fee for service because it is the residential and business development, which requires essential municipal services based upon the nature of the development.  The timing and the extent of development are within the control and discretion of the developer.

B.    The Storm Water and Open Space SDC imposed in this Chapter is not a tax on property or on a property owner as a direct consequence of ownership of property within the meanings of Section II.b., Article XI of the Oregon Constitution or the legislation implementing that section.  The Storm Water and Open Space SDC is not a fee supplanting any property tax based system as envisioned in Article XI of the Oregon Constitution.

C.    If the Storm Water and Open Space SDC herein imposed is viewed under Section II.b., Article XI of the Oregon Constitution as a tax against property or against a property owner as a direct consequence of ownership of that property, it is an incurred charge within the meaning of that Section and the statutes implementing it because:

    1.    It allows the owner to control the quantity of the service by determining the extent of development to occur upon the property.

    2.    It allows the owner to determine when the service is to be initiated or increased by controlling when the development occurs.

    3.    State law and the Ordinances of the City of Grants Pass require the owner to provide certain basic utility services to the property when it is developed for human occupancy.  The provision of these basic services is a routine obligation of the owner of the affected property and essential to the health and safety of the community.

D.    Among the basic services required of every property with a structure designed for human occupancy (except ancillary buildings) are storm water and open space facilities to accommodate and control rain water, snow melt, excess irrigation waters deposited on hard surfaces or otherwise running off of lands, and provision of open space treatment systems to assure the quality of runoff water returning to receiving streams.

E.    The Storm Water and Open Space SDC imposed in this Chapter is based upon the actual costs of developing a master plan for the provision of storm water and open space facilities in areas other than the Sand Creek Storm Drainage Basin,

## City of Grants Pass Municipal Code

and are based on the combination of plan development and the actual costs of providing planned piping facilities and construction of capital improvements in the Sand Creek Basin, and does not impose charges on persons not receiving a service and imposing a burden upon the City's existing storm water and open space system.

F.     The Storm Water and Open Space SDC imposed by this Chapter is separate from and in addition to any applicable tax, assessment, charge, fee, in lieu of assessment or fee otherwise provided by law or imposed as a condition of development.  This SDC is a charge for the provision of required plan updates and the construction of planned facilities required to maintain service levels for storm water and open space facilities.

G.     The Storm Water and Open Space SDC is an incurred charge for the planning, acquisition and capital development of facilities to accommodate and control storm water runoff, directly associated open space, and water quality control facilities to clean surface water runoff prior to return to natural surface water conveyances.  This is a new program to protect the capacity for current and future users of this system and as such does not represent a product or service that was wholly or partially paid for by Ad Valorem taxes on October 15, 1999, or thereafter.  No shift, transference, or conversion of programs previously financed by property tax will occur.

H.     In accord with those findings, no public vote is required for the adoption of this Transportation SDC.

3.50.020  Definitions.

A.     As used in this Chapter, except where the context otherwise requires, the words and phrases defined below have the meaning identified.  For any definitions not complete or modified in this section, the general definitions of Chapter 30 of the Grants Pass Development Code apply.  In cases of conflict, the specific provisions of this chapter will apply.

1.     "Development" means a development which thereby increases the use of any drainage facility or which creates the need for additional drainage facilities beyond those in place September 15, 2003, and shall be determined by the necessity for a building permit or a development permit.  Any act defined as "development" in Article 30.020 of the Grants Pass Development Code shall not apply to this section to the extent that the definition includes land division, partitions, rights of access, storage, drilling or any site alteration.

City of Grants Pass Municipal Code

2.    "Residential Development" means any development designed to be occupied by a family or individual as defined in Article 30 of the Grants Pass Development Code for living and sleeping, and which may or may not include cooking and eating facilities.

3.    "Business Development" means a building designed for use by a commercial or industrial business.

4.    "Storm Water and Open Space Capital Improvement(s)" means all plan development as well as drainage facilities to accommodate and control storm water runoff, provide for open space associated with those drainage ways, and assure water quality for storm water returned to natural surface water systems.

5.    "Storm Water and Open Space System Development Charge (SWOS SDC)" means a fee for costs associated with storm water master plan updates or capital improvements acquired which is assessed or collected at any of the times specified in Section 3.50.080.  SWOS SDC does not include:

    a.    Any fees assessed or collected as part of a local improvement district;

    b.    A charge in lieu of a local improvement district assessment; or

    c.    The cost of complying with requirements or conditions imposed upon a land use decision or limited land use decision.

6.    "Qualified Public Improvements" means the creation of a storm water master plan and shall include the construction of capital improvements identified in the Sand Creek Basin and enumerated in the revised Master Storm Drainage Facilities and Management Plan for the Grants Pass Urban Growth Boundary Area as originally prepared by H.G.E, Inc. and adopted in 1983.

3.50.030  Storm Water and Open Space System Development Charge Established.

A.    Effective March 1, 2004, a Storm Water and Open Space System Development Charge is hereby imposed upon all development within the City Limits of the City of Grants Pass, Josephine County, as defined in this code.

B.    Said charge will also be imposed upon development in accord with this code within the unincorporated Urban Growth Boundary of the City of Grants Pass pursuant the intergovernmental agreement between the City of Grants Pass and

City of Grants Pass Municipal Code

Josephine County entitled "Intergovernmental Agreement for the Orderly Management of the Grants Pass Urban Growth Boundary Area," dated August 5, 1998.

C.    The fee imposed as a Storm Water and Open Space System Development Charge shall be established and amended from time to time by City Council resolution, said fee not shifting, transferring or converting any governmental product or service wholly or partially financed from ad valorem taxes.

D.    Fees are established by development for the update of the Master Plan, and by development area for the identified portion of the Sand Creek Basin.

3.50.040  Compliance with State Law.

A.    The revenues received from the Storm Water and Open Space System Development Charge shall be deposited in an account named "Storm Water and Open Space SDC Fund." Two separate categories shall be established in accord with this code, one for the collection of fees in the Sand Creek Basin as defined in this code, and a separate account within the fund for the update of the master plan for storm water and open space. This activity shall be budgeted and accounted for as provided by state law.

B.    The capital improvement plan required by state law as the basis for expending revenues from the improvement fees portion of the Storm Water and Open Space System Development Charge shall include the update to storm drainage basins throughout the City and Urban Growth Boundary, and the specific pipeline improvements identified for the sub basins in Sand Creek as identified in the methodology update dated 14 January, 2004, and adopted by separate resolution with a listing of capital investments for the identified portion of the Sand Creek Sub-Basin.

3.50.050 Identification of Basins.

The two separate categories of storm basins identified in this code shall be that portion of the Sand Creek Basin specifically included in the attached map Exhibit "A", and all other drainage areas in the Urban Growth Boundary.

3.50.060 Adoption of Calculation Data

The methodology for the Master Plan update for storm water and open space identifies a single fee for all development to fund the pending updates for design of each drainage basin. The calculations of the pipe sizing for installation in a portion of Sand Creek identified in this code by Exhibit "A" is summarized to create a single charge of

City of Grants Pass Municipal Code

$10,890 per acre of development.  Said fee shall be $.25 per square foot of developed property as defined in this code.

3.50.070   Principles of Categorization

The use of categories of development is based on the representation of the developer or principal owner of interest in a project at the time a project is proposed or altered to a sufficient extent to require a building or development permit in accord with the Grants Pass City Development Code, or at the time of land development or subdivision as defined.

In assigning categories of use during the building permit process or the development process the City shall rely on the representation of the principal owner or developer of the project on the intended uses, so long as such uses are permitted in the development code.  The total land area identified in the approved site plan shall be the basis for calculation for area charges, except for construction on an existing lot of record where the total land area exceeds one-half acre in total size.

Occupancy or change of occupancy shall not create liability under this code unless such change of occupancy requires a building permit or development permit in accord with the Grants Pass City Development Code.

Outside sales areas, as defined in the Grants Pass City Development Code and otherwise permitted in the appropriate zone, will not be included in the calculation of square footage for this code, except to the extent such areas are paved or treated in a manner that would create impervious surfaces increasing the runoff from the site to the storm drainage and open space system.

3.50.080 Calculation of Charges

All developments as defined in this ordinance and subject to the Storm Water and Open Space system development charge shall be established in one of two drainage areas in accordance with this code.  The development within the boundaries of the Sand Creek Basin shall have all area developed subject to the area fee.  In addition to such fees for lands within the basin, all lands within the Urban Growth Boundary shall be responsible for the payment of the uniform fee applicable to the development of updated storm water and open space development plan, including those lands within the Sand Creek Basin identified for separate charges in this code.

Whenever reference is made to square footage, it shall apply to gross square footage owned by the applicant, except where development is for the purposes of a single family residence on a lot of record that exceeds one-half acre in size, in which case, the actual area for the site plan shall be the basis for the square footage connection.

City of Grants Pass Municipal Code

3.50.090  Collection of Charge.

A.    The Storm Water and Open Space System Development Charge is due and payable when land is developed or subdivided, or upon issuance of a building permit, or prior to occupancy, for the following:

    1.    New on-site residential construction or expansion which creates additional residential units.

    2.    Any construction which creates a new business building, which required the issuance of a Development Permit.

    3.    Any construction which expands or remodels a business building, which includes an increase in impervious surface that generates runoff to the drainage system when such an expansion increases by 25% or more the area of such impervious surface that existed at the time of adoption of this code.

    4.    New on-site construction on an existing lot of record at the time of the adoption of this code shall have an implied residential area for any lands not further subdivided or separated into any additional lot configurations. Such area shall be the actual building square footage and all impervious surface constructed exterior to the building, except to exempt there from any driveway that is required under the code that is greater than 100 foot in length.

B.    The Storm Water and Open Space System Development Charge is due and payable upon issuance of the first manufactured home placement permit granted upon an individual building lot.

C.    In the case of a manufactured dwelling park or mobile home park shall be required to pay fifty percent (50%) of the Storm Water and Open Space System Development Charge for all spaces in the manufactured home park at the time land use approval is granted.  The remaining balance of the System Development Charge shall be due and payable at the time the placement permit is granted for each space.

D.    The owner(s) of vacant lots or spaces within an existing manufactured home park that has received all necessary land use approvals prior to March 1, 2004, shall pay a Storm Water and Open Space System Development Charge of 100% of the applicable Charge for the total square footage of each space at the time the placement permit is granted for that lot or space.

City of Grants Pass Municipal Code

E.   If a development is commenced without appropriate permit, the Storm Water and Open Space System Development Charge is immediately payable.

F.   The City Manager or his designated representative shall collect the Storm Water and Open Space System Development Charge from the building/placement permit applicant, the person required to apply for the building/placement permit, the owner of the real property upon which the development occurs or any person having received benefit from the development.  The City shall not issue any permit or allow construction described in Section 3.50.080 until the charge has been paid, or arrangements for payment made.

G.   The conversion of existing buildings from one use to another shall not create any liability for storm water and open space system development charges as defined in this chapter.  The expansion of any structure or outside sales area that increases impervious surfaces, if the expansion is required to obtain a building permit or development permit prior to occupancy shall be required to pay only the incremental increase in impervious area in the Sand Creek Basin, and all such alterations both within Sand Creek and in all other areas within the Urban Growth Boundary shall be assessed the single SDC fee for Storm Water and Open space in all other areas of the Urban Growth Boundary.

H.   Where a structure which is benefited by storm drainage capital improvements is destroyed or removed, no System Development Charge shall be imposed for the replacement of the structure, provided however, to the extent that any replacement expands, alters, or increases impervious areas, an incremental fee as described in this code shall be due and payable.

I.   The Storm Water and Open Space System Development Charges may be subject to the payment in installments under the provisions of the Bancroft Bonding Act of the State of Oregon.

## 3.50.100  Exemptions.

A.   Exemptions to the Storm Water and Open Space System Development Charge are as follows:

1.   All pending building/placement permit applications for existing lots of record submitted prior to March 1, 2004.

2.   All existing structures for which a building/placement permit has been issued and which were established and existing prior to March 1, 2004.

3.   All local governments.  Local government for this code includes school districts, county governmental facilities, city facilities, and facilities owned

City of Grants Pass Municipal Code

and operated by special districts formed under Oregon Law as local governments, or any Chapter 190 combination governmental entity controlled by local governments.

    4.    All individual building lots within a subdivision or development that has constructed improvements in accord with the existing adopted Master Plan named in the attached listing as having completed all storm drainage proportional installation requirements.

B.    Any development which is exempt from the Storm Water and Open Space Charge by reason of its intended use shall lose such exemption immediately upon a change in use to a type of development which is not exempt from the Charge obligation.  Upon such loss of exemption, the System Development Charge shall be immediately due and payable upon the entire development

which was previously exempt when any action is taken with the structure that requires the issuance of a building or development permit.

C.    Any natural feature, such as wetlands, creeks or streams, that provide and/or protect open space and preserve existing vegetation and drainage areas through dedication to the City, separate tracts of land recorded on plats, conservation easements, or identified preserved natural features which are established during the site review and subdivision process.  (Added by Ord. 5236, 2004)

### 3.50.110  Credits and Construction in Lieu of SDC Payment

A.    In all areas except the Sand Creek basin, and subject to the approval by the City Council, the City of Grants Pass may grant a credit against the Storm Water and Open Space System Development Charge for the contribution of construction or land or both for any qualified public improvements.

    1.    Prior to issuance of a building or development permit, the applicant may submit to the City, a proposed plan and estimate of value of land or construction or both which the applicant desires to contribute to the City as a full or partial offset to a cash payment for a Storm Water and Open Space System Development Charge. The proposal shall include all of the following:

        a.    A designation of the development for which the proposed plan is being submitted; and

## City of Grants Pass Municipal Code

b.    A legal description of any land proposed to be contributed and a written appraisal based on comparable sales of similar property between unrelated properties; and

c.    A time schedule for completion of the plan.

2.    The principle factors the City will use to determine the eligibility and value of a proposal as a credit against a storm Water and Open Space System Development Charge shall include but are not limited to the following:

a.    The size and location of the improvement; and

b.    The cost of maintenance; and

c.    The extent to which the proposal satisfies capital improvement requirements identified capital improvements identified in the Sand Creek Basin and enumerated in the revised Master Storm Drainage Facilities and Management Plan for the Grants Pass Urban Growth Boundary Area as originally prepared by HGE, Inc. and adopted in 1983; and

d.    The extent to which the proposed improvements are in excess of those required as a condition of land use approval.

3.    If the City Council approves the proposed contribution, it shall establish the amount to be allowed as a credit to the Storm Water and Open Space System Development Charge. The credit can only be applied to the current development including all phasing.

4.    Any applicant who submits a proposed plan pursuant to this Section and desires the immediate issuance of a building permit or development permit shall pay the applicable System Development Charge charges. Any difference between the amount paid and the amount credited shall be refunded to the applicant up to but not exceeding the amount of the System Development Charge.

5.    The decision of the City Council as to whether to accept the proposed plan of contribution and the value of such contribution shall be in writing and issued to the applicant.

B.    The City Manager shall be responsible for all recording and accounting associated with the distribution of credits.

City of Grants Pass Municipal Code

C.      In the Sand Creek Basin, any applicant may apply to construct identified facilities in lieu of payment of System Development Charges.  Construction of any such facilities shall be approved in writing by the City Manager or his designated representative, and shall constitute specifically identified portions of the capital facilities required for construction as the same are adopted by resolution.  The Manager or his designated representative shall grant credit for such development in accord with the portions of such construction that exceed the minimum requirements of the development and are identified on the adopted listing of capital facilities from the Master Plan.

3.50.120  Appeal Procedures.

A.      Parties challenging the methodology for establishing the Storm Water and Open Space System Development Charge must appeal the methodology by filing a Notice of Appeal with the City Manager within 60 days of passage of the Ordinance adopting this Chapter.  Such appeals shall describe with particularity the portion of the methodology, calculations or assumptions that are being asked for reconsideration.  The filing of such an appeal shall temporarily stay the payment of any Storm Water and Open Space System Development Charge until the appeal is determined upon determination of the appeal and subject to legal action pursuant to ORS 233.304(5). All Storm Water and Open Space System Development Charges due as a result of developments occurring subsequent to the effective date of this ordinance, and not otherwise exempt, shall be immediately due and payable.

B.      An appeal of expenditure must be filed with the City Manager within two years of the date of alleged improper expenditure.  Appeals of any other decision must be filed within 14 days of the final determination of the storm water and open space system development charge in the building permit, mobile home park authorization, or other final permit authorization for a development to proceed.  Prior to the formal appeal provisions of this code, any applicant may file a written request for redetermination with the Director of Community Development.  Such a request may be filed without fee, and shall result in the written determination by the Director of the category of use and determination of fee for any development subject to this code.  Any party still aggrieved may pursue the further appeal described in this code.

C.      An appeal fee, established by Council resolution, shall accompany all appeals of Storm Water and Open Space calculation, or expenditures from the Storm Water and Open Space SDC Fund account.

City of Grants Pass Municipal Code

D.    The Notice of Appeal shall state:

1.    The name and address of the applicant; and

2.    The address or tax lot of the subject property; and

3.    The nature of the determination being appealed; and

4.    If issued, the date the building/placement permit or development permit was issued; and

5.    If paid, the date the Storm Water and Open Space System Development Charge was paid and the amount of payment; and

6.    A detailed description of the reasons the determination is incorrect; and

7.    A detailed description of what the correct determination of the system development charge should be.

An applicant who fails to correctly file an appeal within the time permitted waives the objections and the appeal shall be dismissed.

E.    Unless the appellant and the City agree to a longer period, an appeal shall be heard within 30 days of the receipt of the Notice of Appeal. At least 7 days prior to the hearing, the City shall mail notice of the time and location thereof to the appellant. No further public notification shall be required.

F.    The City Council shall hear and determine the appeal on the basis of the appellant's written statement and any additional evidence the City Council deems appropriate. At the hearing, the appellant may present testimony and oral argument personally or by counsel. The rules of evidence as used by courts of law do not apply. This is not a land use action.

G.    The appellant shall carry the burden of proving that the determination being appealed is incorrect and what the correct determination should be.

H.    The City Council shall issue a written decision within 20 days after the hearing date and that decision shall be final. The Council may affirm, amend, modify, or reverse the determination being appealed, with such findings adopted by resolution of the City Council. The City Council may increase, decrease, or make no changes in the categorization, calculation, or application of the Storm Water and Open Space System Development Charge.

I.    The decision of the City Council shall be final.

City of Grants Pass Municipal Code

3.50.130  Construction.

The rules of statutory construction contained in ORS Chapter 174 are adopted and by this reference made a part of this Chapter.

3.50.140  Prohibited Construction.

No development, modification of existing buildings or enterprises, or intensification of use creating more than 200 square feet of additional impervious surface may be made unless the applicable provisions of this code have been met, and applicable Storm Water and Open Space System Development Charges paid.

3.50.150  Severability.

The invalidity of a portion of this Chapter shall not affect the validity of the remainder.

3.50.200    Annual Adjustments for Storm Drainage Water and Open Space System Development Charges.

System development charges for storm drainage water and open space shall be adjusted annually for cost of living as set forth in Sections 3.10.200 et seq.
(Ord. 5389 12/06/06).

1

## CERTIFICATE OF SERVICE

2        The undersigned certifies under the penalty of perjury under the laws of the State of
Washington that I am now and at all times herein mentioned, a citizen of the United States, a
3  resident of the State of Washington, over the age of eighteen years, not a party to or interested
in the above-entitled action, and competent to be a witness herein.

4
        On the date given below I caused to be served the foregoing document on the
5  following individuals via CM/ECF Notification:

6  Carl A. Clyde OSB #095782                    __ U.S. Mail, proper postage affixed
Sorenson, Ransom & Ferguson, LLP           ___ Legal Messenger
7  133 NW D Street                               ___ Facsimile
Grants Pass OR 97526                          ___ Hand Delivery
8  541-476-3883 – Phone                        __X_ ECF/email
541-474-4495 – Fax
9  cclyde@roguevalleylaw.com
Attorney for Plaintiff
10

11 Dated: January 19, 2016                 /s/ Matthew Cleverley
                                           Matthew R. Cleverley, OSB #93235
12

13

14

15

16

17

18

19

20

21

22

23

CTIC'S MOTION FOR SUMMARY JUDGMENT – 14            FIDELITY NATIONAL LAW GROUP
                                                   1200 – 6ᵀᴴ AVENUE, SUITE 620
                                                   SEATTLE, WA 98101
                                                   (206) 223-4525

JOSEPHINE COUNTY OFFICIAL RECORDS
GEORGETTE BROWN, COUNTY CLERK            2002-018474

                                                              $21.00
00018023200200184740020027
                                        09/06/2002 08:05:02 AM
DEE-CIO  Cnt=1  Stn=4  RECEIPTS
$10.00 $11.00

# ORDINANCE NO. 5149

**AN ORDINANCE AMENDING ADVANCE FINANCED DISTRICT "N" STREET FOR PUBLIC WATER, STORM DRAIN AND STREET IMPROVEMENTS IN "N" STREET.**

**WHEREAS, CERTAIN PUBLIC WATER, STORM DRAIN AND STREET IMPROVEMENTS HAVE BEEN INSTALLED IN "N" STREET THAT WILL BENEFIT PROPERTIES HERETOFORE NOT SERVED BY THESE IMPROVEMENTS.**

**NOW, THEREFORE, THE CITY OF GRANTS PASS HEREBY ORDAINS:**

**Section 1:** The amount of reimbursement is set forth in Exhibit "1" which is attached hereto and incorporated herein, and is based upon a prorated share of the cost of installation.

**Section 2:** This ordinance amendment is effective upon passage.

**ADOPTED** by the Council of the City of Grants Pass, Oregon, in regular session this 21ST day of August, 2002.

**SUBMITTED** to and _Approved_ by the Mayor of the City of Grants Pass, Oregon, this 27 day of August, 2002.

_____
Len Holzinger, Mayor

**ATTEST:**

_____          Date submitted to Mayor: 8/23/02
Administrative Services Director

PLAINTIFF'S EXHIBIT
7
PENGAD 800-631-6989

## Agness Crossing Advance Financing District

"N" Street Revised August 21, 2002

| Revised Map | Tax lot | Properyt Owner | Address | Acreage | Length | Total | Water | Road/Storm |
|---|---|---|---|---|---|---|---|---|
| 1 | 36-05-21-24-500 | Farmer | 1815 SE "N" Street | 0.5 | 90.57 | $9,093 | $1,131 | $7,962 |
| 2 | 36-05-21-24-300 | Robinson | 1845 SE "N" Street | 0.5 | 48.43 | $6,633 | $825 | $5,808 |
| 4 | 36-05-21-24-400 | Robinson | 1835 SE "N" Street | 0.92 | 93 | $12,431 | $1,546 | $10,885 |
| 5 | 36-05-21-24-200 | Dickerson | P.O.Box 1222 | 1.89 | 188.57 | $25,392 | $3,158 | $22,234 |
| 6 | 36-05-21-24-800 | Josephine County | 201 River Hts Way | 0.76 | 125 | $13,081 | $1,627 | $11,454 |
| 7 | 36-05-21-21-900 | Josephine County | 201 River Hts Way | 0.62 | 131 | $12,366 | $1,538 | $10,828 |
| | | | | 5.19 | 676.57 | $78,996 | $9,825 | $69,171 |

## ORDINANCE NO. 5215

**AN ORDINANCE CREATING ADVANCE FINANCED DISTRICT WA4366 FOR WATER IMPROVEMENTS IN "N" STREET.**

WHEREAS, CERTAIN PUBLIC IMPROVEMENTS HAVE BEEN INSTALLED IN "N" STREET THAT WILL BENEFIT AN ADJACENT PROPERTY HERETOFORE NOT SERVED BY MUNICIPAL WATER IMPROVEMENTS.

NOW, THEREFORE, THE CITY OF GRANTS PASS HEREBY ORDAINS:

**Section 1:** The City Council hereby finds and determines the public water improvements installed by the City of Grants Pass in "N" Street are recognized as an Advance Financed Improvement and a portion of the costs thereof are reimbursable by those properties to be specially benefited by said improvements.

**Section 2:** The Council hereby determines there is created an Advance Financing District and said District shall be known as Advance Financed District WA4366 which includes the property described on the map marked Exhibit "2" which is attached hereto and incorporated herein.

**Section 3:** The Council determines the property within the District boundary to be specially benefited by water improvements shall be those requesting domestic water service. The amount of reimbursement is set forth in Exhibit "1" which is attached hereto and incorporated herein, and is based upon a prorated share of the cost of installation divided by the total front footage and total acreage of property. The amount shall be due and payable upon connection of the property to the public water system.

**Section 4:** The Council further determines that repayment from the benefited property shall include annual simple interest at a rate of 4% from the date of adoption for this ordinance.

**ADOPTED** by the Council of the City of Grants Pass, Oregon, in regular session this 18th day of February, 2004.

**SUBMITTED** to and _Approved_ by the Mayor of the City of Grants Pass, Oregon, this _25_ day of February, 2004.

_Len Holy_
Len Holzinger, Mayor

**ATTEST:**

_Joanne M. Stump_
Administrative Services Director

Date submitted to Mayor: _2/25/04_

PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
8

EXHIBIT 1

## ADVANCE FINANCING DISTRICT FOR WATER IMPROVEMENTS ON "N" STREET

(Note: these go from the east end to the west edge of tax lot 24-800 . It includes water line.)

| Map | Tax Lot | Owner | Address | Frontage (ft) | Percentage | Area (acre) | Percentage | Cost |
|---|---|---|---|---|---|---|---|---|
| 1 | 36-05-21-21-500 | Blue Line Invest | RE: 1686 SE N St | 34.00 | 0.03 | 1.50 | 0.06 | $2,386 |
| 2 | 36-05-21-21-600 | Torbert | RE: 1730 SE N St | 84.00 | 0.07 | 0.95 | 0.04 | $2,908 |
| 3 | 36-05-21-21-700 | PacWest | RE: 1750 SE N St | 434.50 | 0.38 | 3.75 | 0.16 | $13,778 |
| 23 | 36-05-21-24-1001 | Riverside Elem School | RE: 1200 SE Harvey | 64.00 | 0.06 | 11.49 | 0.49 | $13,882 |
| 24 | 36-05-21-24-501 | Sunday | RE: 1801 SE N St | 25.43 | 0.02 | 0.92 | 0.04 | $1,566 |
| 25 | 36-05-21-24-600 | Lewman | RE: 1785 SE N St | 75.00 | 0.07 | 0.94 | 0.04 | $2,695 |
| 26 | 36-05-21-24-700 | McDonald | RE: 1771 SE N St | 113.57 | 0.10 | 0.95 | 0.04 | $3,569 |
| 27 | 36-05-21-24-800 | Clark | RE: 1747 SE N St | 317.24 | 0.28 | 3.18 | 0.13 | $10,539 |
| | | | | | | | | |
| | Total | | | 1147.74 | 1.00 | 23.68 | 1.00 | $51,321 |
| | Total cost of water | | | | | | | $51,321 |



City of
Grants Pass

DATE 2-5-04
DWN FMS
DES
REV

City of Grants Pass

N St. Improvements

WATER

1" = 60'

000010

2

## ORDINANCE NO. 5217

AN ORDINANCE CREATING ADVANCE FINANCED DISTRICT TR4366 FOR STORM IMPROVEMENTS IN "N" STREET.

WHEREAS, CERTAIN PUBLIC IMPROVEMENTS HAVE BEEN INSTALLED IN "N" STREET THAT WILL BENEFIT AN ADJACENT PROPERTY HERETOFORE NOT SERVED BY MUNICIPAL STORM IMPROVMENTS.

NOW, THEREFORE, THE CITY OF GRANTS PASS HEREBY ORDAINS:

**Section 1:**  The City Council hereby finds and determines the public storm improvements installed by the Grants Pass Redevelopment Agency and City of Grants Pass in "N" Street are recognized as an Advance Financed Improvement and a portion of the costs thereof are reimbursable by those properties to be specially benefited by said improvements.

**Section 2:**  The Council hereby determines there is created an Advance Financing District and said District shall be known as Advance Financed District TR4366 which includes the property described on the map marked Exhibit "2" which is attached hereto and incorporated herein.

**Section 3:**  The Council determines the property within the District boundary to be specially benefited by storm improvements shall be those requesting a development permit or a building permit for an expansion of more than 50%, either of which actions would have required the installation of storm improvements.  The amount of reimbursement is set forth in Exhibit "1" which is attached hereto and incorporated herein, and is based upon a prorated share of the cost of installation divided by the total front footage and total acreage of property.  The amount shall be due and payable upon approval of the development permit or building permit.  Payment shall be made to the Grants Pass Redevelopment Agency for the first 15 years and to the City of Grants Pass thereafter.

**Section 4:**  The Council further determines that repayment to the Redevelopment Agency from the benefited property shall include annual simple interest at a rate of 4% from the date of adoption for this ordinance.

**ADOPTED**  by the Council of the City of Grants Pass, Oregon, in regular session this 18th day of February, 2004.

**SUBMITTED**  to and _Approved_ by the Mayor of the City of Grants Pass, Oregon, this _26_ day of February, 2004.

_Len Holzinger_
Len Holzinger, Mayor

ATTEST:

_Joanne M. Stumay_
Administrative Services Director

Date submitted to Mayor:  _2/25/04_

PLAINTIFF'S
EXHIBIT
9
PENGAD 800-631-6989

EXHIBIT 1

## ADVANCE FINANCING DISTRICT FOR STORM IMPROVEMENTS ON "N" STREET

(Note: these should go from 24-900 to 23-800all the way from the east end of the project to the intersection with Rogue Drive)

| | Tax Lot | Owner | Address | Frontage (ft) | Percentage | Area (acre) | Percentage | Costs |
|---|---|---|---|---|---|---|---|---|
| 1 | 36-05-21-21-500 | Blue Line Invest | RE: 1686 SE N St | 116.43 | 0.03 | 1.50 | 0.03 | $3,893 |
| 2 | 36-05-21-21-600 | Torbert | RE: 1730 SE N St | 84.00 | 0.02 | 0.95 | 0.02 | $2,641 |
| 3 | 36-05-21-21-700 | Luker Family Trust | RE: 1750 SE N St | 434.50 | 0.12 | 3.75 | 0.08 | $12,180 |
| 4 | 36-05-21-22-1000 | Randall | RE: SE M | 165.00 | 0.05 | 1.35 | 0.03 | $4,531 |
| 5 | 36-05-21-22-1001 | Lavier | RE 1412 SE N St | 66.00 | 0.02 | 0.17 | 0.00 | $1,342 |
| 6 | 36-05-21-22-1002 | Magnuson | RE: 1418 SE N | 68.00 | 0.02 | 0.16 | 0.00 | $1,363 |
| 7 | 36-05-21-22-1003 | Thornton | RE: 1464 SE N | 70.00 | 0.02 | 0.17 | 0.00 | $1,410 |
| 8 | 36-05-21-22-1004 | Martin | RE: 1414 SE N | 20.00 | 0.01 | 0.22 | 0.00 | $621 |
| 9 | 36-05-21-22-1005 | Martin | | 20.00 | 0.01 | 0.20 | 0.00 | $595 |
| 10 | 36-05-21-22-1006 | Martin | | 20.00 | 0.01 | 0.20 | 0.00 | $595 |
| 11 | 36-05-21-22-1007 | Dooney | RE: 1420 SE N | 95.00 | 0.03 | 0.16 | 0.00 | $1,824 |
| 12 | 36-05-21-22-1300 | Christensen | RE: 1560 SE M St | 162.84 | 0.04 | 1.88 | 0.04 | $5,168 |
| 13 | 36-05-21-22-1400 | Russell | RE: 1610 SE N St | 162.84 | 0.04 | 1.76 | 0.04 | $5,015 |
| 14 | 36-05-21-22-1500 | Carter & Hop | RE: 1624 SE N St | 252.00 | 0.07 | 3.59 | 0.07 | $8,863 |
| 15 | 36-05-21-23-100 | Hillbrand/Geschwister | RE: 1625 SE N St | 535.00 | 0.15 | 6.96 | 0.14 | $17,975 |
| 16 | 36-05-21-23-1100 | Arnett | RE: 1445 SE N St | 72.25 | 0.02 | 0.38 | 0.01 | $1,716 |
| 17 | 36-05-21-23-1200 | Weland | RE: 1431 SE N St | 72.25 | 0.02 | 0.25 | 0.01 | $1,550 |
| 18 | 36-05-21-23-1301 | Clark, J | RE: 1405 SE N St | 115.00 | 0.03 | 0.20 | 0.00 | $2,216 |
| 19 | 36-05-21-23-700 | Switzer | RE: 1463 SE N St | 24.00 | 0.01 | 0.35 | 0.01 | $854 |
| 20 | 36-05-21-23-701 | Nance Trust | RE: 1467 SE N St | 97.50 | 0.03 | 0.24 | 0.00 | $1,968 |
| 21 | 36-05-21-23-90000 | Leisure Estates | RE: SE N St | 228.24 | 0.06 | 3.41 | 0.07 | $8,229 |
| 22 | 36-05-21-24-1000 | Wilson | RE: 1661 SE N St | 23.00 | 0.01 | 2.46 | 0.05 | $3,520 |
| 23 | 36-05-21-24-1001 | Riverside Elem School | RE: 1200 SE Harvey t | 64.00 | 0.02 | 11.49 | 0.23 | $15,700 |
| 24 | 36-05-21-24-501 | Sunday | RE: 1801 SE N St | 25.43 | 0.01 | 0.92 | 0.02 | $1,603 |
| 25 | 36-05-21-24-600 | Lewman | RE: 1785 SE N St | 75.00 | 0.02 | 0.94 | 0.02 | $2,474 |
| 26 | 36-05-21-24-700 | McDonald | RE: 1771 SE N St | 113.57 | 0.03 | 0.95 | 0.02 | $3,145 |
| 27 | 36-05-21-24-800 | Clark | RE: 1747 SE N St | 317.24 | 0.09 | 3.18 | 0.06 | $9,455 |
| 28 | 36-05-21-23-800 | Riem | RE: 1459 SE N St | 60.00 | 0.02 | 0.28 | 0.01 | $1,380 |
| 29 | 36-05-21-24-900 | Wilson | RE: 1673 SE N St | 94.28 | 0.03 | 0.95 | 0.02 | $2,816 |
| | | | | | | | | |
| | Total | | | 3653.37 | 1.00 | 49.02 | 1.00 | $124,643 |
| | Total cost of storm | | | | | | | $124,643 |

Description: Josephine,OR Document - Year.DocID(Up to 10/20/04) 2004.4636 Page: 3 of 4
Order: deeds Comment:



City of
Grants Pass

| DATE 2-5-04 |
| DWN FMS |
| DES ____ |
| REV ____ |

City of Grants Pass
EXHIBIT 2
N St. Improvements
STORM DRAIN

1" = 60'

000016

Description: Josephine,OR Document - Year.DocID(Up to 10/20/04) 2004.4636 Page: 4 of 4
Order: deeds Comment:

ORDINANCE NO. 5218

**AN ORDINANCE CREATING ADVANCE FINANCED DISTRICT TR4366 FOR LANDSCAPING IMPROVEMENTS IN "N" STREET.**

**WHEREAS, CERTAIN PUBLIC IMPROVEMENTS HAVE BEEN INSTALLED IN "N" STREET THAT WILL BENEFIT AN ADJACENT PROPERTY HERETOFORE NOT SERVED BY LANDSCAPING IMPROVMENTS.**

**NOW, THEREFORE, THE CITY OF GRANTS PASS HEREBY ORDAINS:**

**Section 1:** The City Council hereby finds and determines the landscaping improvements installed by the Grants Pass Redevelopment Agency and City of Grants Pass along "N" Street are recognized as an Advance Financed Improvement and a portion of the costs thereof are reimbursable by those properties to be specially benefited by said improvements.

**Section 2:** The Council hereby determines there is created an Advance Financing District and said District shall be known as Advance Financed District TR4366 which includes the property described on the map marked Exhibit "2" which is attached hereto and incorporated herein.

**Section 3:** The Council determines the property within the District boundary to be specially benefited by landscaping improvements shall be those requesting a development permit or a building permit for an expansion of more than 50%, either of which actions would have required the installation of landscaping improvements. The amount of reimbursement is set forth in Exhibit "1" which is attached hereto and incorporated herein, and is based upon a prorated share of the cost of installation divided by the total front footage and total acreage of property. The amount shall be due and payable upon approval of the development permit or building permit. Payment shall be made to the Grants Pass Redevelopment Agency for the first 15 years and to the City of Grants Pass thereafter.

**Section 4:** The Council further determines that repayment to the Redevelopment Agency from the benefited property shall include annual simple interest at a rate of 4% from the date of adoption for this ordinance.

**ADOPTED** by the Council of the City of Grants Pass, Oregon, in regular session this 18th day of February, 2004.

**SUBMITTED** to and _Approved_ by the Mayor of the City of Grants Pass, Oregon, this _26_ day of February, 2004.

_Len Holzinger_
Len Holzinger, Mayor

ATTEST:

_Jeanne M. Steinguy_
Administrative Services Director

Date submitted to Mayor: _2/25/04_

PLAINTIFF'S
EXHIBIT
_10_
PENGAD 800-631-6989

EXHIBIT 1

## ADVANCE FINANCING DISTRICT FOR LANDSCAPING IMPROVEMENTS ON "N" STREET

(Note: these should go all the way from the east end of the project to the intersection with Rogue Drive)

| Map | Tax Lot | Owner | Address | Frontage (ft) | Percentage | Area (acre) | Percentage | Cost |
|---|---|---|---|---|---|---|---|---|
| 14 | 36-05-21-22-1500 | Carter & Hop | RE: 1624 SE N S | 252.00 | 0.44 | 3.59 | 0.53 | $1,459 |
| 27 | 36-05-21-24-800 | Clark | RE: 1747 SE N S | 317.24 | 0.56 | 3.18 | 0.47 | $1,541 |
| | Total | | | 569.24 | 1.00 | 6.77 | 1.00 | $3,000 |
| | Total cost of landscaping | | | | | | | $3,000 |



City of
Grants Pass

| DATE | 2-5-04 |
|------|--------|
| DWN | FMS |
| DES | |
| REV | |

City of Grants Pass
EXHIBIT 2
N St. Improvements
LANDSCAPE

1" = 60'

000019

Description: Josephine,OR Document - Year.DocID(Up to 10/20/04) 2004.4637 Page: 4 of 4
Order: deeds Comment: -

CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of April, 2016, I served the foregoing FIRST

AMENDED COMPLAINT, by mailing to said parties a true copy thereof, certified by me as

such, contained in a sealed envelope, with postage paid, addressed to said party at the

last known address and deposited in the post office on said day at Grants Pass, Oregon.

N/A

Pursuant to Fed. R. Civ. P. 34, 33, LR 34-1(a), LR 33-1(a) and LR 5-10(b), I also

certify that I concurrently served an electronic copy thereof, via ECF/e-mail, addressed to

said parties at their last known e-mails, on said day at Grants Pass, Oregon:

Matthew R. Cleverley
701 - 5th Avenue, Suite 2710
Seattle, WA 98104
matthew.cleverley@fnf.com

SORENSON, RANSOM, FERGUSON & CLYDE, LLP


/s/ Carl A. Clyde
Carl A. Clyde
OSB No. 095782
cclyde@roguevalleylaw.com
Of Attorneys for Plaintiff

SORENSON, RANSOM, FERGUSON & CLYDE, LLP
ATTORNEYS AT LAW
133 NW 'D' STREET
GRANTS PASS, OR 97526
(541) 476-3883    FAX (541) 474-4495